## No. 2022-1370

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

KONAMI GAMING INC.,

*Plaintiff / Appellee,*

VS.

HIGH 5 GAMES, LLC,

*Defendant / Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA
NO. 2:14-CV-01483-RFB-NJK, JUDGE RICHARD F. BOULWARE, II

## APPELLANT'S (THIRD CORRECTED) OPENING BRIEF

ROBERT C. RYAN
HOLLAND & HART LLP
5441 Kietzke Lane, #200
Reno, Nevada 89511
Telephone:  (775) 327-3000
rcryan@hollandhart.com

TEAGUE I. DONAHEY
HOLLAND & HART LLP
808 West Main Street, Suite 1750
Boise, Idaho 83702
Telephone:  (208) 383-3988
tidonahey@hollandhart.com

JONATHAN A. FALLON
General Counsel & Sr. Vice President
HIGH 5 GAMES, LLC
1200 MacArthur Boulevard
Mahwah, New Jersey 07430
Telephone:  (201) 825-1711
jon.fallon@high5games.com

*Counsel for Appellant High 5 Games, LLC*

# CERTIFICATE OF INTEREST

Counsel for Appellee, High 5 Games, LLC, certifies the following:

**1.    Full name of party represented by us:**

High 5 Games, LLC.

**2.    Name of real party in interest represented by us:**

High 5 Games, LLC.

**3.    Parent corporations and publicly held companies that own 10 percent or more of stock in the party:**

None.

**4.    The names of all law firms and the partners or associates that appeared for High 5 Games, LLC in proceedings before the trial court or are expected to appear in this court are:**

HOLLAND & HART LLP:    Robert C. Ryan, Teague I. Donahey, Jennifer L. Junkin,* Ryan A. Loosvelt,* Adam A. Hubbard.*
*No longer with the firm.

JONES WALDO HOLBROOK & MCDONOUGH, PC:    Christopher B. Hadley.

HIGH 5 GAMES, LLC: Jonathan A. Fallon.

**5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:**

None currently pending.

Dated: April 14, 2022

/s/ *Robert C. Ryan*

Robert C. Ryan

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS .......................................................... iii

TABLE OF AUTHORITIES ....................................................... vi

TABLE OF ABBREVIATIONS AND TERMS ......................................... ix

STATEMENT OF RELATED CASES ................................................. 1

JURISDICTIONAL STATEMENT ................................................... 1

STATEMENT OF THE ISSUES.................................................... 2

STATEMENT OF THE CASE .................................................... 2

I.      Introduction ........................................................... 2

II.     Konami Files Its Meritless Patent Infringement
        Complaint ............................................................. 5

        A.    The State of Relevant Law at the Time the Complaint
              Was Filed....................................................... 6

        B.    The Patents-in-Suit and Their Obvious Deficiencies ............. 8

III.    Konami Ignores High 5's Warnings and Blindly
        Marches Onward With Costly Patent Litigation........................... 14

IV.     The District Court Enters Summary Judgment in High
        5's Favor on Two Separate Patent Invalidity Grounds ................. 16

        A.    Konami Misstates Governing § 112 ¶ 6 Law and
              Misinstructs its Expert Accordingly...................... 17

        B.    Konami Is Unable to Identify Any Software
              Programming or Software Algorithms in the
              Specification, as Required by *Aristocrat*, and Contrary
              to Law Falls Back on the Knowledge of One of
              Ordinary Skill in the Art ....................................... 20

C.    The Court Holds a Four-Day Omnibus Hearing and Grants High 5's Motion for Summary Judgment ................. 22

V.    Konami Pursues a Baseless Appeal ............................... 25

VI.   The District Court Denies High 5's Amended Motion for Attorneys' Fees ........................................................... 31

SUMMARY OF THE ARGUMENT ....................................... 32

ARGUMENT ........................................................................ 37

I.    Standard of Review ...................................................... 37

II.   The District Court's Abbreviated *Octane Fitness* Analysis Constituted an Abuse of Discretion ................ 38

      A.    The District Court's "Exceptional Case" Analysis With Respect to 35 U.S.C. § 112 Alone Constituted an Abuse of Discretion Warranting Reversal ....................................... 40

            1.    The District Court's Attempt to Distinguish This Action From *Aristocrat* Misunderstood and Misapplied the Governing Law ............................ 40

            2.    Under the Governing En Banc *Williamson* Holding, and Given Konami's Fact Admissions, it Was Objectively Unreasonable for Konami to Argue That the Asserted Claims Did Not Invoke § 112 ¶ 6 ........................................................ 42

            3.    The District Court Failed to Consider Konami's Inexplicable Arguments That the Asserted Claims Lacked Functional Language ........... 46

            4.    Konami Had No Objectively Reasonable Basis to Argue That the Specification Disclosed the Required Software Algorithm ..................................... 49

5.     Konami's Numerous *Ad Hominem* Attacks on the District Judge and Misrepresentations to This Court Also Render This Case Exceptional ..........52

B.     The District Court's Truncated Analysis Constituted an Abuse of Discretion in Numerous Other Respects ..........57

1.     The District Court's Consideration of *In re Smith* and Konami's Baseless Arguments Under 35 U.S.C. § 101 Was Fundamentally Flawed .........................................................................57

2.     The District Court's Reliance on the Outcome of PTAB Proceedings Was Legally Erroneous............62

3.     To the Extent the District Court Relied on a Different District Judge's Denial of Attorneys' Fees Against Konami in a Different Case, Any Such Reliance Was Legally Erroneous ........................63

CONCLUSION ..........................................................................65

CERTIFICATE OF SERVICE..................................................67

CERTIFICATE OF COMPLIANCE .......................................68

ADDENDUM ............................................................................69

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alice Corp. Pty. Ltd.* **v.** *CLS Bank Int'l,*
    573 U.S. 208 (2014) ................................................................ *passim*

*Aristocrat Techs. Australia Pty Ltd.* **v.** *International Game Tech.,*
    521 F.3d 1328 (Fed. Cir. 2008) .................................... *passim*

*Bayer CropScience AG* **v.** *Dow AgroSciences LLC,*
    851 F.3d 1302 (Fed. Cir. 2017) ............................................. 37

*Blackboard, Inc.* **v.** *Desire2Learn, Inc.,*
    574 F.3d 1371 (Fed. Cir. 2009) ............................................... 7

*CCS Fitness, Inc.* **v.** *Brunswick Corp.,*
    288 F.3d 1359 (Fed. Cir. 2002) ............................................... 6

*ChargePoint, Inc.* **v.** *SemaConnect, Inc.,*
    920 F.3d 759 (Fed. Cir. 2019) ............................................... 59

*Ergo Licensing LLC* **v.** *Corefusion 303, LLC,*
    673 F.3d 1361 (Fed. Cir. 2012) ............................................... 7

*Gaymar Indus.* **v.** *Cincinnati Sub-Zero Prods.,*
    790 F.3d 1369 (Fed. Cir. 2015) ............................................. 37

*Harris Corp.* **v.** *Ericsson Inc.,*
    417 F.3d 1241 (Fed. Cir. 2005) ............................................... 7

*Highmark Inc.* **v.** *Allcare Health Mgmt. Sys., Inc.,*
    572 U.S. 559 (2014) ................................................... 37, 39

*In re Katz Interactive Call Processing Patent Litig.,*
    639 F.3d 1303 ........................................................................ 47

*In re Smith,*
    815 F.3d 816 (Fed. Cir. 2016) ...................................... *passim*

*Inventor Holdings, LLC* **v.** *Bed Bath & Beyond, Inc.,*
    876 F.3d 1372 (Fed. Cir. 2017) ............................................. 62

*Kilopass Tech., Inc.* **v.** *Sidense Corp.,*
   738 F.3d 1302 (Fed. Cir. 2013) ........................................................ 38

*Konami Gaming Inc.* **v.** *High 5 Games, LLC,*
   756 Fed. Appx. 994 (2019) ........................................................ 1

*Konami Gaming, Inc.* **v.** *Marks Studios, LLC,*
   2017 U.S. Dist. LEXIS 116669 (D. Nev. July 25, 2017) .................... 63

*Konami Gaming, Inc.* **v.** *Marks Studios, LLC,*
   2021 U.S. Dist. LEXIS 255828 (D. Nev. Mar. 15, 2021) .................. 63

*Medical Instr. & Diagnostics Corp.* **v.** *Elekta AB,*
   344 F.3d 1205 (Fed. Cir. 2003) ..................................................... 7,51

*Noah Sys. Inc.* **v.** *Intuit Inc.,*
   675 F.3d 1302 (Fed. Cir. 2012) ........................................................ 8

*Octane Fitness, LLC* **v.** *ICON Health & Fitness, Inc.,*
   572 U.S. 545 (2014) ...................................................................... 38,64

*Romag Fasteners, Inc.* **v.** *Fossil, Inc.,*
   866 F.3d 1330 (Fed. Cir. 2017) ........................................................ 39

*Power Integrations, Inc.* **v.** *Fairchild Semiconductor Int'l,
Inc.,*
   711 F.3d 1348 (Fed. Cir. 2013) ........................................................ 6

*Robert Bosch, LLC* **v.** *Snap-On Inc.,*
   769 F.3d 1094 (Fed. Cir. 2014) ........................................................ 6

*Rothschild Connected Devices Innovations, LLC* **v.** *Guardian
Prot. Servs.,*
   858 F.3d 1383 (Fed. Cir. 2017) ........................................................ 39

*Secure Axcess, LLC* **v.** *PNC Bank Nat'l Ass'n,*
   848 F.3d 1370 (Fed. Cir. 2017) ........................................................ 62

*Stone Basket Innovations, LLC* **v.** *Cook Med., LLC,*
   892 F.3d 1175 (Fed. Cir. 2018) ........................................................ 61

*Watts* **v.** *XL Sys., Inc.,*
   232 F.3d 877 (Fed. Cir. 2000) ........................................................ 6

*Williamson* **v.** *Citrix Online, LLC,*
   792 F.3d 1339 (Fed. Cir. 2015) .............................................. *passim*

*WMS Gaming, Inc.* **v.** *International Game Tech.,*
  184 F.3d 1339 (Fed. Cir. 1999) ...................................................... 7

## Statutes

28 U.S.C. § 1295 ................................................................................ 2

35 U.S.C. § 101 ....................................................................... *passim*

35 U.S.C. § 102 ............................................................................... 62

35 U.S.C. § 103 ............................................................................... 62

35 U.S.C. § 112 ....................................................................... *passim*

35 U.S.C. § 285 ....................................................................... *passim*

35 U.S.C. § 311 ............................................................................... 62

## Other Authorities

Fed. Cir. R. 36 ........................................................................... 1,31

Fed. R. App. P. 4 ............................................................................ 1

Fed. R. Civ. P. 58 .......................................................................... 1

# TABLE OF ABBREVIATIONS AND TERMS

## Parties

| | |
|---|---|
| High 5 | Appellant High 5 Games, LLC |
| Konami | Appellee Konami Gaming, Inc. |

## Defined Terms

| | |
|---|---|
| district court | United States District Court for the District of Nevada, Honorable Richard F. Boulware, II, presiding |
| Court | United States Court of Appeals for the Federal Circuit |
| patents-in-suit | U.S. Patent Nos. 8,096,869; 8,366,540; 8,622,810; and 8,616,955 |
| '869 patent | U.S. Patent No. 8,096,869 |
| '540 patent | U.S. Patent No. 8,366,540 |
| '810 patent | U.S. Patent No. 8,622,810 |
| '955 patent | U.S. Patent No. 8,616,955 |
| asserted claims | Collectively, '869 patent, claims 1–3, 6, 11, and 19–21; '540 patent, claims 1–3, 6–8, 13, and 21–25; '810 patent, claims 1–15; and '955 patent, claims 1, 4–10, and 13–19 |
| APPX____ | Appendix page(s) |
| Order | Order (October 25, 2021) (APPX0001–0008) |

## STATEMENT OF RELATED CASES

An appeal from this action was previously before the Court. The title and number of that prior appeal was *Konami Gaming Inc. v. High 5 Games, LLC*, No. 2018-1723 (Fed. Cir.). The appellate panel in that prior appeal consisted of Circuit Judges Lourie, Clevenger, and Wallach. In that prior appeal, on March 11, 2019, the Court issued a per curiam decision affirming the district court pursuant to Fed. Cir. R. 36. *See Konami Gaming Inc. v. High 5 Games, LLC*, 756 Fed. Appx. 994 (2019).

High 5 is not aware of any currently pending case in this Court or any other court or agency that will directly affect or be directly affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

This proceeding constitutes an appeal from an Order denying High 5's Amended Motion for Attorneys' Fees, which is a final, appealable order. Fed. R. App. P. 4(a)(7)(A)(i); Fed. R. Civ. P. 58(a)(3). The Notice of Appeal was filed on December 15, 2021, *see* APPX2432–2434, within the time permitted under the district court's December 14, 2021 Minute Order extending High 5's time to file a Notice of Appeal until December 21, 2021, *see* APPX2430–2431, and thus was timely.

Fed. R. App. P. 4(a)(5).  Accordingly, this Court has jurisdiction under

28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.     Whether the district court abused its discretion in finding

that this action was not an "exceptional case" for purposes of 35 U.S.C.

§ 285 and on that basis denying High 5's Amended Motion for

Attorneys' Fees and declining to award High 5 its attorneys' fees and

non-taxable expenses incurred in defense of this action.

## STATEMENT OF THE CASE

### I.    Introduction

Throughout this case, Konami presented to the district court a

maze of self-contradictory, incoherent, and misleading positions that

were contrary to fundamental and well-established patent law and the

Konami technical expert's own opinions.  Yet even after its expert had

in effect admitted that Konami's asserted claims were subject to 35

U.S.C. § 112 ¶ 6[1] under the proper legal standard and thus, in essence,

invalid, Konami still kept pressing this case, apparently in the hope

---

[1] 35 U.S.C. § 112 (b) and (f) were formerly codified as 35 U.S.C. § 112 ¶¶ 2 and 6, respectively.  Because the patents-in-suit were prosecuted and issued prior to the recodification of § 112, this brief refers to these provisions as § 112 ¶¶ 2 and 6.

that High 5—a much smaller entity—would cave under the pressure of litigation. High 5 did not, and based on, *inter alia*, Konami's expert's admissions, the district court entered summary judgment against Konami invalidating its patents under both 35 U.S.C. § 112 ¶¶ 2 and 6 and 35 U.S.C. § 101.

But that still did not stop Konami. Instead, Konami raised a frivolous appeal before this Court, accusing the district court of "err[ing] from start to finish" and making a number of *ad hominem* attacks on the district judge. Substantively, Konami asserted the same hodgepodge of thoroughly unsupportable legal positions that it had asserted below; for example, Konami continued to press arguments that ignored the correct legal standards under § 112 ¶ 6 and its own expert's testimony. The Court summarily rejected Konami's appeal.

The district court's opinion denying High 5's Amended Motion for Attorneys' Fees addressed few of Konami's transgressions and erroneously concluded that this was not an "exceptional case" for purposes of 35 U.S.C. § 285. The district court's decision was based on a fundamental misunderstanding of the legal significance of the Court's seminal opinion in *Aristocrat Techs. Australia Pty Ltd. v. International*

*Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008), and it disregarded the operative legal standard for § 112 ¶ 6 that had been articulated by the Court in, among many other cases, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc in pertinent part), as well as Konami's expert's admissions under that very standard. Understood in light of the governing *Williamson* standard, the Konami § 112 ¶ 6 arguments that the district court generously characterized as being "not wholly unreasonable" were in fact utterly baseless under the undisputed facts, including, again, Konami's own expert's testimony. And the Court's analysis of Konami's meritless § 101 positions was likewise excessively charitable, as explained in detail below.

Accordingly, by misapplying the relevant law, failing to address numerous factors relevant to the "exceptional case" analysis, and making clear errors of judgment when weighing the relevant factors, the district court abused its discretion. The Court should thus reverse the district court and remand for the district court to assess the amount of reasonable attorneys' fees to be awarded.

In this regard, in a scenario like this action, where a significantly larger competitor like Konami attacks a much smaller entity like High

4

5 and marches blindly forward with costly patent litigation, all in blatant disregard of the facts and the law, which entity should be required to bear the financial consequences of that decision—a small entity like High 5 or the vastly larger Konami?  Moreover, courts should take action to deter the types of litigation tactics in which Konami engaged.  In short, this action was unquestionably a case that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) and the unreasonable manner in which the case was litigated; and notions of compensation and deterrence require that the district court provide a remedy under § 285.

## II.    Konami Files Its Meritless Patent Infringement Complaint

On September 12, 2014, Konami filed the underlying action in the United States District Court for the District of Nevada.  APPX0039–0115.  Konami's Complaint asserted that High 5 games utilizing the "Super Stacks" game feature infringed a host of claims from the four patents-in-suit. *See generally id.* ¶¶ 7–54.

## A.    The State of Relevant Law at the Time the Complaint Was Filed

At the time this lawsuit was filed, at least three fundamental principles underlying § 112 ¶ 6 had already been well-established in patent law for many years:

First, the absence of the term "means" from a claim element has never been dispositive of the question of whether that claim element invokes the requirements of § 112 ¶ 6; even if the term "means" is absent, a claim element will still be subject to § 112 ¶ 6 if the element recites "function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1349 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)); *see also, e.g.*, *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1097 (Fed. Cir. 2014); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1364 (Fed. Cir. 2013); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002).

Second, in the context of a computer-implemented invention, the disclosure of a general purpose computer or microprocessor is not a sufficient structure to perform a claimed computer-implemented function and thus, to comply with § 112 ¶ 6, the patent must provide a

6

disclosure of the relevant software programming (or at the very least a coherent software algorithm). *Aristocrat*, 521 F.3d at 1333 (citing, *e.g.,* *WMS Gaming, Inc. v. International Game Tech.*, 184 F.3d 1339, 1348–49 (Fed. Cir. 1999)); *see also, e.g.*, *Ergo Licensing LLC v. Corefusion 303, LLC*, 673 F.3d 1361, 1365 (Fed. Cir. 2012); *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382–84 (Fed. Cir. 2009); *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005).

Third, if a claim element recites a computer-implemented invention and the patent fails to disclose the required software programming or software algorithm, a patent holder cannot rely upon the knowledge of one of ordinary skill in the art to fill in the gap. *Aristocrat*, 521 F.3d at 1337 ("[T]he proper inquiry for purposes of section 112 paragraph 6 analysis is to 'look at the *disclosure* of the patent and determine if one of skill in the art would have understood that *disclosure* to encompass software [to perform the function] and been able to implement such a program, not simply whether one of skill in the art would have been able to write such a software program.'") (emphases in original) (quoting *Medical Instr. & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1212 (Fed. Cir. 2003)); *see also Williamson,*

792 F.3d at 1354 ("The prohibition against using expert testimony to create structure where none otherwise exists is a direct consequence of the requirement that the specification adequately disclose corresponding structure.") (quoting *Noah Sys. Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012)).

### B.  The Patents-in-Suit and Their Obvious Deficiencies

Here, the patents-in-suit all shared the same specification. *Compare* APPX0055–0065 *with* APPX0072–0082 & APPX0087–0097 & APPX0102–0112.  As reflected in the shared specification, the patents-in-suit generally concerned aspects of a "slot-style video game" in which spinning "simulated reels" containing symbols are displayed to the game player.  *See, e.g.*, APPX2323; APPX2326; APPX0109.  Figures 1, 8, and 9 from the parent '869 patent illustrate a gaming machine showing a matrix of symbols on portions of the displayed simulated rotatable reels:



Fig. 9

APPX0055; APPX0059–0060.

Konami contended that the patents-in-suit disclose and claim an allegedly inventive "game feature" of such video games that provide "dynamic gameplay different from conventional slot games" and "a heightened sense of interest, excitement and anticipation of potential big wins." APPX2323; APPX2326. Specifically, this allegedly new "game feature" constituted "displaying a consecutive run of identical symbols as the reels appear spinning." APPX2326; *see also, e.g.*, APPX0053 (Abstract).

The claims of the patents-in-suit were plainly drafted to capture this "game feature" as broadly as possible, and not surprisingly were riddled with functional claiming as a result: in general, the claims

recited generic computer components ("processors" and "game controllers") that are vaguely "configured to" generate particular visual outcomes in the game—*e.g.*, the consecutive run of identical symbols that is displayed to the player on a simulated spinning reel. Representative '869 patent claim 1 is instructive:

> 1. A gaming machine comprising:
>
> ***a processor configured to*** execute a game displaying a matrix of symbol containing elements having a plurality of rows and a plurality columns;
>
> at least one column of said matrix comprising a portion of a simulated rotatable reel of a plurality of said symbol containing elements;
>
> said simulated rotatable reel comprising sections of symbol containing elements displaying a plurality of symbols that are fixed for each game played on said gaming machine;
>
> said simulated rotatable reel including at least one section in which a consecutive run of three or more of said symbol containing elements is populated by an identical symbol so that, as the simulated rotatable reel rotates, a consecutive string of said same identical symbol is sequentially displayed within said consecutive string of symbol containing elements;
>
> and said identical symbol is randomly selected anew for each play of said game, wherein said identical symbol is selected by virtually spinning

> a notional, non-visible, inner reel comprising a
> subset of said plurality of symbols.

APPX0065 (emphasis added). Neither the claims nor the shared specification, however, provided any specific details, beyond the most generic references to a "processor" for example, concerning how the claimed "game features" should be implemented from either a hardware or software standpoint.

Indeed, the shared specification discusses "Game Implementation" with reference to Figure 7. *See* APPX0064–0065 at 6:57–7:50. Figure 7 is shown below:



APPX0058.   Discussing Figure 7 and "Game Implementation," the specification states vaguely:

> Game Implementation
>
> Any of the above described embodiments may be implemented on any gaming machine or group of gaming machine provided with a control module. As shown in FIG. 7, a control module 60 is provided with a microprocessor 62 and working random access memory (RAM) 64. The program code driving any of the described embodiments may be introduced into the control module 60 by connection of a data storage device 66.   The device may take any of a number of forms, such as read only memory (ROM), erasable read only memory (EPROM), Compact Flash Card, PCMCIA card and the like.  Alternatively, control module 60 may incorporate a hard disc drive to which the code may be written via a suitable input device.
>
> Control module 60 acts to implement appropriate elements of the program code according to inputs from a user keyboard 68 and outputs video imagery to at least a main display module 70.

APPX0064–0065 at 6:57–7:50.  Beyond these two paragraphs and the generic Figure 7, no details concerning hardware configuration are provided.  *See id.*   Moreover, although the specification recites that "program code" is what "driv[es]" the described embodiments, no actual

"program code" of any kind—or even a software algorithm—is disclosed. *See id.*

On September 19–20, 2016, High 5 took the deposition of the sole named inventor on the patents-in-suit, Osamu Yoshimi.  Consistent with the patents' failure to disclose technological details, Mr. Yoshimi confirmed that his invention was not directed to any particular technological implementations, but instead that "[t]he invention is game rules."  APPX2667 at 142:6–12; *see also* APPX2662 at 17–25 (defining his "game rules" as "if certain symbols, you know, all in a row, you know, together, then, say, a free game is provided . . . .").  Mr. Yoshimi freely admitted that he had not invented any particular software program, APPX2667 at 142:6–14, and that the claimed "game rules" could be executed by any software and any hardware, without limitation:

> I'm not particular about, say, this thing has to be used or that thing has to be used.  As long as the game rule as it implemented, say, how that's done, is not—I'm not particular about how it is—as long as it's possible to implement the game rules, I'm not particular about how it's implemented.

APPX2667 at 142:6–24; *see also* APPX2668 at 147:21–148:6 (same).

13

In short, the patents-in-suit indisputably implicated three well-established and well-known principles of § 112 ¶ 6. First, the asserted claims recited numerous functions, but because the claimed functions are performed with merely generic computer components, the claimed structures were insufficient to perform the claimed functions, which are driven by unclaimed and undisclosed "program code" (software). APPX0064–0065 at 6:57–7:50. Thus, the asserted claims all invoked section § 112 ¶ 6. *E.g.*, *Williamson*, 792 F.3d at 1349. Second, because the shared specification did not disclose how to perform the claimed functions in terms of software programming or a software algorithm, the specification did not disclose the appropriate corresponding structure for purposes of § 112 ¶ 6 and the asserted claims were all invalid for indefiniteness. *E.g.*, *Aristocrat*, 521 F.3d at 1333. Finally, these fundamental disclosure deficiencies in the patents-in-suit could not be cured by relying on the alleged knowledge of one of ordinary skill in the art, such as Konami's technical expert. *E.g.*, *id.* at 1337.

## III. Konami Ignores High 5's Warnings and Blindly Marches Onward With Costly Patent Litigation

Faced with Konami's clearly deficient patents and meritless lawsuit, High 5's General Counsel, Jon Fallon, initiated an immediate

meeting with Konami in late September 2014 to try to resolve the matter short of full-blown patent litigation. APPX2284–0085 ¶¶ 6–10. At this meeting, for example, Mr. Fallon explained to Konami that the claims of the patents-in-suit were invalid under § 112 ¶ 6 given the lack of adequate disclosure in the specification. *Id.* ¶ 9. But Konami disregarded Mr. Fallon's warnings. *Id.* ¶ 10.

On May 27, 2015, Konami served its initial Infringement Contentions in the action. *See* APPX2529–2572. Consistent with Mr. Yoshimi's testimony, Konami's infringement allegations were premised on "game rules" and the visual features that a player "observed during game play"; they were devoid of any evidence or even allegations concerning ***how*** the High 5 accused products operated from a technological standpoint (*e.g.*, software coding or even software algorithms). *See* APPX2551–2572 (Konami claim charts).

In response, on July 13, 2015, High 5 served its Initial Disclosure of Non-Infringement, Invalidity, and Unenforceability Contentions. APPX2574. Once again putting Konami on notice regarding the deficiencies in the patents-in-suit, High 5 specifically cited 35 U.S.C. § 112 ¶ 6 and *Williamson*, and explained why the patents utilized "means

plus function" claiming but failed to disclose adequate corresponding structure in the specification. APPX2587–2592. High 5 also specifically cited 35 U.S.C. § 101 and the Supreme Court's governing opinion in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014), and explained that the claims were directed to unpatentable abstract ideas for similar reasons. APPX2592–2593.

Several months later, on November 17, 2015, Mr. Fallon met with Konami's counsel and technical expert to explain yet again why the asserted claims were invalid. APPX2286 ¶¶ 13–14. Yet again, Konami ignored reality and pressed forward, attempting to bury its smaller competitor High 5 with the burdens of costly patent litigation.

## IV. The District Court Enters Summary Judgment in High 5's Favor on Two Separate Patent Invalidity Grounds

On October 21, 2016, High 5 filed a Motion for Summary Judgment. *See* APPX0745–0782. High 5's Motion for Summary Judgment demonstrated that the asserted claims of the patents-in-suit were invalid for at least two separate reasons: (1) the patents' functional claiming was not supported by the deficient specification and the claims were thus indefinite, in violation of 35 U.S.C. § 112 ¶¶ 2 and 6; and (2) the undisputed focus on game rules confirmed that the

16

patents claimed unpatentable subject matter in violation of 35 U.S.C. § 101. *See id. passim*.

In its opposition briefing, Konami had another opportunity to articulate an objectively reasonable basis for its assertion of its plainly deficient patents. It could not do so. *See* APPX1318–1354. To the contrary, in its effort to escape its § 112 ¶ 6 predicament, Konami repeatedly relied on a fundamental misstatement of the legal standard underlying § 112 ¶ 6, as well as mischaracterizations concerning the nature of the claims and the content of the specification.

## A. Konami Misstates Governing § 112 ¶ 6 Law and Misinstructs its Expert Accordingly

To begin with, in arguing that § 112 ¶ 6 did not apply, Konami completely misstated the operative legal standard, arguing: "The legal standard determining whether a claim terms [sic] invokes construction under 35 U.S.C. § 112 ¶ 6 as a means-plus-function limitation is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." APPX1326. As explained above, however, this is not the operative test. *E.g.*, *Williamson*, 792 F.3d at 1349 (holding that § 112

17

¶ 6 applies where, *inter alia*, a claim element recites "function without reciting sufficient structure for performing that function").

Having misstated the legal standard, Konami then argued that § 112 ¶ 6 did not apply to its patent claims under its (misstated) standard because the claim terms at issue ("processor" and "game controller") are "recognized as the name for structure" by persons of ordinary skill in the art. *See, e.g.*, APPX1326–1329. In other words, Konami's argument was that, because the "processor" and "game controller" are somehow understood to be "structural," the inquiry was at an end and § 112 ¶ 6 did not apply. Again, that argument was contrary to longstanding governing law and meritless at best.

Konami's misstatements of governing law were not confined to the briefing. In connection with its claim construction and summary judgment briefs, Konami relied upon declarations from its technical expert, John Acres. In a declaration dated October 6, 2016, Mr. Acres opined that the "processor" and "game controller" claim elements were understood as "specific structural elements" and were not mere "nonce words" or "generic placeholders," thus in essence opining that § 112 ¶ 6 was not invoked. APPX0648–0649 ¶¶ 31–35. Egregiously, however,

Konami had misinstructed Mr. Acres on § 112 ¶ 6 law, as Mr. Acres's

declaration reflected:

> I have been informed that claim limitations
> "may" be defined by function even when the
> phrases "means for" and "step for" are not
> present, such as when a claim element with
> functional language uses a generic placeholder or
> nonce word coupled to the function and where the
> claim does not recite structure for performing the
> function. Likewise, in a method claim, I have
> been informed that a claim limitation "may" be
> defined by function when an element with
> functional language uses a generic placeholder or
> nonce word coupled to the function and where the
> claim does not recite the action for achieving that
> function.

*Id.* ¶ 34; APPX2672–2673 at 101:6–102:3. Thus, Mr. Acres's opinions

were tainted by the same misstatements of the law that Konami had

used in its briefing.

Moreover, in a separate declaration dated December 2, 2016, Mr.

Acres conceded both that the asserted claims recited functions, *e.g.*,

APPX1375 ¶ 42 ("[O]ne of ordinary skill in the art would understand

that the structure of the game controller performs the function of

performing random selection."), and that the "processor" and "game

controller" elements required special software in order to perform those

functions, *e.g.*, APPX1378-1379 ¶ 49; *see also* APPX2671 at 90:2–91:14;

19

92:12–93:11 (testifying at his May 2017 deposition that specially-written software was necessary to implement the claimed game functionality). Thus, Konami's own expert had established that the "processor" and "game controller" elements alone were ***not*** sufficient structure to perform the claimed functions and that § 112 ¶ 6 ***did*** in fact apply under the correct legal standard and contrary to Konami's baseless arguments.

### B. Konami Is Unable to Identify Any Software Programming or Software Algorithms in the Specification, as Required by *Aristocrat*, and Contrary to Law Falls Back on the Knowledge of One of Ordinary Skill in the Art

In its summary judgment briefing, Konami also took the remarkable position that the shared specification of its four asserted patents disclosed a software algorithm for implementing the claimed functions and thus that § 112 ¶ 6, if invoked, was satisfied. APPX1336–1342. Konami acknowledged that a software algorithm in this context would be a "sequence of computational steps," *i.e.*, a "step-by-step procedure for accomplishing a given result" that the claimed "processor" or "game controller" must follow in accordance with software instructions to implement the claimed game functionalities.

APPX1336–1337. But Konami could not identify any such sequence of computational steps. Instead, Konami pretended that the specification's disclosures of game functionality constituted an algorithm "in prose," APPX1336—an approach that is simply not allowed under, *e.g.*, *Aristocrat*. *See* 521 F.3d at 1334 ("[T]hat language simply describes the function to be performed, not the algorithm by which it is performed."); *id.* at 1334–35 ("[T]he description of the embodiments is simply a description of the outcome of the claimed functions, not a description of the structure, i.e., the computer programmed to execute a particular algorithm.").

In consequence, Konami again fell back on the improper argument that the specification describes "steps that inform one of ordinary skill in the art about the scope of the claims," APPX1338, and implementing the claimed invention would be "well within the skill of persons of ordinary skill in the art in view of the attendant disclosure," APPX1339. As support for this contention, Konami relied on the testimony of Mr. Acres, who testified that one of ordinary skill in the art could implement the claimed inventions in software. *See, e.g.*, APPX1377 ¶ 47 ("One of ordinary skill in the art would understand the steps to

execute the function of 'the game controller being further configured to replace each of the symbols.'"); APPX1378–1379 ¶ 49 ("One of ordinary skill in the art at the time of the invention can follow this recited structure to know how to implement this limitation in software code and thus execute the game."). Once again, however, Konami's arguments were legally impermissible. *E.g.*, *Aristocrat*, 521 F.3d at 1336 ("Whether the disclosure would enable one of ordinary skill in the art to make and use the invention is not at issue here. Instead, the pertinent question in this case is whether Aristocrat's patent discloses structure that is used to perform the claimed function.").

## C. The Court Holds a Four-Day Omnibus Hearing and Grants High 5's Motion for Summary Judgment

Once the briefing was complete, the district court held a 4-day Omnibus Hearing beginning in May 2017 encompassing technology tutorials, live testimony from the parties' respective technical experts, and oral argument on claim construction issues and High 5's Motion for Summary Judgment. The district court was not persuaded by Konami's meritless arguments.

For example, the district court emphasized the fact that there were multiple technological ways to generate the visual outcome of a

22

consecutive run of identical symbols, but no particular way was disclosed in the patents, creating an invalidity "problem" for Konami from the perspective of both § 112 ¶ 6 and § 101. *E.g.*, APPX2118–2125. In this connection, both the district court and Konami were in agreement that multiple technological methods for selecting symbols for use in the games—*i.e.*, random number generators and look up tables— were well-known in the art. *See* APPX2123 at 26:20–21; APPX2141 at 44:22–25; APPX2199 at 102:12–22. Konami argued that one of ordinary skill in the art would have been able to use this prior art knowledge to fill in the gaps in the deficient specification. *E.g.*, APPX2123–2124 at 26:9–27:12. Again, however, it is black-letter law that the knowledge of one of ordinary skill in the art cannot be used to fill in such gaps and avoid indefiniteness. *Aristocrat*, 521 F.3d at 1337.

On February 22, 2018, the district court granted High 5's Motion for Summary Judgment. APPX2214–2247. The district court held that the asserted claims of the patents-in-suit were all invalid on both of the alternative grounds raised by High 5: (1) that the patents were invalid for indefiniteness under § 112 ¶¶ 2 and 6; and (2) the patents claimed

unpatentable subject matter in violation of § 101. *See generally id.*

Among other things, the district court held:

- The asserted claims invoked § 112 ¶ 6 under *Williamson*, based on the testimony of both parties' experts, because the claimed "processors" and "game controllers" were not sufficient structure for performing the claimed game functions—additional software programming or coding would be needed. APPX2233–2234 ("[T]he expert testimony confirmed that the multiple functions and outcomes associated with the invention would require unique and special programming based on a customized algorithm(s) or specific flowchart(s) to accomplish the range of functions disclosed in the [patents-in-suit].").

- Based in part on the testimony of both parties' experts, the specifications did not disclose the software programming or algorithms required by *Aristocrat* that would explain how the claimed game functionality could be implemented; Konami's argument that the specification disclosed an algorithm "in prose" was rejected. APPX2235–2242 ("Based upon the record here, including the testimony of both experts, the Court does not find that a person of ordinary skill in the art would understand the specifications to disclose sufficient or adequate structure in terms of an algorithm or flowchart(s) to support the identified functions . . . .").

- It was "immaterial" whether one of ordinary skill in the art (such as Konami's expert, Acres) could create a software program or algorithm "from scratch" to perform the claimed functions. APPX2227 (citing *Aristocrat*).

- The asserted claims were also invalid under § 101 for many of the same reasons: the claims were directed to the abstract idea of game rules, and the claims recitation of conventional technology coupled with the lack of disclosure of any specific

software programming meant that there was no separate inventive concept disclosed in the claims. APPX2242–2247.

Accordingly, summary judgment was entered in High 5's favor on all claims.

## V.   Konami Pursues a Baseless Appeal

Konami subsequently appealed to this Court in *Konami Gaming Inc. v. High 5 Games, LLC*, No. 2018-1723 (Fed. Cir.), arguing that the district court "fundamentally misunderstood the technology at issue," APPX2336, and had "erred from start to finish" in granting summary judgment. APPX2328. Konami pointedly noted that the district court had not issued a written opinion until nearly five months after entering summary judgment, implying that the district court's judgment was results-driven, and the written opinion a mere post hoc rationalization. APPX2323. Despite making such disparaging remarks, however, Konami was unable to support its appeal with an objectively reasonable explanation for its patent assertions. Instead, Konami doubled-down on the many baseless and unsupportable arguments that it had advanced before the district court. *See generally* APPX2309–2381; APPX2470–2506.

Unlike in its summary judgment briefing, however, on appeal Konami expressly recognized that § 112 ¶ 6 applies to claim elements lacking the term "means" if the element "recites function without reciting sufficient structure for performing that function." APPX2350. Having finally recited the correct legal standard, Konami immediately began ignoring it. In the very next sentence, Konami contended, without any supporting citation, that "[t]o determine whether a claim term recites sufficient structure, the court examines whether the term has an understood meaning in the art." *Id.* Konami then argued that the claimed "processors" and "game controllers" are "used in common parlance to define structures or a class of structures," as if that alone was enough to avoid application of § 112 ¶ 6. APPX2351. Thus, once again, Konami was basing its § 112 ¶ 6 arguments on an incorrect statement of the law.

In continuing to make these baseless arguments on appeal, Konami avoided making any substantive analysis of § 112 ¶ 6 under the proper inquiry: whether "processors" and "game controllers" are sufficient structures to perform the claimed functions. *See* APPX2349–2355. Konami clearly had a tactical incentive to avoid this inquiry.

26

Konami's own expert, Mr. Acres, had repeatedly conceded that the claimed "processors" and "game controllers" alone are insufficient to perform the claimed functions because additional software programming was required. *E.g.*, APPX1378-1379 ¶ 49 ("One of ordinary skill in the art at the time of the invention can follow this recited structure to know how to implement this limitation in software code and thus execute the game."); APPX2671 at 90:2–91:14; 92:12–93:11 (admitting that specially-written software code is necessary to create the claimed game functionality). Thus, had Konami attempted to analyze the facts under the legal standard that it had finally conceded was correct, Konami inescapably would have had to admit that § 112 ¶ 6 applied to the asserted claims.

But Konami's appellate arguments were even more unreasonable. Remarkably, Konami went so far as to deny that the asserted claims even recited functions at all. APPX2480–2481 (arguing that no functions were claimed because, "[r]ather than 'outcomes,' the referenced limitations define the unique layout and structure of the simulated rotatable reel used for the game, including being displayed during gameplay"). This argument directly contradicted innumerable

27

Konami admissions and admissions from Konami's expert, Mr. Acres, before the district court, all of which conceded that the asserted claims were replete with functional claiming. *E.g.*, APPX1325 ("[T]he Konami patents outline the sequential actions or step-by-step procedure in executing the game" and "[t]he structure or acts that perform ***these functions*** are well within the abilities of persons of ordinary skill in the art.") (emphasis added); APPX1374 ("The game controller of the patents-in-suit is described in terms of the structure it contains as well as the ***functions*** that structure performs . . . .") (emphasis added).

Konami's about-face on functionality was not only self-contradictory, it also made no sense: contrary to Konami's arguments, and as Konami had admitted elsewhere, the "simulated rotatable reel" is not a "structure"—it is a virtual reel displayed to a player on a display screen. APPX0475 ("Throughout the specification, the written description describes the operation of the invention including the display of simulated rotatable reels, and the display of the simulated rotation as the motion of the simulated reels."). Thus, the "simulated rotatable reel" and the ways in which it is displayed to the player were obviously game functionality—the result or outcome of, *e.g.*, the

28

processor "executing the game" according to some kind of unspecified software programming. APPX0065 at 7:52–57.

Next, Konami once again peddled the baseless argument that the patents-in-suit disclosed a software algorithm "in prose" for performing the claimed functions. APPX2355–2361. This time, however, Konami contended that the algorithm was actually disclosed in the asserted claims themselves, instead of the specification. APPX2356–2357 (arguing that the algorithms are defined within the claims as a series of steps). Perhaps recognizing the futility of this argument, Konami added the caveat that "[a] patent is not required to disclose 'how' items get displayed when this is understandable to a POSITA," APPX2358, and accordingly that it had no obligation to disclose in the patents "structures well-known in the art." APPX2356. Again, such arguments are legally erroneous. *See Aristocrat*, 521 F.3d at 1337 (holding that a patent holder cannot rely on alleged abilities of one of ordinary skill in the art to avoid its disclosure obligations under § 112 ¶ 6).

As a specific example, Konami attempted to excuse the patents' failure to disclose any specific process for generating random numbers by asserting that the process was "well-known and . . . standard," and

that the district court "erred by concluding random number generation was not well-known." APPX2347. But this assertion directly contradicted the district court's actual summary judgment finding: that a number of different random number generators were known in the prior art. APPX2222; *see also* APPX2141 at 44:22–25 (district court statement during oral argument that random number generation was "known" and "clearly an established part of the industry"). The district court had simply held, however, that there was no single known methodology for random number generation, APPX2223, and on that basis that the patents-in-suit needed to disclose at least one specific methodology (via at least a software algorithm)—which, fatally, they did not do, APPX2236–2242.

This Court then held oral argument on March 6, 2019. *See generally* APPX2510–2519. During the hearing, the Court focused intently on Konami's false assertions regarding random number generation: "Where did [the district court] conclude that random number generation was not well-known in the record?" APPX2511 at 4:13–15. Konami did not respond directly and was repeatedly unable to identify to the Court any support for its assertion. *See* APPX2511–2512

30

at 4:16–9:5; APPX2518–2519 at 32:19–36:8.    Konami's repeated

evasiveness caused the Court to state:  "I – I guess we're talking past

each other, but, unfortunately for you, when you talk past me, it doesn't

help you."  APPX2512 at 7:10–12.

On March 11, 2019, the Court summarily affirmed the district

court's entry of summary judgment pursuant to Fed. Cir. R. 36.

APPX2248–2249.

## VI.  The District Court Denies High 5's Amended Motion for Attorneys' Fees

Following this Court's affirmance, on April 8, 2019, High 5 filed an

Amended Motion for Attorneys' Fees under 35 U.S.C. § 285

demonstrating that this action was an "exceptional case" and that

Konami should be required to reimburse High 5 for its attorneys' fees

and non-taxable expenses.  APPX2250–2281.  On May 6, 2019, Konami

opposed the Amended Motion.   Amazingly, despite the fact that the

Court on appeal had summarily affirmed the district court's rejection of

Konami's arguments, Konami misrepresented to the district court that

the Federal Circuit "had essentially reaffirmed Konami's argument on

the § 112 ¶ 6 construction" and had likewise agreed with Konami's

§ 101 arguments.   APPX2779.   On May 20, 2019, High 5 replied.

31

APPX2824–2842.    The district court held hearings related to the Amended Motion on March 6 and September 3, 2020.  *See* APPX2844–2897; APPX2922–2931.

On October 25, 2021, the district court denied High 5's Amended Motion, finding that Konami's lawsuit did not present an "exceptional case" for purposes of § 285.  APPX0001–0008.  The district court's opinion articulated only a limited number of reasons for finding the case not "exceptional"; the reasons articulated were based on a flawed analysis; and the opinion failed to substantively consider most of the circumstances warranting an "exceptional case" finding.

## SUMMARY OF THE ARGUMENT

In determining that this action was not an "exceptional case" under 35 U.S.C. § 285 and denying High 5's Amended Motion for Attorneys' Fees, the district court issued an abbreviated analysis based on several important legal errors, failing to address numerous important considerations, and consequently making clear errors of judgment in attempting to weigh the relevant factors overall. Accordingly, the district court's denial of the Amended Motion constituted an abuse of discretion and should be reversed.

First, the district court committed legal error in crediting Konami's attempt to distinguish the critical *Aristocrat* case. Konami had argued that the district court should not apply the *Aristocrat* holding to this case because the claims at issue in *Aristocrat* expressly recited the term "means," whereas the asserted claims here did not. But the issue of whether the asserted claims implicated § 112 ¶ 6 because they lacked the term "means" was not addressed at all in *Aristocrat*. *Aristocrat* concerned the issue of the sufficiency of a patent's corresponding disclosure of structure assuming that § 112 ¶ 6 does govern. Thus, the distinction raised by Konami was wholly irrelevant here.

Second, the district court failed to properly consider the undisputed governing test recited in *Williamson* for whether § 112 ¶ 6 is invoked: even if the term "means" is absent, a claim element will still be subject to § 112 ¶ 6 if the element recites function without reciting sufficient structure for performing that function. Konami's repeated arguments that § 112 ¶ 6 is avoided if a claim term (such as a "processor" or a "game controller") is understood in the art as a

"structure," and not a mere "nonce word," were contrary to well-established law and objectively unreasonable.

Moreover, the district court failed to address the fact that Konami had misinstructed its technical expert, John Acres, on the very same point of § 112 ¶ 6 law. This was critical because, as the district court found, Mr. Acres had separately testified that the claimed "processors" and "game controllers" were not sufficient structures to perform the claimed game functionalities because special software programming was also required. Thus, under the correct *Williamson* standard—which Konami's attorneys finally conceded on appeal but had never provided to Mr. Acres—the asserted claims indisputably invoked § 112 ¶ 6 contrary to Konami's incorrect and misleading arguments.

Third, the district court also failed to address Konami's alternative effort to avoid the disclosure requirements of § 112 ¶ 6: Konami's argument that the asserted claims lacked any functional claiming whatsoever. This remarkable argument was not only belied by the face of the patents-in-suit, in which a variety of game functions were obviously claimed, but also directly contradicted numerous

admissions by Konami and its expert, Mr. Acres, that the claims did in fact include functional claiming.

Fourth, the district court also failed to address Konami's baseless argument that the patents-in-suit complied with § 112 ¶ 6 because they disclosed a software algorithm "in prose." On their face, the patents-in-suit were devoid of technical details and did not disclose anything close to the requisite software algorithm. Konami's attempt to circumvent this problem by using the alleged knowledge of one of ordinary skill in the art to fill in the gaps was contrary to law.

Fifth, the district court also failed to address Konami's baseless appeal to this Court in which Konami continued to pursue all of its meritless arguments, made numerous misrepresentations to the Court concerning what had conspired before the district court, and even resorted to *ad hominem* attacks on the district court.

Sixth, the district court's analysis of Konami's § 101 arguments was also flawed. Contrary to the district court's understanding, Konami's attempt to distinguish the *Alice* holding on the basis that it was limited to "economic arrangements" was legally insupportable. Furthermore, the district court improperly discounted the testimony of

the sole named inventor, Osamu Yoshimi, who testified that his invention was "game rules," which is an unpatentable abstract idea under the Court's holding in *In re Smith*. Moreover, Konami's argument that the asserted claims nevertheless passed muster under § 101 because the "simulated rotatable reel" was a separate "inventive concept" was baseless because the "simulated rotatable reel" was simply game functionality; the only claimed mechanisms for implementing such functionality were conventional computer components, which under *Alice* could not possibly constitute the required "inventive concept."

Seventh, the district court improperly based its holding in part on the fact that the Patent Trial and Appeal Board ("PTAB") had declined to institute *Inter Partes* Review ("IPR") proceedings concerning the patents-in-suit. By statute, however, IPR proceedings cannot include defenses under §§ 101 and 112. Thus, the PTAB's decisions had no bearing on the question of whether Konami had a reasonable basis to assert its claims under §§ 101 or 112, which was the relevant question.

Finally, eighth, the district court appears to have taken into consideration the fact that a different federal judge in a different patent

case involving Konami and a different defendant had denied a motion for attorneys' fees. To the extent that the district court did so, that was further legal error. The district court's "exceptional case" analysis here should have been limited to the totality of circumstances present in this case.

## ARGUMENT

### I.    Standard of Review

This Court reviews a district court's overall grant or denial of attorney's fees under 35 U.S.C. § 285 for abuse of discretion. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 561 (2014). In conducting this review, the Court reviews de novo whether the district court applied the correct legal standards, and the district court's factual findings underlying an exceptional case determination are reviewed for clear error. *Gaymar Indus. v. Cincinnati Sub-Zero Prods.*, 790 F.3d 1369, 1372 (Fed. Cir. 2015). Accordingly, a district court abuses its discretion when it makes "a clear error of judgment in weighing relevant factors or in basing its decision on an error of law or on clearly erroneous factual findings." *Bayer CropScience AG v. Dow AgroSciences LLC*, 851 F.3d 1302, 1306 (Fed. Cir. 2017) (citing *Highmark*, 572 U.S. at 563 n.2).

## II.    The District Court's Abbreviated *Octane Fitness* Analysis Constituted an Abuse of Discretion

Under 35 U.S.C. § 285, a district court "in exceptional cases may award reasonable attorney fees to the prevailing party." An "exceptional case" under § 285 "is simply one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). In determining whether an action is an "exceptional case," a court must consider "the totality of the circumstances," including factors such as "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* & n.6. A party must prove its entitlement to fees by a preponderance of the evidence. *Id.* at 557–58. "[I]t is clear that the aim of § 285 is to compensate a defendant for attorneys' fees it should not have been forced to incur." *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1313 (Fed. Cir. 2013).

Here, the district court failed to conduct a proper "exceptional case" analysis and consequently abused its discretion in at least two principle ways, both of which infected the district court's analysis in numerous different contexts, as explained below. First, the district court's analysis reflected significant misunderstandings and misapplications of relevant law, resulting in clear errors of judgment. *Highmark Inc. v. Allcare Health Mgmt. Sys.*, 572 U.S. 559, 563 n.2 (2014) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law . . . ."). Second, the district court's analysis was materially incomplete. The district court failed to even address numerous factors relevant to the inquiry and thus did not consider the "totality of the circumstances," as required under *Octane Fitness*. *Romag Fasteners, Inc. v. Fossil, Inc.*, 866 F.3d 1330, 1340 (Fed. Cir. 2017) (vacating decision where district court failed to consider all of the relevant factors) ("[A] district court must consider the totality of the circumstances."); *Rothschild Connected Devices Innovations, LLC v. Guardian Prot. Servs.*, 858 F.3d 1383, 1388 (Fed. Cir. 2017) (reversing where district court failed to address relevant

factors) ("A district court abuses its discretion when, as here, it 'fail[s] to conduct an adequate inquiry.'").

A.    **The District Court's "Exceptional Case" Analysis With Respect to 35 U.S.C. § 112 Alone Constituted an Abuse of Discretion Warranting Reversal**

1.    **The District Court's Attempt to Distinguish This Action From *Aristocrat* Misunderstood and Misapplied the Governing Law**

The district court found that Konami's § 112 ¶ 6 arguments were not objectively baseless because, in *Aristocrat*, the relevant claims included the magic language "means," whereas in this action "means" was absent from the claims. APPX0006. But *Aristocrat* is inapplicable and irrelevant to the question of whether the asserted claims invoked § 112 ¶ 6. In *Aristocrat*, the parties had ***agreed*** that the relevant "control means" claim language invoked § 112 ¶ 6, and thus the Court in *Aristocrat* did not adjudicate anything related to the issue of when § 112 ¶ 6 will be invoked by claim language lacking the term "means." *Aristocrat*, 521 F.3d at 1331. *Aristocrat* addressed a second, corollary issue: assuming a claim invokes § 112 ¶ 6, what kind of corresponding structure must be disclosed in the specification to satisfy that statutory provision? *See id.* at 1332–38 (holding that the specification's mere disclosure of a microprocessor and failure to disclose a software

40

algorithm meant that the specification lacked sufficient disclosure of corresponding structure for the claimed functions).

With respect to the question of whether and to what extent § 112 ¶ 6 will be invoked in the context of a claim that lacks the term "means," that question is governed by a different rule.  In *Williamson*, the Court, reviewing the issue en banc, held:

> When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.

*Williamson*, 792 F.3d at 1349; *see also* APPX2225 (district court summary judgment order reciting and applying *Williamson* standard); APPX2350 (Konami appeal brief reciting *Williamson* standard).

In short, it is undisputed that the objective reasonableness of Konami's § 112 ¶ 6 invocation arguments must be measured against the legal standard set forth in *Williamson*, not *Aristocrat*.  The district court's finding that Konami had raised a valid distinction with *Aristocrat*—that *Aristocrat* dealt with patent claims reciting the term "means," while the asserted claims here did not—was thus based on a

fundamental misunderstanding of applicable law, was legal error, and therefore resulted in an abuse of discretion.

### 2. Under the Governing En Banc *Williamson* Holding, and Given Konami's Fact Admissions, it Was Objectively Unreasonable for Konami to Argue That the Asserted Claims Did Not Invoke § 112 ¶ 6

The asserted claims recite "processor" and "game controller" elements that are "configured to" perform certain functions. *E.g.*, APPX0065 at 7:52–54. Konami's arguments that § 112 ¶ 6 did not apply were always based on an argument that § 112 ¶ 6's applicability is limited to patent claims that either (A) expressly use the terms "means for" or "step for" or (B) recite so-called "nonce words" as a substitute. *See, e.g.*, APPX0507 ("[C]laim language that does not use the 'magic words' of 'means for' or 'step for' may nonetheless invoke § 112 ¶ 6, when a mere nonce word is substituted for 'means for' or 'step for' in the claim."). According to Konami, if a claim element recites a term with "known structural meaning to those of skill in the art," the § 112 ¶ 6 inquiry is at an end. APPX1327. Thus, Konami erroneously argued that the asserted claims avoided § 112 ¶ 6 because they lacked the terms "means for" or "step for" and the terms "processors" and

"game controllers" were known structures and not "nonce words." *E.g.*, APPX1326–1327.

In denying the Amended Motion for Attorneys' Fees, the district court characterized this argument as being "not wholly unreasonable." APPX0006.    Yet Konami's arguments were directly contrary to governing law.    Again, under, *e.g.*, *Williamson*—an opinion that the district court apparently failed to consider given its misplaced focus on *Aristocrat* in this context—a claim element lacking the word "means" will still invoke § 112 ¶ 6 if the element recites "function without reciting ***sufficient structure for performing that function***." *Williamson*, 792 F.3d at 1349 (emphasis added).    Thus, a claim's recitation of some generic computer "structure" is legally insufficient; for purposes of this action, the real question was:    are the claimed "processors" and "game controllers" sufficient structures for performing the claimed functions?

The answer to this question was supplied by Konami's own expert, Mr. Acres, who in his declarations and deposition testimony had conceded that the "processor" and "game controller" elements were ***not*** sufficient to perform the functions recited in the asserted claims ***in the***

*absence of software*. APPX1378–1379 § 49 ("One of ordinary skill in the art at the time of the invention can follow this recited structure to know how to implement this limitation *in software code* and thus execute the game.") (emphasis added); APPX2671 at 90:2–91:14; 92:12–93:11 (conceding that software is necessary to generate the game functionality). This meant that, under *Williamson* for example, § 112 ¶ 6 indisputably applied to the asserted claims even though the magic word "means" was not recited. Thus, Konami's legal approach to § 112 ¶ 6 not only relied on a fundamental mischaracterization of the law, but also, under an accurate characterization of the governing legal standards, its § 112 ¶ 6 arguments were precluded as a matter of undisputed fact.

But it gets worse. In one of Mr. Acres's declarations, he had set forth his understanding of § 112 ¶ 6 law that had been provided to him by Konami's attorneys and, on the basis of this understanding, effectively opined that the asserted claims did not contain "means-plus-function" language and thus did not invoke § 112 ¶ 6. APPX0648–0649 ¶¶ 31–35; APPX2672–2673 at 101:6–102:3. The legal summary of § 112

44

¶ 6 that Konami's attorneys had provided to Mr. Acres, however, was fundamentally erroneous:

> I have been informed that claim limitations "may" be defined by function even when the phrases "means for" and "step for" are not present, such as when a claim element with functional language uses a generic placeholder or nonce word coupled to the function and where the claim does not recite structure for performing the function. Likewise, in a method claim, I have been informed that a claim limitation "may" be defined by function when an element with functional language uses a generic placeholder or nonce word coupled to the function and where the claim does not recite the action for achieving that function.

APPX0649 ¶ 34; APPX2672–2673 at 101:6–102:3. Thus, not only had Konami advocated a fundamentally incorrect statement of the law before the district court, but it had likewise misinstructed its expert. *Compare id. with Williamson*, 792 F.3d at 1349. Given Mr. Acres's testimony concerning the need for special software programming to implement the claimed game functionality, had Konami's attorneys accurately informed Mr. Acres concerning the law, Mr. Acres would not have been in a position to support Konami's § 112 ¶ 6 positions. Konami's pursuit of arguments that were based on misstatements of the governing law and precluded by the testimony of one's own expert

witness (who had been misinstructed on the law) was the epitome of objectively baseless and improper litigation behavior.    Yet these circumstances were not even addressed in the district court's Order. *See* APPX0006–0008.

### 3.    The District Court Failed to Consider Konami's Inexplicable Arguments That the Asserted Claims Lacked Functional Language

In denying fees, the district court failed to consider Konami's unreasonable arguments that the asserted claims did not include functional claiming, and thus that § 112 ¶ 6 was inapplicable for this separate reason.    *See* APPX0006–0008.    The district court's "exceptional case" analysis was inadequate for this reason as well.

Throughout this action, Konami strenuously resisted the application of § 112 ¶ 6 to the asserted claims, including by refusing to acknowledge the obvious functional aspects of the claims, *see, e.g.*, APPX1141 ("High 5 has not identified any . . . 'nonce word,' . . . which is modified by functional language . . . ."), or even in some instances outright denying that the claims involved any functional claiming whatsoever, *see, e.g.*, APPX2480–2481 (arguing that High 5 "misled" the

46

district court because the display of a "simulated rotatable reel" is not a "function" or an "outcome," but instead, allegedly, is a "structure").

Konami's argument that the visual game outcomes recited throughout the asserted claims were not functional, but were instead some kind of "structure," was frivolous. For example, claim 1 of the '869 patent recites "a processor configured to execute a game displaying a matrix of symbol containing elements having a plurality of rows and a plurality columns; at least one column of said matrix comprising a portion of a simulated rotatable reel of a plurality of said symbol containing elements . . . ." APPX0065 at 7:52–57. As Konami's own expert confirmed, a "simulated rotatable reel" is simply a virtual depiction of a reel that is displayed on a display screen; it is not a physical "structure." APPX1369 ¶ 29. Moreover, "displaying" the "simulated rotatable reel" is clearly a function to be performed. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, & n.12 (Fed. Cir. 2011) ("[D]isplay terminals are the corresponding structure for the function of 'visually displaying the customer number data' . . . ."). No reasonable litigant could have asserted otherwise.

Even worse, in other contexts, Konami repeatedly admitted that the asserted claims were replete with functional language. *See, e.g.*, APPX1325 ("[T]he Konami patents outline the sequential actions or step-by-step procedure in executing the game.  The structure or acts that perform these ***functions*** are well within the abilities of persons of ordinary skill in the art . . . .") (emphasis added); *see also, e.g.*, APPX0098 at 9:11–12 ('810 patent, claim 15) ("A non-transitory computer readable medium recording a program for controlling a computer ***to function*** as a . . . ").  Indeed, in a co-pending action brought by Konami involving the same patents and claims, *Konami Gaming, Inc. v. Marks Studios, LLC*, No. 2:14-cv-01485 (D. Nev.) ("*Marks Studios*"), Konami went so far as to assert in its claim construction arguments that the claimed "game controller" should be "understood ***according to its function***."  APPX2633–2634 (emphasis added).  Thus, not only did Konami's arguments on functionality contradict the plain language of the asserted claims, they contradicted Konami's own admissions repeatedly made elsewhere.

The district court failed to consider any of these circumstances in its Order. *See* APPX0006–0008.

####     4.　　Konami Had No Objectively Reasonable Basis to Argue That the Specification Disclosed the Required Software Algorithm

As the district court properly recognized on summary judgment, Konami failed to properly identify any legally-sufficient structure in the specification corresponding to the claimed functions, rendering the asserted claims invalid for indefiniteness. APPX2235–2242.

It is hornbook law that, if a claim element invokes § 112 ¶ 6, the patent specifications must adequately disclose structures for performing the claimed functions, to ensure that the claims are properly bounded. *E.g.*, *Williamson*, 792 F.3d at 1347. Furthermore, under *Aristocrat*, "[i]n cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, the court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." *Aristocrat*, 521 F.3d. at 1333. In such instances, the corresponding structure that must be disclosed is ***at least a software algorithm***. *Id.* As noted above, this is well-established law.

The shared specification here, however, plainly did not disclose the required software algorithm. The only colorable disclosure in the

entirety of the specification describing how the claimed functions are to be executed, such as via a "processor" "game controller" or "control module," is illustrated in Figure 7 and briefly described in only the most generic terms. *See* APPX0058; APPX0064–0065 at 6:57–7:50. The only express references to software are passing references to "program code," which is otherwise undescribed and undetailed. *See id.* The remainder of the specification is essentially a disclosure of various visual outcomes, *e.g.*, what symbols are displayed to a game player and under what circumstances. *See* APPX0055–0065 *passim*. Although Konami attempted to argue that such disclosures constituted an "algorithm, in prose," APPX1336, under *Aristocrat*, such disclosures are inescapably disclosures of game functionality, *i.e.*, "the function to be performed"— "not the algorithm by which it is performed"—and it was frivolous for Konami to argue otherwise. *Aristocrat*, 521 F.3d at 1334.

Clearly recognizing that the specification fails to disclose an algorithm, Konami quickly fell back on an argument that the disclosure requirement of § 112 ¶ 6 could be satisfied through the knowledge of one of ordinary skill in the art—such as Konami's technical expert, Mr. Acres, who asserted that he knew how to construct a gaming device

that could perform the claimed slot wagering game even if no software was disclosed. *See* APPX1336–1342; *see also* APPX2674 at 106:1–23. Konami's reliance on the knowledge of one of ordinary skill in the art as a "gap-filler," however, is unequivocally precluded under *Aristocrat* and many other cases. *See, e.g.*, *Aristocrat*, 521 F.3d at 1334 ("Aristocrat's real point is that devising an algorithm to perform that function would be within the capability of one of skill in the art, and therefore it was not necessary for the patent to designate any particular algorithm to perform the claimed function. As we have noted above, however, that argument is contrary to this court's law."); *Medical Instr.*, 344 F.3d at 1212. Once again, Konami's arguments were directly contrary to governing law and groundless.

Finally, as a last-ditch effort to avoid the ramifications of *Aristocrat*, Konami attempted to distinguish *Aristocrat* by arguing that "[t]he claim limitations in *Aristocrat* were specifically drafted with the intent to invoke § 112 ¶ 6 by using 'means' phrasing." APPX1340. Once again, whether § 112 ¶ 6 is invoked by any particular claim language (*e.g.*, "means") was not the issue addressed in *Aristocrat*. *Aristocrat* concerned the nature of the disclosure that must be present in the

51

specification in order to comply with § 112 ¶ 6 once that statutory provision has been invoked. Thus, yet again, Konami was unable to provide an objectively reasonable explanation for bringing and maintaining this lawsuit.

In connection with adjudicating High 5's fee motion, however, the district court did not address Konami's baseless arguments related to corresponding structure. *See* APPX0006–0008. This is a further reason why the district court's "exceptional case" analysis was incomplete and inadequate.

> **5.** **Konami's Numerous *Ad Hominem* Attacks on the District Judge and Misrepresentations to This Court Also Render This Case Exceptional**

The district court's "exceptional case" analysis also failed to consider what occurred during the prior appeal in this action. Specifically, after Konami lost on summary judgment and appealed to this Court, it not only took the same objectively baseless § 112 ¶ 6 positions that it had taken before the district court, but it also resorted to a series of *ad hominem* attacks on the district court, as well as misrepresentations to this Court, in an effort to obtain reversal.

The Court is already well aware of Konami's false representation that the district court had "conclude[ed] random number generation was not well-known," APPX2347—an assertion that was the topic of extended discussion during oral argument before the Court in the prior appeal. *See generally* APPX2511–2512 at 4:13–9:5; APPX2518–2519 at 32:19–36:8. In actuality, the district court had found the exact opposite: that multiple methods of random number generation were well-known in the art. APPX2222; *see also* APPX2220 (quoting examiner statement in prosecution history that "random number generators are widely well known in the art"). Indeed, both the district court and Konami's counsel had expressly agreed on this non-controversial fact during oral argument at the Omnibus hearing. *E.g.*, APPX2199 at 102:12–22 (discussing Telnaes prior art reference).

But that misrepresentation to the Court was only the tip of the iceberg. Konami launched its appeal with an *ad hominem* attack on the district court, noting that "[t]he court granted summary judgment on September 30, 2017, and nearly five months later, issued the written order on February 22, 2018"—implying that the district court was results-oriented in its approach to summary judgment and that its

subsequent opinion was merely a post hoc rationalization. APPX2323. When this Court immediately pressed Konami on its inappropriate suggestion during oral argument, Konami appeared to backtrack, stating that the delay may also have been caused by the district court's alleged "misunderstanding" of "how the technology operated." APPX2511 at 2:20–3:14; *see also* APPX2336 (arguing that the district court "fundamentally misunderstood the technology at issue").

In accordance with its ridiculous contention that the district court had "erred from start to finish" in granting summary judgment, APPX2328, Konami then proceeded to lob a multitude of baseless arguments at the Court, many of which were premised on outright misrepresentations of what had transpired below. For example, Konami asserted that the district court failed to apply the presumption against the applicability of § 112 ¶ 6 when a claim lacks the term "means" and instead "started its analysis with the assumption that means-plus-function applied." APPX2329. In actuality, however, the district court expressly recognized that the absence of the term "means" creates a presumption that § 112 ¶ 6 does not apply, APPX2225, but it

54

found that that "presumption against means-plus-function claiming [had] been rebutted . . . ." APPX2231.

Similarly, Konami accused the district court of "fail[ing] to consider extrinsic evidence regarding the 'game controller' and 'processor' terms, which conclusively showed that such terms were used in the common parlance by POSITA to refer to structure." APPX2329. To the contrary, the district court expressly held: "[T]he Court rejects Konami's argument that 'processor' and 'game controller' are terms connoting adequate structure for the associated functions to individuals with ordinary skill in the art . . . . The Court finds that the expert testimony and record in this case did not establish the existence of such off-the-shelf commercial processors which could readily and adequately perform the functions noted above and disclosed in the asserted claims." APPX2233–2234.

Indeed, Konami went so far as to contend that the district court "rejected testimony from the experts about what would have been understood by a POSITA, and instead substituted its own understanding." APPX2335. The record, however, reflects that the district court carefully considered the expert testimony and relied upon

55

such testimony in reaching its conclusions.  *E.g.*, APPX2222–2223 (detailing factual findings that were based on the testimony of both parties' technical experts at the four-day Omnibus hearing).

Konami also contended that the district court "did not examine the method claims [of the patents-in-suit] apart from the conclusory treatment that it gave the system claims . . . ."  APPX2330; *see also* APPX2342 (similar).  This was also clearly false.  The district court expressly discussed Konami's argument that the method claims must be treated differently.  APPX2229–2230.  It also expressly examined "means-plus-function" language contained in multiple method claims. APPX2216–2217.  Finally, in its legal analysis, the district court discussed at least one method claim extensively.  APPX2236.  Konami's problem was not a lack of the district court's attention; it was that § 112 ¶ 6 by its terms is analyzed on an element-by-element basis, and Konami's method claims included the very same "means-plus-function" claim elements as did its apparatus claims.  *Compare, e.g.*, APPX0065 ('869 patent, claim 1—apparatus claim) at 7:52–53 ("processor configured to . . .") *with* APPX0066 ('869 patent, claim 19—method

claim) at 9:2–3 ("said method comprising a processor . . . configured to . . .").

In short, Konami's positions on appeal were not only unreasonable, they were detached from reality and riddled with misrepresentations and mischaracterizations of what actually transpired in the district court. The district court's failure to consider Konami's arguments and tactics on appeal was yet another reason why its "exceptional case" analysis was inadequate and constituted an abuse of discretion. *See* APPX0006–0008.

## B.    The District Court's Truncated Analysis Constituted an Abuse of Discretion in Numerous Other Respects

### 1.    The District Court's Consideration of *In re Smith* and Konami's Baseless Arguments Under 35 U.S.C. § 101 Was Fundamentally Flawed

In granting High 5's Motion for Summary Judgment, the district court held that the asserted claims were also invalid for claiming unpatentable abstract ideas under 35 U.S.C. § 101. APPX2242–2247. Applying the well-known *Alice* two-step test for abstractness, the district court held that the claims were directed to an aesthetic variation on slot-style game play that was analogous to new game rules. APPX2245–2246; *see also Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573

U.S. 208 (2014).  The district court further determined that there was no separate inventive concept present in the claims sufficient to confer patent eligibility, particularly given that only generic computing components were recited.  *Id.*  Accordingly, under *Alice* as well as this Court's holding in *In re Smith*, the claims were all invalid.  *See In re Smith*, 815 F.3d 816, 819 (Fed. Cir. 2016) ("[W]e conclude that the rejected claims, describing a set of rules for a game, are drawn to an abstract idea.")

The district court's finding that the claims were directed to game rules was fully consistent with the claim language and shared specification, and was further corroborated by at least (1) the testimony of the sole named inventor, Osamu Yoshimi, who confirmed that his invention was strictly "game rules" and that he had not invented any particular technological implementations of those game rules, APPX2667 at 142:6–24; APPX2668 at 147:21–148; and (2) Konami's own infringement contentions, which were exclusively and explicitly directed to "game rules" and the visual features that a player "observed during game play," *see* APPX2551–2572.

Despite all of this evidence—which placed Konami's claims squarely within the framework of § 101, *Alice*, and *In re Smith*—the district court still declined to award fees on the basis of Konami's § 101 assertions, stating that "Konami's arguments against abstractness [under 35 U.S.C. § 101] were not so utterly without merit as to warrant an award of attorney fees." APPX0007. The district court's reasoning in this regard was flawed.

The district court first credited as "reasonabl[e]" Konami's effort to distinguish the asserted claims from the *Alice* holding on the basis that the reasoning in *Alice* is somehow limited to patent claims involving "economic arrangement[s]." APPX0007. But the impact of the *Alice* holding sweeps across all technologies, not simply "economic arrangements." *See, e.g.*, *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759 (Fed. Cir. 2019) (applying *Alice* framework to patents involving electric vehicle charging stations and finding claims invalid under § 101). Indeed, in *In re Smith*, this Court squarely held that claimed inventions in the gaming field were subject to the *Alice* test like any other kind of inventions. *See In re Smith*, 815 F.3d at 819. Thus,

Konami's attempted "economic arrangements" distinction was plainly baseless and not reasonable.

Second, the district court found that Konami "was not wholly unreasonable" to argue that the asserted claims disclosed an "inventive concept" under *Alice* step two because the claimed "simulated rotatable reel" was like the "new or original deck of cards" that the Court in *In re Smith* had envisioned as being hypothetically patentable in a gaming context. APPX0007; *see also In re Smith*, 815 F.3d at 819 ("We could envisage, for example, claims directed to conducting a game using a new or original deck of cards potentially surviving step two of Alice.").

Konami's argument, however, was utterly meritless. The "new or original deck of cards" referenced in *In re Smith* conceivably could constitute a patentable mechanism for implementing abstract game rules, which game rules would remain unpatentable in and of themselves. *See id.* at 818–19. In the asserted claims at issue here, however, the "simulated rotatable reel" with a consecutive run of identical symbols is simply game functionality implemented by conventional computer components (*i.e.*, "processors" and "game controllers"). *See* APPX0064–0065 at 6:57–7:50; APPX1366 ¶ 21

("[A]nyone of ordinary skill in the art at the time knew that game controller indicates a microprocessor or its equivalent and associated circuitry."); APPX1376 ¶ 43 ("In the 2004/2005 time, there were approximately 800,000 electronic gaming machines in legal use within the casino and lottery markets in the United States. Each and every one of these gaming machines utilized a microprocessor . . . ."). Under *Alice*, such conventional computer components could not possibly constitute the requisite "inventive concept." *Alice*, 573 U.S. at 223 ("[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention.").

Finally, the district court deemed Mr. Yoshimi's damning testimony regarding his "game rules" invention to be insufficient to establish objective unreasonableness. APPX0008. In doing so, the district court relied on *Stone Basket Innovations, LLC v. Cook Medical, LLC*, 892 F.3d 1175 (Fed. Cir. 2018), a case in which the inventor had conceded that there was nothing novel about a single element of a larger invention. *Id.* at 1180. Here, in contrast, Mr. Yoshimi's testimony concerned the fundamental nature of his entire invention— *i.e.*, that the entirety of his invention was "game rules." *See, e.g.*,

APPX2667 at 142:6–24; APPX2668 at 147:21–148. Moreover, significantly, Mr. Yoshimi's testimony did not stand alone in isolation. It was important corroborating evidence—evidence that corroborated the only conclusion that could be drawn from the face of the patents, understood in light of Konami's own expert testimony and infringement allegations and well-established governing law: the asserted claims were directed to unpatentable abstract ideas, possessed no separate inventive concept, and were invalid under § 101. In the face of all of this evidence, it was objectively unreasonable for Konami to saddle the district court and High 5 with this litigation, and compensation under § 285 is appropriate. *E.g.*, *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1377–80 (Fed. Cir. 2017) (affirming fee award where claims were plainly invalid under § 101 and *Alice*).

### 2. The District Court's Reliance on the Outcome of PTAB Proceedings Was Legally Erroneous

The District Court also based its decision to deny attorneys' fees on the fact that the PTAB rejected High 5 IPR petitions concerning the patents-in-suit. APPX0008. The district court's reliance on this fact was legal error. IPR proceedings are statutorily limited in scope to evaluating invalidity based on the prior art under 35 U.S.C. §§ 102 and

103.  *See* 35 U.S.C. § 311(b).  An IPR petitioner is not permitted to raise

§ 112 (or § 101 for that matter) in an IPR petition.  *See id.*; *see also, e.g.*,

*Secure Axcess, LLC v. PNC Bank Nat'l Ass'n*, 848 F.3d 1370, 1379 (Fed.

Cir. 2017) (noting that IPR statute excludes petitioner from raising

invalidity grounds based on § 101 or § 112).  Thus, the fact that the

PTAB decided not to initiate IPRs based on prior art defenses is

irrelevant to whether Konami had a reasonable basis to assert patent

claims under §§ 101 or 112, and it was legal error for the district court

to rely upon this factor.

> **3.    To the Extent the District Court Relied on a Different District Judge's Denial of Attorneys' Fees Against Konami in a Different Case, Any Such Reliance Was Legally Erroneous**

In its Order, the district court also took judicial notice of an order

denying a motion for attorneys' fees against Konami in a separate

action, *Marks Studios*,[2] and cited that attorney fee denial in its decision

---

[2] At approximately the same time it was litigating this action against High 5, Konami brought a second patent infringement lawsuit in the District of Nevada, in which it asserted the patents-in-suit against another entity, Marks Studios, LLC.  See APPX0002 (citing *Marks Studios*).  *Marks Studios* was assigned to U.S. District Judge Jennifer A. Dorsey. *See id.*  In *Marks Studios*, the defendant only contended that asserted claims from two of the patents-in-suit (not all of them) were invalid for indefiniteness under 35 U.S.C. § 112(f), and that is what

to deny attorneys' fees in this case.  APPX0002; APPX0003.  The very first sentence of the district court's substantive discussion states:  "The Court has reviewed . . . Judge Dorsey's Order denying attorney fees in *Marks Studios*."  APPX0003.  It therefore appears that the district court may have been influenced at least in part by the outcome of a similar motion in *Marks Studios*.  *See id.*  To that extent, the Court's Order was legally erroneous.

Under § 285 and *Octane Fitness*, the task of the district court was to determine whether ***this case*** was "exceptional" based on a consideration of the "totality of the circumstances" related to ***this case***. *Octane Fitness*, 572 U.S. at 554 (requiring a "case-by-case" analysis based on the "totality of the circumstances").  That requires consideration of both the substantive strength of Konami's litigating position in ***this case*** and the unreasonable manner in which Konami litigated ***this case***.  *Id.*  Accordingly, to the extent that the district

---

Judge Dorsey held.  *See Konami Gaming, Inc. v. Marks Studios, LLC*, 2017 U.S. Dist. LEXIS 116669 (D. Nev. July 25, 2017).  After this Court affirmed Judge Boulware's invalidity findings on all four patents-in-suit in this action, Konami voluntarily dismissed the *Marks Studios* action, after which Judge Dorsey denied Marks Studios's motion for attorneys' fees.  *See Konami Gaming, Inc. v. Marks Studios, LLC*, 2021 U.S. Dist. LEXIS 255828 (D. Nev. Mar. 15, 2021).

court permitted Judge Dorsey's fee denial in *Marks Studios* to impact its decision in this case, that was an additional legal error and abuse of discretion.

## CONCLUSION

The patents-in-suit were invalid on their face under both 35 U.S.C. § 112 ¶¶ 2 and 6 and 35 U.S.C. § 101, and Konami knew or should have known it. Konami had no business burdening High 5 and the judicial system with costly patent litigation that had no merit from the beginning. This action should never have been filed. Accordingly, High 5 respectfully requests that the Court reverse the district court's Order, find that this action was an "exceptional case" for purposes of 35 U.S.C. § 285, and remand for the district court to assess the amount of reasonable attorneys' fees to be awarded.

Dated:  April 14, 2022

Respectfully submitted,

*/s/ Robert C. Ryan*
ROBERT C. RYAN
HOLLAND & HART LLP
5441 Kietzke Lane, #200
Reno, Nevada  89511
Telephone:  (775) 327-3000
rcryan@hollandhart.com

TEAGUE I. DONAHEY
HOLLAND & HART LLP
808 West Main Street, Suite 1750
Boise, Idaho  83702
Telephone:  (208) 383-3988
tidonahey@hollandhart.com

JONATHAN A. FALLON
General Counsel & Sr. Vice President
HIGH 5 GAMES, LLC
1200 MacArthur Boulevard
Mahwah, New Jersey  07430
Telephone:  (201) 825-1711
jon.fallon@high5games.com

*Counsel for Appellant*

# CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. The following registered CM/ECF users were served by the appellate CM/ECF system, with courtesy copies provided by e-mail:

Kristopher K. Hulliberger
Christopher J. Worrel
Patrick M. McCarthy
Howard & Howard Attorneys PLLC
450 West Fourth Street
Royal Oak, Michigan 48067
Telephone: (248) 645-1483
kkh@h2law.com
cworrel@howardandhoward.com
pmccarthy@howardandhoward.com

W. West Allen
Howard & Howard Attorneys PLLC
3800 Howard Huges Pkwy #1000
Las Vegas, Nevada 89169
Telephone: (702) 667-4843
wallen@howardandhoward.com

*/s/ Robert C. Ryan*
ROBERT C. RYAN
HOLLAND & HART LLP

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(g) and Fed. Cir. R. 32(b)(3), undersigned counsel certifies that this brief complies with the type-volume limitation set forth in Fed. Cir. R. 32(b)(1) because this brief, exclusive of the items listed in Fed. R. App. 32(f) and Fed. Cir. R. 32(b)(2), contains 12,385 words.

*/s/ Robert C. Ryan*
ROBERT C. RYAN
HOLLAND & HART LLP

*Counsel for Appellant*

# ADDENDUM
## (Fed. Cir. R. 28(a)(11)–(12))

## ADDENDUM TABLE OF CONTENTS

| ECF# | DESCRIPTION | PAGE NOS. |
|------|-------------|-----------|
| 209 | 2021-10-25 Order | 0001-0008 |
| 1 | U.S. PATENT 8,096,869 B2 | 0053-0068 |
| 1 | U.S. PATENT 8,366,540 B2 | 0070-0083 |
| 1 | U.S. PATENT 8,622,810 B2 | 0085-0098 |
| 1 | U.S. PATENT 8,616,955 B2 | 0100-0115 |

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| Konami Gaming Inc. | Case No. 2:14-cv-01483-RFB-NJK |
| Plaintiff, | |
| v. | **ORDER** |
| High 5 Games, LLC | |
| Defendant. | |

### I.     INTRODUCTION

Before the Court is Defendant's Motion for Attorney Fees. ECF No. 181. For the reasons stated below, Defendant's motion is **DENIED**.

### II.     PROCEDURAL HISTORY

This litigation dates back to September 12, 2014, when Plaintiff Konami first filed suit against Defendant High 5 Games, alleging that Defendant's "Super Stacks" slot wagering gaming technology infringed four of Konami's gaming patents. ECF No. 1. An Amended Complaint was filed on February 29, 2016. ECF No. 53. On October 21, 2016, Defendant moved for summary judgement, alleging that all of Plaintiff's asserted claims were invalid for indefiniteness under 35 U.S.C. § 112(f), and for abstractness under 35 U.S.C. § 101.

Discovery was stayed until after the Court held a claim construction hearing. ECF No. 52. The Court held a four-day omnibus hearing between May and August 2017, in which it considered both the parties' claim construction briefs as well as Defendant's Motion for Summary Judgment. ECF Nos. 139, 140, 141, 150. At that hearing, the Court took testimony from both parties' expert witnesses. On July 24, 2017, per the Court's order, the parties submitted complete copies of the patents' prosecution histories, as well as summary descriptions of the prosecutions. ECF Nos. 143-48.

On September 30, 2017, the Court granted Defendant's Motion for Summary Judgment in its entirety. ECF No. 150. The Court issued its written Opinion and Order on February 22, 2018. ECF No. 155. On March 23, 2018, Plaintiff filed a Notice of Appeal of this Court's Summary Judgment Order. ECF No. 166. The Federal Circuit summarily affirmed this Court's order on March 11, 2019. ECF No. 176.

Defendant filed an Amended Motion for Attorney Fees on April 8, 2019. ECF No. 181. Plaintiff responded on May 6, 2019, ECF No. 190, and Defendant replied on May 20, 2019, ECF No. 195. A hearing on Defendant's Motion for Attorney Fees was held on March 6, 2020. ECF No. 200. On March 16, 2021, Plaintiff filed a Motion for Leave to File Supplementation in Opposition to Defendant's Motion for Attorney Fees, asking this Court to take notice of Judge Dorsey's Order denying attorney fees in the companion case of <u>Konami Gaming, Inc. v. Marks Studios, LLC</u>, No. 2:14-cv-01485 (D. Nev. Mar. 15, 2021). ECF No. 205. Defendant responded on March 19, 2021, ECF No. 206, and Plaintiff replied on March 26, 2021, ECF No. 207. On October 18, 2021, the Court granted Plaintiff's Motion for Leave to File Supplementation. ECF No. 208.

This Order follows.

## III.   LEGAL STANDARD

In a patent action, the court "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. An exceptional case is one that "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." <u>Octane Fitness, LLC v. ICON Health & Fitness, Inc.</u>, 572 U.S. 545, 554 (2014). District courts are to exercise their discretion on a case-by-case basis when determining whether a case qualifies as "exceptional" for the purpose of granting attorney fees. <u>Ibid.</u> A "noninclusive" list of factors for consideration include "'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" <u>Id.</u> at 554 n.6 (quoting <u>Fogerty v. Fantasy, Inc.</u>,

510 U.S. 517, 534 n.19 (1994)). "'[T]here is no precise rule or formula for making these determinations.'" Ibid. (quoting Fogerty, 510 U.S. at 534 (1994)).

District courts analyzing a request for fees in a patent case are to "examine the 'totality of the circumstances' to determine if the case was exceptional . . . exercising equitable discretion in light of the nonexclusive factors identified in Octane Fitness and Fogerty, and using a preponderance of the evidence standard." SunEarth, Inc. v. Sun Earth Solar Power Co., 839 F.3d 1179, 1181 (9th Cir. 2016) (quoting Octane Fitness, 572 U.S. at 554).

## IV.   DISCUSSION

The Court has reviewed Defendant's Motion for Attorney Fees, Plaintiff's Response, Defendant's Reply, and Judge Dorsey's Order denying attorney fees in Marks Studios. For the reasons stated below, the Court denies Defendant's motion.

The Court's order and opinion granting High 5's Motion for Summary Judgment found that the asserted claims of Konami's four patents were invalid as indefinite and abstract under 35 U.S.C. §§ 112(f) and 101. The Court determined that the '869 parent patent and its child patents failed to disclose sufficient structure – such as through an algorithm, flowchart, or code – to accomplish the range of functions named in Plaintiff's claimed slot machine invention. Through a review of the patents and their prosecution history, the Court found that the patents were granted because the USPTO determined the invention was novel for its use of a "notional, non-visible, inner reel" which, when "virtually spun," displays a random selection of symbols. The Court concluded that the actual process by which the notional, non-visible, inner reel operates was never actually disclosed. The Court found that Plaintiff failed to establish that its claimed invention involved anything beyond the use of a look-up table and random number generator, and was therefore unpatentable over prior art. The Court rejected Plaintiff's argument that other terms used in the patent claims – such as "game controller" and "processor" – were sufficient for a person of ordinary skill in the art to recognize the structure in the specification and to associate it with the claims' corresponding functions. The Court further found that the asserted claims were directed to aesthetic variations on the slot machine game, and did not articulate any additional inventive

concept sufficient to transform the claimed idea into a patent-eligible invention.

High 5 now argues that this is an exceptional case because Konami clung to objectively baseless positions throughout the course of litigation, far longer than any reasonable party should have. High 5 contends it is entitled to fees because Konami should have known from the outset that its claimed invention was unpatentable for indefiniteness and abstractness under §§ 112(f) and 101. High 5 does not explicitly contend that Konami proceeded in bad faith or engaged in litigation misconduct.

With respect to § 112(f), High 5 argues that it was unreasonable for Konami to proceed in the face of substantial evidence that the Asserted Patents involved pure functional claiming, as shown by the fact that (1) the asserted claims contained functional language; (2) Konami admitted that the claims were functional in this litigation and in the Marks Studios matter; (3) the sole inventor made certain admissions demonstrating the asserted claims' functionality and abstract nature; and (4) Konami's expert agreed that undisclosed software needed to be created to perform the claimed game. High 5 argues it was unreasonable not only for Konami to assert that its claims did not involve functional claiming, but also for Konami to argue that its patents disclosed sufficient structure through the terms "processor" and "game controller," in light of the decision in Aristocrat Technologies Australia PTY Limited v. International Game Technology, 521 F.3d 1328 (Fed. Cir. 2008).

High 5 further argues that Konami acted unreasonably in insisting that its patents were not invalid for abstractness under § 101 given the controlling decisions in Alice Corporation Party Limited v. CLS Bank International, 573 U.S. 208 (2014), and In re Smith, 815 F.3d 816 (Fed. Cir. 2016). High 5 asserts that Konami's patents plainly failed to disclose structure beyond a "basic drawing showing a generic computer devoid of any accompanying discussion concerning a technological advance or improvement thereof," in contravention of Alice and In re Smith's holdings that abstract ideas like the rules of a game are patent-ineligible concepts.

High 5 adds that Konami acted unreasonably in pursuing an appeal before the Federal Circuit, and argues that Konami's arguments before that appellate court involved numerous mischaracterizations of this Court's summary judgment order. Konami requests attorney fees in

the sum of $2,398,777.48,

Konami counters that it did not pursue this case knowing that its patents were invalid, and that its arguments as to the patents' validity were reasonable throughout. Konami contends, in essence, that the legal standards pertaining to §§ 112(f) and 101 as applied in gaming patent cases were far from clear during the course of this litigation, and that this Court's Order granting summary judgment to High 5 ushered in a sea change in gaming patent litigation.

With respect to the Court's finding that the patents were indefinite under § 112(f), Konami first argues that it did not act unreasonably in maintaining that its patents did not involve means-plus-function claiming. Konami emphasizes that it sought to distinguish <u>Aristocrat</u> on the grounds that <u>Aristocrat</u> involved computer-implemented inventions in which the inventor explicitly invoked means-plus-function claiming, whereas Konami's patents did not explicitly use "means for" language. Further, Konami argues that numerous district court opinions issued before and during the course of this litigation have found that patents which use the word "processor" and like terms connote some structure, and do not invoke means-plus-function claiming. Konami adds that district court decisions issued subsequent to this Court's summary judgment order reach similar conclusions, demonstrating the reasonableness of Konami's position.

With respect to the Court's abstractness finding, Konami's principle argument is that it is difficult to ascertain what types of subject matter are or are not patent eligible, and that "the legal precedent for § 101 continues to evolve." Konami contends that the import of <u>Alice</u> was far from clear at the time it brought this suit, and it emphasizes that in <u>In re Smith</u>, the Federal Circuit noted that an "inventive concept" – such as introducing a game using a new or original deck of cards – may transform a claimed abstract idea into a patent-eligible application. Konami contends that it was not unreasonable for it to believe that its claimed reel, which included "a run of identical symbols, randomly selected anew from game to game," was akin to the new or original deck of cards described in <u>In re Smith</u> as a patent-saving "inventive concept."

The Court finds that Konami's litigating position, while ultimately flawed, was not so objectively baseless as to make this an "exceptional case" under § 285. As a preliminary matter, there is a presumption that an assertion of infringement of a duly granted patent is made in good

faith." <u>Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH</u>, 603 F.3d 943, 954 (Fed. Cir. 2010); <u>see also</u> <u>SHFL Entertainment, Inc. v. Digideal Corporation</u>, No. 2:12-cv-1782, 2016 U.S. Dist. LEXIS 128049, *3 (D. Nev. June 29, 2016) (stating that a patent holder is "entitled to presume the validity of its patent and engage in a good-faith effort to enforce its perceived rights under the patent"). Further, courts are not to award attorney fees "'as a penalty for failure to win a patent infringement suit,'" and winning on a motion for summary judgement does not automatically entitle the prevailing party to attorney fees. <u>Gaymar Indus. V. Cincinnati Sub-Zero Prods.</u>, 790 F.3d 1369, 1373 (Fed. Cir. 2015) (quoting <u>Octane</u>, 572 U.S. at 548).

The Court maintains that Konami's patents were ultimately illusory, as they were approved based on the examiner's finding that the "notional nonvisible inner reel" created a new process beyond the ordinary random number generator and look-up table captured by prior art, but this litigation revealed that the patents never disclosed what this new process actually consisted of – whether by algorithm, flowchart, code, or other structure. That said, with respect to the invalidation of the patents under § 112(f), the Court recognizes that Konami could have reasonably believed that the patents' asserted claims disclosed sufficient structure for two reasons.

First, while this Court ultimately determined that the central holding of <u>Aristocrat</u> applied in this case, Konami's position that <u>Aristocrat</u> is distinguishable because it involved explicit invocation of means-plus-function claiming is not objectively baseless. In <u>Aristocrat</u>, unlike here, the patent's asserted claim explicitly recited the term "means," and the parties agreed this usage constituted means-plus-function claiming. Here, by contrast, none of Konami's asserted claims used such language, and Konami consistently contested means-plus-function claiming throughout the litigation. Second, Konami's position that the terms "game controller" and "processor" disclosed sufficient structure was not wholly unreasonable, given that <u>Aristocrat</u> did not strictly discuss these terms, and other courts have concluded that "processor" and like terms connote structure and do not invoke means-plus-function claiming. <u>See, e.g.</u>, <u>EnOcean GmbH v. Face Int'l Corp.</u>, 742 F.3d 955, 959 (Fed. Cir. 2014) (finding that the term "receiver" is reasonably well understood to those of skill in the art as a name for a structure which performs the recited function); <u>Advanced Mktg. Sys., LLC v. CVS Pharm., Inc.</u>, 6:15-CV-134-JRG-KNM, 2016 U.S. Dist.

LEXIS 58472 *67 (E.D. Tex. May 3, 2016) (". . .'[P]rocessor' is not a generic nonstructural term such as 'means,' 'element,' and 'device' that typically do not connote sufficient structure."); PalmTop Productions, Inc. v. Lo-Q PLC, 450 F. Supp. 2d 1344, 1368 (N.D. Ga. 2006) (stating that "processor" connotes some structure and does not invoke means-plus-function). While this Court ultimately found that the logic of Aristocrat applies to this case, such that "processor" and "game controller" did not disclose sufficient structure for Konami's asserted claims, it is "not the correctness or eventual success" of a party's litigating position that is relevant to an exceptional case determination, but rather whether the party's position was clearly unreasonable or objectively baseless. Stone Basket Innovations, LLC v. Cook Med. LLC, 892 F.3d 1175, 1181 (Fed. Cir. 2018). In light of the bases put forth by Konami for distinguishing its patents from those at issue in Aristocrat, it cannot be said that Konami's position was so untenable that "no reasonable litigant could reasonably expect success on the merits." Dominant Semiconductors Sdn. Bhd. V. OSRAM GmbH, 524 F.3d 1254, 1260 (Fed. Cir. 2008) (quoting GP Indus., Inc. v. Eran Indus., Inc., 500 F.3d 1369, 134 (Fed. Cir. 2007)).

The Court further finds that Konami's arguments against abstractness were not so utterly without merit as to warrant an award of attorney fees. Konami reasonably sought to distinguish its patents from those at issue in Alice on the basis that the asserted claims in Alice were directed to an "economic arrangement" implemented using generic computer technology, whereas Konami's asserted claims involved gaming devices. Further, Konami maintains that it had a reasonable basis to claim that its invention was saved from abstractness by the presence of an inventive concept, under the exception articulated in In re Smith. Rather than merely displaying a different configuration of displayed symbols (like a shuffled deck of cards), Konami argued, its claimed reel instead displayed a run of identical symbols randomly selected anew from game to game (like a brand new and original deck of cards). High 5 emphasizes that this Court squarely rejected this argument, and further contends that this argument is belied by the deposition testimony of Osamu Yoshimi, the patents' sole inventor. Mr. Yoshimi testified that his invention "is game rules," and that "as long as it's possible to implement the game rules," he was "not particular about how it's implemented." The Court finds that, while Konami ultimately failed to demonstrate the presence

of an inventive concept, it was not wholly unreasonable for it to construe its claimed reel as something more than "appending purely conventional steps to an abstract idea." In re Smith, 815 F.3d at 819. Further, as to Yoshimi's testimony, the Federal Circuit has observed that even when an inventor's statements undermine the novelty of a patent's asserted claim, they do not necessarily establish the invalidity of the patent, nor reflect that "material false statement[s]" were made to the USPTO during the course of the patent prosecution. Stone Basket Innovations, LLC v. Cook Med. LLC, 392 F.3d 1175, 1180 (Fed. Cir. 2018). In Stone Basket Innovations, the Federal Circuit affirmed the district court's finding that the inventor's deposition testimony – while weakening Plaintiff's litigating position overall – did not ultimately demonstrate that Plaintiff had "failed to evaluate its case" or that Plaintiff's actions were "objectively unreasonable in light of the circumstances." Id. at 1178-79.

Finally, the Court acknowledges that during the course of this litigation, High 5 sought reexamination of Konami's issued patents through *inter partes* review before the Patent Trial and Appeal Board ("PTAB"). The PTAB declined to institute such review, citing High 5's failure to demonstrate a reasonable likelihood of establishing the invalidity of any of the challenged claims in the '869 patent. While this Court disagrees with the PTAB's findings with respect to validity, it acknowledges that the PTAB's rejection supports Konami's assertion that its litigating position was not objectively baseless or unreasonable to an outside evaluator with knowledge of patent law.

V.  CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Motion for Attorney Fees is DENIED.

DATED October 25, 2021.

_____
RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE



US008096869B2

(12) **United States Patent**
Yoshimi

(10) Patent No.: **US 8,096,869 B2**
(45) Date of Patent: **Jan. 17, 2012**

(54) **GAMING MACHINE WITH RUNS OF CONSECUTIVE IDENTICAL SYMBOLS**

(75) Inventor: **Osamu Yoshimi**, Botany (AU)

(73) Assignee: **Konami Australia Pty Ltd.**, Botany (AU)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1292 days.

(21) Appl. No.: **11/299,009**

(22) Filed: **Dec. 9, 2005**

(65) **Prior Publication Data**
US 2006/0183534 A1 Aug. 17, 2006

(30) **Foreign Application Priority Data**

Feb. 14, 2005 (AU) .................................. 2005900681

(51) **Int. Cl.**
| | | |
|---|---|---|
| G06F 17/00 | (2006.01) | |
| G06F 19/00 | (2011.01) | |
| A63F 9/24 | (2006.01) | |
| A63F 13/00 | (2006.01) | |

(52) **U.S. Cl.** ........... 463/20; 463/16; 463/29; 273/138.1
(58) **Field of Classification Search** .............. 463/16–20, 463/25, 29; 273/138.1, 139
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,448,419 A | * | 5/1984 | Telnaes | ............................ 463/21 |
| 5,152,529 A | | 10/1992 | Okada | |
| 5,395,111 A | | 3/1995 | Inoue | |
| 5,580,055 A | | 12/1996 | Hagiwara | |
| 5,609,524 A | | 3/1997 | Inoue | |

| | | | | |
|---|---|---|---|---|
| 5,611,535 A | | 3/1997 | Tiberio | |
| 5,624,119 A | * | 4/1997 | Leake | |
| 5,722,891 A | | 3/1998 | Inoue | |
| 5,752,881 A | | 5/1998 | Inoue | |
| 5,807,172 A | * | 9/1998 | Piechowiak | |
| 5,976,016 A | | 11/1999 | Moody et al. | |
| 5,984,781 A | * | 11/1999 | Sunaga | ........................... 463/20 |
| 6,007,066 A | | 12/1999 | Moody | |
| 6,056,642 A | | 5/2000 | Bennett | |
| 6,159,096 A | * | 12/2000 | Yoseloff | ........................... 463/20 |
| 6,227,971 B1 | | 5/2001 | Weiss | |
| 6,241,607 B1 | * | 6/2001 | Payne et al. | ........................... 463/20 |
| 6,309,299 B1 | | 10/2001 | Weiss | |
| 6,319,124 B1 | | 11/2001 | Baerlocher et al. | |
| 6,394,902 B1 | * | 5/2002 | Glavich et al. | ........................... 463/20 |

(Continued)

FOREIGN PATENT DOCUMENTS

AU          768153          1/2002

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 11/413,707, filed Apr. 28, 2006, Yoshimi, 2006/0287060, Office Action dated Jan. 28, 2008, Response to Office Action of Jan. 28, 2008 filed Jul. 28, 2008.*

(Continued)

*Primary Examiner* — Milap Shah
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear, LLP

(57) **ABSTRACT**

A gaming machine arranged to display a matrix of symbol containing elements; each column of said matrix comprising a portion of a simulated rotatable reel of said symbol containing elements; and wherein each of said symbol containing elements of at least one consecutive run of said symbol containing elements of at least one said reel is caused to display an identical symbol.

**23 Claims, 7 Drawing Sheets**



## US 8,096,869 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,439,993 | B1 * | 8/2002 | O'Halloran | 463/16 |
| 6,464,581 | B1 * | 10/2002 | Yoseloff et al. | 463/20 |
| 6,517,432 | B1 | 2/2003 | Jaffe | |
| 6,517,433 | B2 | 2/2003 | Loose et al. | |
| 6,544,120 | B2 | 4/2003 | Ainsworth | |
| 6,604,999 | B2 * | 8/2003 | Ainsworth | 463/20 |
| 6,644,664 | B2 * | 11/2003 | Muir et al. | 273/146 |
| 6,663,487 | B1 | 12/2003 | Ladner | |
| 6,726,204 | B2 | 4/2004 | Inoue | |
| 6,805,349 | B2 | 10/2004 | Baerlocher et al. | |
| 6,869,357 | B2 | 3/2005 | Adams et al. | |
| 6,880,826 | B2 | 4/2005 | Inoue | |
| 6,893,018 | B2 | 5/2005 | Inoue | |
| 6,896,615 | B2 * | 5/2005 | Berman | |
| 6,905,408 | B2 | 6/2005 | Inoue | |
| 6,908,381 | B2 * | 6/2005 | Ellis | 463/13 |
| 6,910,962 | B2 | 6/2005 | Marks et al. | |
| 6,932,700 | B2 * | 8/2005 | Bennett et al. | 463/20 |
| 6,960,134 | B2 * | 11/2005 | Hartl et al. | |
| 7,056,213 | B2 | 6/2006 | Ching et al. | |
| 7,179,166 | B1 * | 2/2007 | Abbott | 463/9 |
| 7,214,132 | B2 | 5/2007 | Inoue | |
| 7,237,775 | B2 | 7/2007 | Thomas et al. | |
| 7,252,589 | B1 * | 8/2007 | Marks et al. | 463/16 |
| 7,311,602 | B2 | 12/2007 | Inoue | |
| 7,316,395 | B1 | 1/2008 | Kromydas | |
| 7,479,061 | B2 | 1/2009 | Okada | |
| 7,690,984 | B2 | 4/2010 | Tran et al. | |
| 2002/0039920 | A1 * | 4/2002 | Bryant | 463/20 |
| 2002/0123378 | A1 | 9/2002 | Bucknall et al. | |
| 2003/0013517 | A1 | 1/2003 | Bennett et al. | |
| 2003/0027611 | A1 | 2/2003 | Recard | |
| 2003/0087687 | A1 | 5/2003 | Locke et al. | |
| 2004/0012145 | A1 | 1/2004 | Inoue | |
| 2004/0014516 | A1 | 1/2004 | Inoue | |
| 2004/0014517 | A1 | 1/2004 | Inoue | |
| 2004/0017041 | A1 | 1/2004 | Inoue | |
| 2004/0026854 | A1 | 2/2004 | Inoue | |
| 2004/0036218 | A1 | 2/2004 | Inoue | |
| 2004/0038726 | A1 | 2/2004 | Inoue | |
| 2004/0048646 | A1 | 3/2004 | Visocnik | |
| 2004/0053679 | A1 | 3/2004 | Getz et al. | |
| 2004/0058727 | A1 * | 3/2004 | Marks et al. | 463/20 |
| 2004/0063488 | A1 | 4/2004 | Berman | |
| 2004/0072610 | A1 * | 4/2004 | White et al. | 463/20 |

| | | | | |
|---|---|---|---|---|
| 2004/0116175 | A1 * | 6/2004 | Aida | 463/16 |
| 2004/0198486 | A1 | 10/2004 | Walker et al. | |
| 2004/0219969 | A1 | 11/2004 | Casey et al. | |
| 2004/0266520 | A1 * | 12/2004 | Aida | 463/20 |
| 2005/0043083 | A1 * | 2/2005 | Inoue | |
| 2005/0043084 | A1 | 2/2005 | Inoue | |
| 2005/0159208 | A1 | 7/2005 | Pacey | |
| 2005/0277460 | A1 | 12/2005 | Inoue | |
| 2006/0046830 | A1 | 3/2006 | Webb | |
| 2006/0052155 | A1 | 3/2006 | Inoue | |
| 2006/0084492 | A1 | 4/2006 | Baerlocher et al. | |
| 2006/0084498 | A1 | 4/2006 | Baerlocher et al. | |
| 2006/0166731 | A1 | 7/2006 | Yoshimi et al. | |
| 2006/0183533 | A1 | 8/2006 | Tran et al. | |
| 2006/0183534 | A1 | 8/2006 | Yoshimi | |
| 2006/0247002 | A1 | 11/2006 | Yoshimi et al. | |
| 2006/0287060 | A1 | 12/2006 | Yoshimi | |
| 2007/0015565 | A1 | 1/2007 | Chan | |
| 2007/0270203 | A1 * | 11/2007 | Aida | 463/16 |
| 2008/0045300 | A1 | 2/2008 | Quayle et al. | |
| 2008/0045323 | A1 | 2/2008 | Berman | |
| 2009/0082087 | A1 * | 3/2009 | Pacey et al. | 463/20 |
| 2009/0227332 | A1 * | 9/2009 | Yoshizawa | 463/20 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 2002301067 A1 | 6/2003 |
| AU | 2004203045 A1 | 7/2004 |
| JP | 6-246043 | 9/1994 |
| JP | 2002-325881 | 11/2002 |
| JP | 2003-236055 | 8/2003 |

### OTHER PUBLICATIONS

U.S. Appl. No. 11/281,258, filed Nov. 17, 2005, Tran, 2006/0183533, Office Action of Dec. 13, 2007, Response to Office Action of Dec. 13, 2007 filed Mar. 13, 2008, Office Action dated Jun. 24, 2008.*
U.S. Appl. No. 10/583,210, filed Mar. 26, 2007, Quayle, 2008/0045300, Office Action dated Aug. 7, 2008.*
Office Action of Dec. 13, 2007 for U.S. Appl. No. 11/281,258.
Response to Office Action of Dec. 13, 2007 for U.S. Appl. No. 11/281,258 dated Mar. 13, 2008.
International Search Report on Patentability for PCT Application No. PCT/AU2005/001767.
Office Action of Jan. 28, 2008 for U.S. Appl. No. 11/413,707.

* cited by examiner



*Fig. 1*

*Fig 2*



Fig. 3



Fig. 4A



Fig 4B

Fig. 4C



Fig. 5



Fig. 6



Fig. 7

Case: 22-1370   Document: 30   Page: 95   Filed: 07/18/2022



100

112

Fig. 8



**Fig. 9**



Fig. 10

US 8,096,869 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# GAMING MACHINE WITH RUNS OF CONSECUTIVE IDENTICAL SYMBOLS

### RELATED APPLICATIONS

This application claims priority to Australian Provisional Patent Application No. 2005900681, filed Feb. 14, 2005, which is hereby incorporated in its entirety by reference herein.

### BACKGROUND

The present invention relates to gaming machines for the playing of games of chance and, more particularly, to special features of games or feature games which may be offered on such machines.

Gaming, or poker machines, have become a major source of amusement and diversion in such places as clubs, hotels and casinos in many parts of the world.

Traditionally such machines were mechanical devices where a number of reels marked with a plurality of numbers or symbols could be made to spin randomly by the application of some mechanical input. If the adjacent patterns of numbers or symbols displayed on the reels, when these returned to a rest state, corresponded to predetermined patterns, the machine would provide a prize or payout. Generally such gaming machines have come to be regulated by government authorities as to their number and in the manner in which the machines must return a percentage of the monetary turnover to the players.

The introduction of electronics, computers and electronic graphical displays, has allowed a continual increase in the complexity and variations of gaming machines, games and displays while maintaining the basic concept of the traditional machine. Nevertheless, in some jurisdictions at least, government regulations effectively restrict the degree of variation which may be incorporated in games played on coin-freed machines.

Machines and games therefore that offer novel and stimulating variations on the basic game theme and environment, yet comply with these restrictions are eagerly sought by the gaming industry and there is consequently intense competition between machine manufacturers to innovate.

Games based on simulated rotatable reels typically display a matrix of elements each of which displays a symbol. Predetermined patterns of symbols, if displayed after the reels are spun and come to rest, may then award a prize to the player of the game. Typically also, the symbols are arranged in the elements of a reel so that adjoining elements do not display the same symbol.

An exception to this is found for example in Australian Patent Application number 2004203045 (Aristocrat Technologies Australia Pty Ltd), in which arrangements are envisaged where two special symbols may occur adjacent one to the other.

A similar exception is found in Australian Patent Application number 2002301067 (Stargames Corporation Limited), in which a specific symbol and the number of its occurrences in the display at the conclusion of a game sequence, is determinant of a win. As indicated in FIG. 2 of the specification, two such symbols may appear in adjoining elements of a reel.

Both these examples of the prior art allow for only a single predetermined or special symbol to take up such adjacent positions on a reel.

It is an object of the present invention to address or at least ameliorate some of the above disadvantages.

### BRIEF DESCRIPTION OF INVENTION

Accordingly, in a first broad form of the invention, there is provided a gaming machine arranged to display a matrix of symbol containing elements; each column of said matrix comprising a portion of a simulated rotatable reel of said symbol containing elements; and wherein each of said symbol containing elements of at least one consecutive run of said symbol containing elements of at least one said reel is caused to display an identical symbol.

Preferably, said identical symbol is selected by a game controller from a subset of available symbols.

Preferably, each symbol of said subset of symbols is assigned a probability of selection.

Preferably, said matrix of elements is comprised of five columns and three rows of elements.

Preferably, said at least one said reel is a first left-most reel.

Preferably, each element of said first left-most reel other than elements of said at least one consecutive run of elements is populated by a random selection of said available symbols.

Preferably, said game controller selects one potential win element from each said reel.

Preferably, a prize is awarded to a player of a game on said gaming machine if a predetermined arrangement of said potential win elements is displayed on a pre-defined payline of said matrix of elements when a game sequence is concluded.

Preferably, elements of each of reels two, three, four and five are populated with a default random selection of said available symbols.

Preferably, each symbol of at least one pre-defined consecutive run of said elements of each of said reels two, three, four and five is adapted for potential modification from said default random selection of available symbols to a said identical symbol.

Preferably, said identical symbol is that symbol populating said consecutive run of elements of a leftwardly adjoining reel.

Preferably, said modification from said default random selection occurs within any one of said reels two, three, four or five, if a said win element of a preceding reel coincides with a said element of a consecutive run of elements of said preceding reel.

Preferably, each said reel, which includes said at least one consecutive run of identical symbols, is pre-spun at a relatively slow rate when a game sequence is initiated.

Preferably, all symbols of all elements of at least one said reel are identical.

Preferably, said gaming machine is a single display stand-alone gaming machine.

Preferably, said gaming machine is a stand-alone gaming machine provided with an upper secondary display.

Preferably, said gaming machine is one of a plurality of gaming machine linked to a progressive jackpot controller.

Preferably, said elements are N-sided elements; where N is a variable and values of N include N=1.

Preferably, said values of N include 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20.

Preferably, said N-sided elements are regular hexagons.

In a further broad form of the invention there is provided a method for increasing probability of a winning outcome on a gaming machine; wherein said winning outcome is determined by pre-defined arrangements of symbols displayed in a

US 8,096,869 B2

3

matrix of elements comprising portions of simulated rotatable reels; said method including the steps of:

(a) arranging at least one of said simulated rotatable reels with at least one consecutive run of elements displaying an identical symbol; said identical symbol selected from a subset of available symbols,

(b) a game controller randomly selecting one element from each one of said simulated rotatable reels as a potential win element.

Preferably, said matrix of elements comprises three rows and five columns of said elements; said columns comprising portions of said rotatable reels.

Preferably, said identical symbol is selected from a look-up table of said subset of available symbols.

Preferably, said at least one of said simulated rotatable reels is a first left-most reel.

Preferably, all said elements of said reels, except said at least one consecutive run of elements displaying said identical symbol on said first left-most reel, display randomly selected symbols from said available symbols.

Preferably, reels other than said first left-most reel are each provided with at least one potential consecutive run of elements adapted for modification from said randomly selected symbols to said identical symbol.

Preferably, said modification from said randomly selected symbols within said potential consecutive run of said reels other than said first left-most reel, occurs if said potential win element of a leftwardly preceding reel falls within a said consecutive run of elements of said leftwardly preceding reel.

In yet a further broad form of the invention there is provided a method of implementing a game on a gaming machine; said method including the steps of:

(c) providing said gaming machine with a control module; said module including a microprocessor, a working memory and a data storage device connection means,

(d) writing program code to said data storage device,

(e) connecting said data storage device to said control module.

In still a further broad form of the invention there is provided media for storing enabling digital code for playing games; said media comprising solid state data retaining devices including, read only memory (ROM) and erasable programmable read only memory (EPROM), compact flash cards and PCMCIA cards; said media further including disc-based storage devices.

BRIEF DESCRIPTION OF DRAWINGS

Embodiments of the present invention will now be described with reference to the accompanying drawings wherein:

FIG. **1** is a partial view of a gaming machine with a display showing a matrix of elements and symbols comprising portions of simulated rotatable reels,

FIG. **2** is a schematic representation of the elements and symbols of portions of the first or left-most rotatable reel of FIG. **1**,

FIG. **3** is a schematic representation of an "inner reel" or look-up table,

FIGS. **4**A to **4**C are schematic representations of portions of the reel of FIG. **2** and of the adjoining second reel for a particular game situation,

FIGS. **5** and **6** show examples of the display of FIG. **1** during play of a game using hexagonal elements,

FIG. **7** is a schematic representation of a control module, input keyboard and display for implementing the game embodiments of FIGS. **3** to **9**,

4

FIG. **8** is a perspective view of a stand-alone gaming machine with a single display unit,

FIG. **9** is a front view of a stand-alone gaming machine with a main display and a secondary display unit,

FIG. **10** is a perspective view of a number of the gaming machines of FIG. **8** or **9** when linked to a progressive jackpot system.

DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

First Preferred Embodiment

With reference to FIGS. **1** and **2**, a gaming machine **10** is provided with a display **12**, showing portions of a number of adjoining simulated rotatable reels **26** to **30**. Each reel is divided into a given number of elements, for example 256 elements. In this example, when rotatable reels **26** to **30** are at rest, the display shows a matrix of elements **14** in five columns, **16** to **20** and three rows, **22** to **24**, so that each column comprises a three-element portion of the respective simulated rotatable reel. Each element **14** of simulated rotatable reels **26** to **30** is arranged to display a symbol **32**. With some exceptions, as explained below, the sequence of symbols within the elements of a reel remains fixed for all games played.

A game controller (not shown) pre-selects at random, at the initiation of a game sequence, a potential win element for each reel from the set of elements. That is, the game controller predetermines which element, and therefore which symbol, will be displayed in a pay line position at the end of a game sequence, and may therefore contribute to a winning outcome.

In this first preferred embodiment of the invention, at least one reel, the first left-most reel, is arranged to have at least one run of an identical symbol in each of a number of consecutive elements. The arrangement is shown schematically in FIG. **2** where portions of the left-most reel **26** are shown in strip form and, for example, a run of kings (crown symbol) is arranged for display in runs of five consecutive elements **30** at three locations **31** to **33** respectively. The three runs of consecutive elements in this example are elements **20** to **24**, **100** to **104** and **200** to **204**, within the 256-element length of the strip. In this preferred embodiment, the number of elements in a run and the location of the consecutive run or runs within the strip are predetermined and remain constant for each game played on the machine. The identical symbol which populates these consecutive run or runs of elements may be considered as one of a set of "inner reel" symbols.

The game controller (not shown) determines the identical symbol to be displayed in each consecutive element of the run or runs of consecutive elements in which the symbol is to be shown. The selection of the identical symbol is through a notional rotation of an "inner reel" **34** shown as a strip of elements and symbols in FIG. **3**. This "inner reel" is in effect a look-up table and is not displayed, but its simulated rotation and "coming to rest" determines which symbol will populate the run or runs of consecutive elements of the left-most reel.

The symbols of the "inner reel" or look-up table from which the selection is made, are a sub-set of the set of symbols displayed in the remaining non-"inner reel" elements of the left-most reel. Thus, where the symbols are those of a suit of cards, the "inner reel" symbols may be those of the Ace, King, Queen and Jack, sometimes called the trump or court cards. The look-up table could also include a "wild" or "scatter" symbol. As previously noted, the arrangement or ordering of the symbols in the elements of the reel, other than the consecutive run or runs of elements, remain constant for every

US 8,096,869 B2

5

game, only the selection of the identical symbol from the look-up table is performed anew for each new play of a game.

The symbols 36 of the look-up table 34 need not all have the same probability of selection but may be assigned a hierarchy of probability. Thus for example, those symbols for which a winning combination confers on the player of a game a relatively higher value prize, such as the ace and the king, may have an inversely proportional probability of being selected as an "inner reel" symbol.

The reels are now spun as normal. The player will notice the run or runs of identical symbols passing through the display 12 for each revolution of the left-most reel 26, thereby providing a heightening of interest, since the odds of a winning arrangement of symbols appearing on a pre-defined pay line in the matrix at the conclusion of the game sequence will be increased.

Second Preferred Embodiment

In a second preferred embodiment of the invention, the second reel, that is the second reel from the left in this example, may also be modified to include at least one run of consecutive elements displaying the same "inner reel" symbol as that used to populate the elements of the consecutive run or runs of the left-most reel. As for the first, left-most reel, the number and location of the consecutive elements of the potential run or runs forming the simulated reel, is predetermined and remains constant.

Prior to modification, all the elements of the second reel (and likewise those of the third fourth and fifth reel) are randomly populated with symbols from the set of available symbols. Unless modification is triggered in the manner explained below, the ordering of these symbols within the elements of the reels remains constant for every game; only those symbols of the potential run or runs being displaced should a modifying event occur.

The populating of the potential "inner reel" elements of the second reel, and of any subsequent reels, is dependent on the potential win element for the first, or preceding reel, which was randomly selected by the game controller, lying within a run of consecutive elements of that reel. For example if, as shown in FIG. 4A, in the left-most reel 26, which has consecutive runs comprising the elements as numbered in the First Preferred Embodiment above, the potential win element selected is element number 103, the second reel 27 will be modified. Second reel 27 in this example has two potential runs 40 and 41 of consecutive "inner reel" elements, element numbers 83 to 87 and 191 to 195 respectively, which in a default state are randomly populated from the set of available symbols as shown in FIG. 4B. However, because the selected potential win element 103 of reel 26 falls within run 32, the potential "inner reel" elements 83 to 87 and 191 to 195 of reel 27 are replaced with the same identical symbol as used for the consecutive run or runs of the left-most reel 26 as shown in FIG. 4C.

A player will now discern a bias of symbols, (in our example crown symbols), in both the first, left-most, and second reels as these are spun during the play of a game. The effect is clearly an increase in the probability of a winning combination of symbols appearing along a pre-defined pay line within the matrix and consequently a raised level of interest in the outcome of the game for the player.

The same process of populating potential "inner reel" elements with the "inner reel" symbol of the preceding reel, may be sequentially applied to the third, fourth and fifth reels. As described for the second reel, the modification of a succeed-

6

ing reel depends on the selected potential win element of the preceding reel falling within a run of "inner reel" elements of that reel.

Third Preferred Embodiment

In at least one preferred form of this embodiment, a player is made aware of the populating of one or more consecutive runs of the left-most reel with the identical symbol. This may be done prior to the main game sequence, for example, by a slower pre-spin of only the left-most reel. If any further reels are so populated, each may be pre-spun sequentially.

The displayed game rules and experience will alert a player to the fact that the potential winning element for a given reel is positioned somewhere within the run, or one of the runs of consecutive elements populated with the identical symbol if the second and any subsequent reels are also pre-spun to display a run or runs of that symbol. The player will appreciate that the probability of a winning combination occurring increases with each additional reel which is pre-spun to display its run or runs of elements with the same symbol.

Fourth Preferred Embodiment

The above described embodiments may be applied to a main game of a gaming machine or to a feature game offered as a result of some triggering event in a main game.

In a preferred embodiment of the invention as adapted for a feature game, the number of elements comprising a run of identical "inner reel" symbols and the number of such runs in any given reel is not constant but may be determined in a number of ways. Thus, in at least one preferred embodiment, the number of elements comprising a run may be a function of the amount of a bet placed by the player on the main game which triggered the feature game, or as a function of accumulated throughput of bets over a given time period. In one special case, all the elements of the first left-most reel may be populated by the same "inner reel" element.

Likewise, the number of runs in a given reel may be a function also of the betting pattern preceding the conferring of the feature game or alternatively, may be a function of the particular triggering event of the main game which led to the feature game.

Fifth Preferred Embodiment

The elements comprising the matrix of elements of any of the above described embodiments may be of conventional rectangular configuration, but in at least one preferred embodiment the delineation of an element, that is, the boundary defining the field containing a symbol, may be any N-sided figure, where N may take the value 1 (thus a circular field) or any value from 3 to 20. In at least one preferred form of N-sided element, as shown in FIGS. 5 and 6, the elements 50 are hexagon shape for the value of N=6.

Game Implementation

Any of the above described embodiments may be implemented on any gaming machine or group of gaming machine provided with a control module. As shown in FIG. 7, a control module 60 is provided with a microprocessor 62 and working random access memory (RAM) 64. The program code driving any of the described embodiments may be introduced into the control module 60 by connection of a data storage device 66. The device may take any of a number of forms, such as read only memory (ROM), erasable read only memory (EPROM), Compact Flash Card, PCMCIA card and the like.

US 8,096,869 B2

7

Alternatively, control module **60** may incorporate a hard disc drive to which the code may be written via a suitable input device.

Control module **60** acts to implement appropriate elements of the program code according to inputs from a user keyboard **68** and outputs video imagery to at least a main display module **70**.

1. Stand-Alone Gaming Machines

As shown in FIG. **8**, any of the above described embodiments for use on electronic display gaming machines may be incorporated into a stand-alone gaming machine **100** provided with a single display unit **112**. In this implementation of games according to the invention, both main games and feature games (if offered) are displayed on the single display unit.

2. Stand-Alone Gaming Machines with Secondary Display Unit

In a further preferred embodiment of the invention as shown in FIG. **9**, a stand-alone gaming machine **120** is provided with a secondary display unit **125** as well as a main display unit **122**. In this embodiment the main game played on the primary display unit may take the form of either the first or second preferred embodiments described above. It is then a triggering event in the main game which offers a player a feature game as described in the third preferred embodiment above.

3. Gaming Machines Linked to Progressive Jackpot System

In yet a further preferred embodiment of the invention as shown in FIG. **10**, a plurality of gaming machines **300** are arranged side by side in a line or arc so as to allow each of the players (not shown) of the machines to view a common jackpot prize display unit **313**. Each individual machine **310** is provided with at least a main game display unit **315** for the playing of a main game according to the above described first and second embodiments

Each of machines **310** of the embodiment illustrated in FIG. **7** is electronically linked to a jackpot control module **311** which monitors the volume of play on each of the linked machines and displays an incrementing jackpot value **312** determined according to the combined volume of play on the linked machines.

A win of the jackpot prize may be triggered by specific outcomes of either a main game or of a feature game. If the jackpot trigger is dependent on an outcome of the feature game, players on adjoining machines may be made aware by means of the common display that a potential triggering of the jackpot is to commence on the machine offered the feature game, thus adding interest for all the players.

It will be appreciated that the linked machines may form part of Local Area Networks (LAN) or Wide Area Networks (WAN).

What is claimed is:

**1.** A gaming machine comprising: a processor configured to execute a game displaying a matrix of symbol containing elements having a plurality of rows and a plurality columns; at least one column of said matrix comprising a portion of a simulated rotatable reel of a plurality of said symbol containing elements; said simulated rotatable reel comprising sections of symbol containing elements displaying a plurality of symbols that are fixed for each game played on said gaming machine; said simulated rotatable reel including at least one section in which a consecutive run of three or more of said symbol containing elements is populated by an identical symbol so that, as the simulated rotatable reel rotates, a consecutive string of same identical symbol is sequentially displayed within said consecutive string of symbol containing elements; and said identical symbol is randomly selected anew for each play of said game, wherein said identical sym-

8

bol is selected by virtually spinning a notional, non-visible, inner reel comprising a subset of said plurality of symbols.

**2.** The gaming machine of claim **1** wherein said identical symbol is selected by the processor from the subset of said plurality of symbols.

**3.** The gaming machine of claim **2** wherein each symbol of said subset of symbols is assigned a probability of selection.

**4.** The gaming machine of claim **2** wherein said game controller selects one potential wining symbol containing element from said simulated rotatable reel.

**5.** The gaming machine of claim **4** wherein a prize is awarded to a player of said game on said gaming machine if a predetermined arrangement of said potential winning symbol containing elements is displayed on a pre-defined pay line of said matrix of symbol containing elements when a game sequence is concluded.

**6.** The gaming machine of claim **1** wherein said matrix of symbol containing elements is comprised of five columns and three rows of symbol containing elements, said five columns being portions respectively of simulated rotatable reels one, two, three, four, and five.

**7.** The gaming machine of claim **6** wherein symbol containing elements of each of simulated rotatable reels two, three, four, and five are populated with a default random selection of said plurality of symbols.

**8.** The gaming machine of claim **7** wherein each symbol containing element of at least one section of a consecutive run of three or more of said symbol containing elements of each of said simulated rotatable reels two, three, four, and five is adapted for potential modification from said default random selection of said plurality of symbols to said identical symbol.

**9.** The gaming machine of claim **8** wherein said identical symbol is that symbol populating said consecutive run of symbol containing elements of a leftwardly adjoining reel.

**10.** The gaming machine of claim **8**, wherein said potential modification from said default random selection occurs within any of said simulated rotatable reels two, three, four, or five, if a win element of a preceding simulated rotatable reel coincides with a said identical symbol of a consecutive run of symbol containing elements of said preceding reel.

**11.** The gaming machine of claim **1** wherein said simulated rotatable reel is a first left-most reel.

**12.** The gaming machine of claim **1** wherein said simulated rotatable reel, which includes said consecutive run three or more symbol containing elements populated with said identical symbol, is pre-spun at a relatively slow rate when a game sequence is initiated.

**13.** The gaming machine of claim **1** wherein said gaming machine is a single display stand-alone gaming machine.

**14.** The gaming machine of claim **1** wherein said gaming machine is a stand-alone gaming machine provided with an upper secondary display.

**15.** The gaming machine of claim **1** wherein said gaming machine is one of a plurality of gaming machines linked to a progressive jackpot controller.

**16.** The gaming machine of claim **1** wherein said symbol containing elements are N-sided elements, where N is a variable and values of N include N=3.

**17.** The gaming machine of claim **16** wherein said values of N include 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20.

**18.** The gaming machine of claim **16** wherein said N-sided elements are regular hexagons.

**19.** A method for increasing probability of a winning outcome on a gaming machine; wherein said winning outcome is determined by a game including pre-defined arrangements of a plurality of symbols displayed in a matrix of symbol con-

US 8,096,869 B2

9                                                              10

taining elements comprising portions of simulated rotatable reels; said method comprising a processor of the gaming machine configured to:

(a) arrange at least one of said simulated rotatable reels with at least one consecutive run of three or more symbol containing elements displaying an identical symbol; said identical symbol selected from a subset of said plurality of symbols so that, as the simulated rotatable reel rotates, a consecutive string of the same identical symbol is sequentially displayed in said consecutive run of three or more symbol containing elements within a column defined by the simulated rotatable reel; and

(b) randomly select one of the plurality of symbols from each one of said simulated rotatable reels as a potential win element;

wherein, said at least one consecutive run of three or more symbol containing elements comprises a section of said simulated rotatable reel, such that all other remaining symbol containing elements of said simulated rotatable reel are populated with fixed symbols from the plurality of symbols for each play of the game; and

wherein said subset of said plurality of symbols is arranged on a notional non-visible inner reel, such that said iden-

tical symbol is randomly selected anew for each play of the game by virtual rotation of said notional non-visible inner reel.

**20**. The method of claim **19** wherein said matrix of symbol containing elements comprises three rows and five columns, said columns comprising portions of said simulated rotatable reels.

**21**. The method of claim **19** wherein said at least one of said simulated rotatable reels is a first left-most reel.

**22**. The method of claim **21** wherein said simulated rotatable reels other than said first left-most reel are each provided with at least one potential consecutive run of three or more symbol containing elements adapted for modification from said fixed symbols to said identical symbol.

**23**. The method of claim **22** wherein said modification from said fixed symbols within said potential consecutive run of three or more symbol containing elements of said simulated rotatable reels other than said first left-most reel, occurs if said potential win element of a leftwardly preceding simulated rotatable reel falls within a said consecutive run of three or more symbol containing elements of said leftwardly preceding simulated rotatable reel.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,096,869 B2                                          Page 1 of 1
APPLICATION NO.     : 11/299009
DATED               : January 17, 2012
INVENTOR(S)         : Osamu Yoshimi

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In Column 7, Line 14, please change "diplayed" to --displayed--.

In Column 7, Line 18, please change "gaining" to --gaming--.

In Column 7, Line 34, please change "embodiments" to --embodiments.--.

In Column 7, Line 34, Claim 1, after "plurality" please insert --of--.

Signed and Sealed this
Twenty-fifth Day of September, 2012

David J. Kappos

David J. Kappos
*Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 8,096,869 B2 | Page 1 of 1 |
| APPLICATION NO. | : 11/299009 | |
| DATED | : January 17, 2012 | |
| INVENTOR(S) | : Osamu Yoshimi | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In Column 7, Line 54, Claim 1, after "plurality" please insert --of--.

Signed and Sealed this
Twenty-ninth Day of January, 2013

David J. Kappos
Director of the United States Patent and Trademark Office



US008366540B2

## (12) United States Patent
### Yoshimi

(10) Patent No.: **US 8,366,540 B2**
(45) Date of Patent: **\*Feb. 5, 2013**

(54) **GAMING MACHINE WITH RUNS OF CONSECUTIVE IDENTICAL SYMBOLS**

(75) Inventor: **Osamu Yoshimi**, Botany (AU)

(73) Assignee: **Konami Gaming, Inc.**, Las Vegas, NV (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/316,025**

(22) Filed: **Dec. 9, 2011**

(65) **Prior Publication Data**

US 2012/0094740 A1     Apr. 19, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 11/299,009, filed on Dec. 9, 2005, now Pat. No. 8,096,869.

(30) **Foreign Application Priority Data**

Feb. 14, 2005    (AU) ................................. 2005900681

(51) **Int. Cl.**
*A63F 9/24*     (2006.01)
*A63F 13/00*    (2006.01)

(52) **U.S. Cl.** ............ 463/20; 463/16; 463/29; 273/138.1

(58) **Field of Classification Search** ............. 463/16–20, 463/25, 29; 273/138.1, 139
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,448,419 A | 5/1984 | Teinaes | |
| 5,152,529 A | 10/1992 | Okada | |
| 5,395,111 A | 3/1995 | Inoue | |
| 5,580,055 A | 12/1996 | Hagiwara | |
| 5,609,524 A | 3/1997 | Inoue | |
| 5,611,535 A | 3/1997 | Tiberio | |
| 5,624,119 A | 4/1997 | Leake | |
| 5,722,891 A | 3/1998 | Inoue | |
| 5,752,881 A | 5/1998 | Inoue | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 768153 | 1/2002 |
| AU | 2002301067 B2 | 6/2003 |

(Continued)

OTHER PUBLICATIONS

International Search Report—date of mailing Apr. 22, 2005.

(Continued)

*Primary Examiner* — Milap Shah

(74) *Attorney, Agent, or Firm* — Howard & Howard Attorneys PLLC

(57)     **ABSTRACT**

A gaming machine for executing a game displaying a matrix of symbol containing elements having a plurality of rows and columns; at least one column of the matrix comprising a portion of a simulated rotatable reel of a plurality of the symbol containing elements; the simulated rotatable reel comprising sections of symbol containing elements displaying a plurality of symbols; the simulated rotatable reel including at least one section in which a consecutive run of two or more of the symbol containing elements is populated by a first identical symbol so that, the first identical symbol being used for a first play of the game, a second identical symbol being randomly selected, the first identical symbol being replaced by the second identical symbol in the consecutive run of two or more of the symbol containing elements, the second identical symbol being used for a second play of the game.

**27 Claims, 7 Drawing Sheets**



## US 8,366,540 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,807,172 | A | 9/1998 | Piechowiak |
| 5,976,016 | A | 11/1999 | Moody et al. |
| 5,984,781 | A | 11/1999 | Sunaga |
| 6,007,066 | A | 12/1999 | Moody |
| 6,056,642 | A | 5/2000 | Bennett |
| 6,159,096 | A | 12/2000 | Yoseloff |
| 6,227,971 | B1 | 5/2001 | Weiss |
| 6,241,607 | B1 | 6/2001 | Payne et al. |
| 6,309,299 | B1 | 10/2001 | Weiss |
| 6,319,124 | B1 | 11/2001 | Baerlocher et al. |
| 6,394,902 | B1 | 5/2002 | Glavich et al. |
| 6,439,993 | B1 | 8/2002 | O'Halloran |
| 6,464,581 | B1 | 10/2002 | Yoseloff et al. |
| 6,517,432 | B1 | 2/2003 | Jaffe |
| 6,517,433 | B2 | 2/2003 | Loose et al. |
| 6,544,120 | B2 | 4/2003 | Ainsworth |
| 6,604,999 | B2 | 8/2003 | Ainsworth |
| 6,644,664 | B2 | 11/2003 | Muir et al. |
| 6,663,487 | B1 | 12/2003 | Ladner |
| 6,726,204 | B2 | 4/2004 | Inoue |
| 6,805,349 | B2 | 10/2004 | Baerlocher et al. |
| 6,869,357 | B2 | 3/2005 | Adams et al. |
| 6,880,826 | B2 | 4/2005 | Inoue |
| 6,893,018 | B2 | 5/2005 | Inoue |
| 6,896,615 | B2 | 5/2005 | Berman |
| 6,905,400 | B2 | 6/2005 | Inoue |
| 6,908,381 | B2 | 6/2005 | Ellis |
| 6,910,962 | B2 | 6/2005 | Marks et al. |
| 6,932,700 | B2 | 8/2005 | Bennett et al. |
| 6,960,134 | B2 | 11/2005 | Hartl et al. |
| 7,056,213 | B2 | 6/2006 | Ching et al. |
| 7,179,166 | B1 | 2/2007 | Abbott |
| 7,214,132 | B2 | 5/2007 | Inoue |
| 7,237,775 | B2 | 7/2007 | Thomas et al. |
| 7,252,589 | B1 | 8/2007 | Marks et al. |
| 7,252,591 | B2* | 8/2007 | Van Asdale ................ 463/22 |
| 7,311,602 | B2 | 12/2007 | Inoue |
| 7,316,395 | B1 | 1/2008 | Kromydas |
| 7,479,061 | B2 | 1/2009 | Okada |
| 7,690,984 | B2 | 4/2010 | Tran et al. |
| 2002/0039920 | A1 | 4/2002 | Bryant |
| 2002/0123378 | A1 | 9/2002 | Bucknall et al. |
| 2003/0013517 | A1 | 1/2003 | Bennett et al. |
| 2003/0027611 | A1 | 2/2003 | Recard |
| 2003/0087687 | A1 | 5/2003 | Locke et al. |
| 2003/0134673 | A1* | 7/2003 | Moody ...................... 463/20 |
| 2004/0012145 | A1 | 1/2004 | Inoue |
| 2004/0014516 | A1 | 1/2004 | Inoue |
| 2004/0014517 | A1 | 1/2004 | Inoue |
| 2004/0017041 | A1 | 1/2004 | Inoue |
| 2004/0026854 | A1 | 2/2004 | Inoue |
| 2004/0036218 | A1 | 2/2004 | Inoue |
| 2004/0038726 | A1 | 2/2004 | Inoue |
| 2004/0048646 | A1 | 3/2004 | Visocnik |
| 2004/0053679 | A1 | 3/2004 | Getz et al. |
| 2004/0058727 | A1 | 3/2004 | Marks et al. |
| 2004/0063488 | A1 | 4/2004 | Berman |
| 2004/0072610 | A1 | 4/2004 | White et al. |
| 2004/0116175 | A1 | 6/2004 | Aida |
| 2004/0198486 | A1 | 10/2004 | Walker et al. |
| 2004/0219969 | A1 | 11/2004 | Casey et al. |
| 2004/0266520 | A1 | 12/2004 | Aida |
| 2005/0043083 | A1 | 2/2005 | Inoue |
| 2005/0043084 | A1 | 2/2005 | Inoue |
| 2005/0159208 | A1 | 7/2005 | Pacey |
| 2005/0277460 | A1 | 12/2005 | Inoue |
| 2006/0046830 | A1 | 3/2006 | Webb |
| 2006/0052155 | A1 | 3/2006 | Inoue |
| 2006/0084492 | A1 | 4/2006 | Baerlocher et al. |
| 2006/0084498 | A1 | 4/2006 | Baerlocher et al. |
| 2006/0166731 | A1 | 7/2006 | Yoshimi et al. |
| 2006/0183533 | A1 | 8/2006 | Tran et al. |
| 2006/0183534 | A1 | 8/2006 | Yoshimi |
| 2006/0247002 | A1 | 11/2006 | Yoshimi et al. |
| 2006/0287060 | A1 | 12/2006 | Yoshimi |
| 2007/0015565 | A1 | 1/2007 | Chan |
| 2007/0270201 | A1 | 11/2007 | Aida |
| 2008/0045300 | A1 | 2/2008 | Quayle et al. |
| 2008/0045323 | A1 | 2/2008 | Berman |
| 2009/0082087 | A1 | 3/2009 | Pacey et al. |
| 2009/0227332 | A1 | 9/2009 | Yoshizawa |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 2004203045 A1 | 7/2004 |
| JP | 6-246043 A | 9/1994 |
| JP | 2002-325881 A | 11/2002 |
| JP | 2003-236055 A | 8/2003 |

### OTHER PUBLICATIONS

Office Action for U.S Appl. No. 11/281,258 (Notification Date Dec. 13, 2007).

Response to Office Action of Dec. 13, 2007 (dated Mar. 13, 2008) for U.S. Appl. No. 11/281,258.

Office Action for U.S Appl. No. 11/413,707 (Notification Date Jan. 28, 2008).

* cited by examiner



Fig. 1

Fig. 2



Fig. 3

Fig. 4A

Fig. 4B

Fig. 4C

APPX0073

Case: 22-1370    Document: 30    Page: 109    Filed: 07/18/2022
Case: 22-1370-RF Document Document Page: 109 of Filed 07/18/2022 of 15



Fig. 5



Fig. 6



Fig. 7



100

112

Fig. 8



Fig. 9



Fig. 10

US 8,366,540 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## GAMING MACHINE WITH RUNS OF CONSECUTIVE IDENTICAL SYMBOLS

### CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 11/299,009 filed on Dec. 5, 2005, now U.S. Pat. No. 8,096,869, issued on Jan. 17, 2012, which claims priority to Australian Patent Application No. 2005900681, filed on Feb. 14, 2005, the disclosures of which are hereby incorporated by reference in their entirety.

### BACKGROUND

The present invention relates to gaming machines for the playing of games of chance and, more particularly, to special features of games or feature games which may be offered on such machines.

Gaming, or poker machines, have become a major source of amusement and diversion in such places as clubs, hotels and casinos in many parts of the world.

Traditionally such machines were mechanical devices where a number of reels marked with a plurality of numbers or symbols could be made to spin randomly by the application of some mechanical input. If the subsequent patterns of numbers or symbols displayed on the reels, when these returned to a rest state, corresponded to predetermined patterns, the machine would provide a prize or payout. Generally such gaming machines have come to be regulated by government authorities as to their number and in the manner in which the machines must return a percentage of the monetary turnover to the players.

The introduction of electronics, computers and electronic graphical displays, has allowed a continual increase in the complexity and variations of gaming machines, games and displays while maintaining the basic concept of the traditional machine. Nevertheless, in some jurisdictions at least, government regulations effectively restrict the degree of variation which may be incorporated in games played on coin-freed machines.

Machines and games therefore that offer novel and stimulating variations on the basic game theme and environment, yet comply with these restrictions are eagerly sought by the gaming industry and there is consequently intense competition between machine manufacturers to innovate.

Games based on simulated rotatable reels typically display a matrix of elements each of which displays a symbol. Predetermined patterns of symbols, if displayed after the reels are spun and come to rest, may then award a prize to the player of the game. Typically also, the symbols are arranged in the elements of a reel so that adjoining elements do not display the same symbol.

An exception to this is found for example in Australian Patent Application number 2004203045 (Aristocrat Technologies Australia Pty Ltd), in which arrangements are envisaged where two special symbols may occur adjacent one to the other.

A similar exception is found in Australian Patent Application number 2002301067 (Stargames Corporation Limited), in which a specific symbol and the number of its occurrences in the display at the conclusion of a game sequence, is determinant of a win. As indicated in FIG. 2 of the specification, two such symbols may appear in adjoining elements of a reel.

Both these examples of the prior art allow for only a single predetermined or special symbol to take up such adjacent positions on a reel.

It is an object of the present invention to address or at least ameliorate some of the above disadvantages.

### BRIEF DESCRIPTION OF INVENTION

Accordingly, in a first broad form of the invention, there is provided a gaming machine arranged to display a matrix of symbol containing elements; each column of said matrix comprising a portion of a simulated rotatable reel of said symbol containing elements; and wherein each of said symbol containing elements of at least one consecutive run of said symbol containing elements of at least one said reel is caused to display an identical symbol.

Preferably, said identical symbol is selected by a game controller from a subset of available symbols.

Preferably, each symbol of said subset of symbols is assigned a probability of selection.

Preferably, said matrix of elements is comprised of five columns and three rows of elements.

Preferably, said at least one said reel is a first left-most reel.

Preferably, each element of said first left-most reel other than elements of said at least one consecutive run of elements is populated by a random selection of said available symbols.

Preferably, said game controller selects one potential win element from each said reel.

Preferably, a prize is awarded to a player of a game on said gaming machine if a predetermined arrangement of said potential win elements is displayed on a pre-defined payline of said matrix of elements when a game sequence is concluded.

Preferably, elements of each of reels two, three, four and five are populated with a default random selection of said available symbols.

Preferably, each symbol of at least one pre-defined consecutive run of said elements of each of said reels two, three, four and five is adapted for potential modification from said default random selection of available symbols to a said identical symbol.

Preferably, said identical symbol is that symbol populating said consecutive run of elements of a leftwardly adjoining reel.

Preferably, said modification from said default random selection occurs within any one of said reels two, three, four or five, if a said win element of a preceding reel coincides with a said element of a consecutive run of elements of said preceding reel.

Preferably, each said reel, which includes said at least one consecutive run of identical symbols, is pre-spun at a relatively slow rate when a game sequence is initiated.

Preferably, all symbols of all elements of at least one said reel are identical.

Preferably, said gaming machine is a single display stand-alone gaming machine.

Preferably, said gaming machine is a stand-alone gaming machine provided with an upper secondary display.

Preferably, said gaming machine is one of a plurality of gaming machine linked to a progressive jackpot controller.

Preferably, said elements are N-sided elements; where N is a variable and values of N include N=1.

Preferably, said values of N include 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20.

Preferably, said N-sided elements are regular hexagons.

In a further broad form of the invention there is provided a method for increasing probability of a winning outcome on a gaming machine; wherein said winning outcome is determined by pre-defined arrangements of symbols displayed in a

US 8,366,540 B2

3

matrix of elements comprising portions of simulated rotatable reels; said method including the steps of:

(a) arranging at least of said simulated rotatable reels with at least one consecutive run of elements displaying an identical symbol; said identical symbol selected from a subset of available symbols.

(b) a game controller randomly selecting one element from each one of said simulated rotatable reels as a potential win element.

Preferably, said matrix of elements comprises three rows and five columns of said elements; said columns comprising portions of said rotatable reels.

Preferably, said identical symbol is selected from a look-up table of said subset of available symbols.

Preferably, said at least one of said simulated rotatable reels is a first left-most reel.

Preferably, all said elements of said reels, except said at least one consecutive run of elements displaying said identical symbol on said first left-most reel, display randomly selected symbols from said available symbols.

Preferably, reels other than said first left-most reel are each provided with at least one potential consecutive run of elements adapted for modification from said randomly selected symbols to a said identical symbol.

Preferably, said modification from said randomly selected symbols within said potential consecutive run of said reels other than said first left-most reel, occurs if said potential win element of a leftwardly preceding reel falls within a said consecutive run of elements of said leftwardly preceding reel.

In yet a further broad form of the invention there is provided a method of implementing a game on a gaming machine; said method including the steps of:

(a) providing said gaming machine with a control module; said module including a microprocessor, a working memory and a data storage device connection means,

(b) writing program code to said data storage device,

(c) connecting said data storage device to said control module.

In still a further broad form of the invention there is provided media for storing enabling digital code for playing games; said media comprising solid state data retaining devices including, read only memory (ROM) and erasable programmable read only memory (EPROM), compact flash cards and PCMCIA cards; said media further including disc-based storage devices.

BRIEF DESCRIPTION OF DRAWINGS

Embodiments of the present invention will now be described with reference to the accompanying drawings wherein:

FIG. 1 is a partial view of a gaming machine with a display showing a matrix of elements and symbols comprising portions of simulated rotatable reels,

FIG. 2 is a schematic representation of the elements and symbols of portions of the first or left-most rotatable reel of FIG. 1,

FIG. 3 is a schematic representation of an "inner reel" or look-up table,

FIGS. 4A to 4C are schematic representations of portions of the reel of FIG. 2 and of the adjoining second reel for a particular game situation,

FIGS. 5 and 6 show examples of the display of FIG. 1 during play of a game using hexagonal elements,

FIG. 7 is a schematic representation of a control module, input keyboard and display for implementing the game embodiments of FIGS. 3 to 9,

4

FIG. 8 is a perspective view of a stand-alone gaming machine with a single display unit,

FIG. 9 is a front view of a stand-alone gaming machine with a main display and a secondary display unit,

FIG. 10 is a perspective view of a number of the gaming machines of FIG. 8 or 9 when linked to a progressive jackpot system.

DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

First Preferred Embodiment

With reference to FIGS. 1 and 2, a gaming machine 10 is provided with a display 12, showing portions of a number of adjoining simulated rotatable reels 26 to 30. Each reel is divided into a given number of elements, for example 256 elements. In this example, when rotatable reels 26 to 30 are at rest, the display shows a matrix of elements 14 in five columns, 16 to 20 and three rows, 22 to 24, so that each column comprises a three-element portion of the respective simulated rotatable reel. Each element 14 of simulated rotatable reels 26 to 30 is arranged to display a symbol 32. With some exceptions, as explained below, the sequence of symbols within the elements of a reel remains fixed for all games played.

A game controller (not shown) pre-selects at random, at the initiation of a game sequence, a potential win element for each reel from the set of elements. That is, the game controller predetermines which element, and therefore which symbol, will be displayed in a pay line position at the end of a game sequence, and may therefore contribute to a winning outcome.

In this first preferred embodiment of the invention, at least one reel, the first left-most reel, is arranged to have at least one run of an identical symbol in each of a number of consecutive elements. The arrangement is shown schematically in FIG. 2 where portions of the left-most reel 26 are shown in strip form and, for example, a run of kings (crown symbol) is arranged for display in runs of five consecutive elements 30 at three locations 31 to 33 respectively. The three runs of consecutive elements in this example are elements 20 to 24, 100 to 104 and 200 to 204, within the 256-element length of the strip. In this preferred embodiment, the number of elements in a run and the location of the consecutive run or runs within the strip are predetermined and remain constant for each game played on the machine. The identical symbol which populates these consecutive run or runs of elements may be considered as one of a set of "inner reel" symbols.

The game controller (not shown) determines the identical symbol to be displayed in each consecutive element of the run or runs of consecutive elements in which the symbol is to be shown. The selection of the identical symbol is through a notional rotation of an "inner reel" 34 shown as a strip of elements and symbols in FIG. 3. This "inner reel" is in effect a look-up table and is not displayed, but its simulated rotation and "coming to rest" determines which symbol will populate the run or runs of consecutive elements of the left-most reel.

The symbols of the "inner reel" or look-up table from which the selection is made, are a sub-set of the set of symbols displayed in the remaining non-"inner reel" elements of the left-most reel. Thus, where the symbols are those of a suit of cards, the "inner reel" symbols may be those of the Ace, King, Queen and Jack, sometimes called the trump or court cards. The look-up table could also include a "wild" or "scatter" symbol. As previously noted, the arrangement or ordering of the symbols in the elements of the reel, other than the consecutive run or runs of elements, remain constant for every

US 8,366,540 B2

| 5 | 6 |

game, only the selection of the identical symbol from the look-up table is performed anew for each new play of a game.

The symbols 36 of the look-up table 34 need not all have the same probability of selection but may be assigned a hierarchy of probability. Thus for example, those symbols for which a winning combination confers on the player of a game a relatively higher value prize, such as the ace and the king, may have an inversely proportional probability of being selected as an "inner reel" symbol.

The reels are now spun as normal. The player will notice the run or runs of identical symbols passing through the display 12 for each revolution of the left-most reel 26, thereby providing a heightening of interest, since the odds of a winning arrangement of symbols appearing on a pre-defined pay line in the matrix at the conclusion of the game sequence will be increased.

### Second Preferred Embodiment

In a second preferred embodiment of the invention, the second reel, that is the second reel from the left in this example, may also be modified to include at least one run of consecutive elements displaying the same "inner reel" symbol as that used to populate the elements of the consecutive run or runs of the left-most reel. As for the first, left-most reel, the number and location of the consecutive elements of the potential run or runs within the strip of elements forming the simulated reel, is predetermined and remains constant.

Prior to modification, all the elements of the second reel (and likewise those of the third fourth and fifth reel) are randomly populated with symbols from the set of available symbols. Unless modification is triggered in the manner explained below, the ordering of these symbols within the elements of the reels remains constant for every game; only those symbols of the potential run or runs being displaced should a modifying event occur.

The populating of the potential "inner reel" elements of the second reel, and of any subsequent reels, is dependent on the potential win element for the first, or preceding reel, which was randomly selected by the game controller, lying within a run of consecutive elements of that reel. For example if, as shown in FIG. 4A, in the left-most reel 26, which has consecutive runs comprising the elements as numbered in the First Preferred Embodiment above, the potential win element selected is element number 103, the second reel 27 will be modified. Second reel 27 in this example has two potential runs 40 and 41 of consecutive "inner reel" elements, element numbers 83 to 87 and 191 to 195 respectively, which in a default state are randomly populated from the set of available symbols as shown in FIG. 4B. However, because the selected potential win element 103 of reel 26 falls within run 32, the potential "inner reel" elements 83 to 87 and 191 to 195 of reel 27 are replaced with the same identical symbol as used for the consecutive run or runs of the left-most reel 26 as shown in FIG. 4C.

A player will now discern a bias of symbols, (in our example crown symbols), in both the first, left-most, and second reels as these are spun during the play of a game. The effect is clearly an increase in the probability of a winning combination of symbols appearing along a pre-defined pay line within the matrix and consequently a raised level of interest in the outcome of the game for the player.

The same process of populating potential "inner reel" elements with the "inner reel" symbol of the preceding reel, may be sequentially applied to the third, fourth and fifth reels. As described for the second reel, the modification of a succeed-

ing reel depends on the selected potential win element of the preceding reel falling within a run of "inner reel" elements of that reel.

### Third Preferred Embodiment

In at least one preferred form of this embodiment, a player is made aware of the populating of one or more consecutive runs of the left-most reel with the identical symbol. This may be done prior to the main game sequence, for example, by a slower pre-spin of only the left-most reel. If any further reels are so populated, each may be pre-spun sequentially.

The displayed game rules and experience will alert a player to the fact that the potential winning element for a given reel is positioned somewhere within the run, or one of the runs of consecutive elements populated with the identical symbol if the second and any subsequent reels are also pre-spun to display a run or runs of that symbol. The player will appreciate that the probability of a winning combination occurring increases with each additional reel which is pre-spun to display its run or runs of elements with the same symbol.

### Fourth Preferred Embodiment

The above described embodiments may be applied to a main game of a gaming machine or to a feature game offered as a result of some triggering event in a main game.

In a preferred embodiment of the invention as adapted for a feature game, the number of elements comprising a run of identical "inner reel" symbols and the number of such runs in any given reel is not constant but may be determined in a number of ways. Thus, in at least one preferred embodiment, the number of elements comprising a run may be a function of the amount of a bet placed by the player on the main game which triggered the feature game, or as a function of accumulated throughput of bets over a given time period. In one special case, all the elements of the first left-most reel may be populated by the same "inner reel" symbol.

Likewise, the number of runs in a given reel may be a function also of the betting pattern preceding the conferring of the feature game or alternatively, may be a function of the particular triggering event of the main game which led to the feature game.

### Fifth Preferred Embodiment

The elements comprising the matrix of elements of any of the above described embodiments may be of conventional rectangular configuration, but in at least one preferred embodiment the delineation of an element, that is, the boundary defining the field containing a symbol, may be any N-sided figure, where N may take the value 1 (thus a circular field) or any value from 3 to 20. In at least one preferred form of N-sided element, as shown in FIGS. 5 and 6, the elements 50 are hexagon shape for the value of N=6.

### Game Implementation

Any of the above described embodiments may be implemented on any gaming machine or group of gaming machine provided with a control module. As shown in FIG. 7, a control module 60 is provided with a microprocessor 62 and working random access memory (RAM) 64. The program code driving any of the described embodiments may be introduced into the control module 60 by connection of a data storage device 66. The device may take any of a number of forms, such as read only memory (ROM), erasable read only memory (EPROM), Compact Flash Card, PCMCIA card and the like.

US 8,366,540 B2

7

Alternatively, control module **60** may incorporate a hard disc drive to which the code may be written via a suitable input device.

Control module **60** acts to implement appropriate elements of the program code according to inputs from a user keyboard **68** and outputs video imagery to at least a main display module **70**.

1. Stand-Alone Gaming Machines

As shown in FIG. **8**, any of the above described embodiments for use on electronic display gaming machines may be incorporated into a stand-alone gaming machine **100** provided with a single display unit **112**. In this implementation of games according to the invention, both main games and feature games (if offered) are displayed on the single display unit.

2. Stand-Alone Gaming Machines with Secondary Display Unit

In a further preferred embodiment of the invention as shown in FIG. **9**, a stand-alone gaming machine **120** is provided with a secondary display unit **125** as well as a main display unit **122**. In this embodiment the main game played on the primary display unit may take the form of either the first or second preferred embodiments described above. It is then a triggering event in the main game which offers a player a feature game as described in the third preferred embodiment above.

3. Gaming Machines Linked to Progressive Jackpot System

In yet a further preferred embodiment of the invention as shown in FIG. **10**, a plurality of gaming machines **300** are arranged side by side in a line or are so as to allow each of the players (not shown) of the machines to view a common jackpot prize display unit **313**. Each individual machine **310** is provided with at least a main game display unit **315** for the playing of a main game according to the above described first and second embodiments.

Each of machines **310** of the embodiment illustrated in FIG. **7** is electronically linked to a jackpot control module **311** which monitors the volume of play on each of the linked machines and displays an incrementing jackpot value **312** determined according to the combined volume of play on the linked machines.

A win of the jackpot prize may be triggered by specific outcomes of either a main game or of a feature game. If the jackpot trigger is dependent on an outcome of the feature game, players on adjoining machines may be made aware by means of the common display that a potential triggering of the jackpot is to commence on the machine offered the feature game, thus adding interest for all the players.

It will be appreciated that the linked machines may form part of Local Area Networks (LAN) or Wide Area Networks (WAN).

The invention claimed is:

1. A gaming machine comprising:
a display device; and,
a processor configured to execute a game displaying, on said display device, a matrix of symbol containing elements having a plurality of rows and a plurality of columns;
wherein at least one column of said matrix comprising a portion of a simulated rotatable reel of a plurality of said symbol containing elements;
wherein said simulated rotatable reel comprising sections of symbol containing elements displaying a plurality of symbols;

8

wherein said simulated rotatable reel including at least one section in which a consecutive run of two or more of said symbol containing elements is populated by a first identical symbol;
wherein said first identical symbol is used for a first play of said game; wherein a second identical symbol is randomly selected, and
wherein the first identical symbol is replaced by the second identical symbol in said consecutive run of two or more of said symbol containing elements, said second identical symbol being used for a second play of said game.

2. The gaming machine of claim 1 wherein said second identical symbol is selected by the processor from a subset of said plurality of symbols.

3. The gaming machine of claim 2 wherein each symbol of said subset of symbols is assigned a probability of selection.

4. The gaming machine of claim 2 wherein said game processor selects one potential winning symbol containing element from said simulated rotatable reel.

5. The gaming machine of claim 4 wherein a prize is awarded to a player of said game on said gaming machine if a predetermined arrangement of said potential winning symbol containing elements is displayed on a pre-defined pay line of said matrix of symbol containing elements when a game sequence is concluded.

6. The gaming machine of claim 1 wherein said first identical symbol is randomly selected.

7. The gaming machine of claim 1 wherein said second identical symbol is selected by virtually spinning a notional, non-visible, inner reel comprising a subset of said plurality of symbols.

8. The gaming machine of claim 1 wherein said matrix of elements is comprised of five columns and three rows of elements; said five columns being portions respectively of rotatable reels one, two, three, four and five.

9. The gaming machine of claim 8 wherein symbol containing elements of each of simulated reels two, three, four and five are populated with a default random selection of said plurality of symbols.

10. The gaming machine of claim 9 wherein each symbol containing element of at least one section of a consecutive run of two or more of said symbol containing elements of each of said simulated rotatable reels two, three, four and five is adapted for potential modification from said default random selection of said plurality of symbols to said first or second identical symbol.

11. The gaming machine of claim 10 wherein said first or second identical symbol is that symbol populating said consecutive run of symbol containing elements of a leftwardly adjoining reel.

12. The gaming machine of claim 10 wherein said potential modification from said default random selection occurs within any one of said simulated rotatable reels two, three, four or five, if a win element of a preceding simulated rotatable reel coincides with said first or second identical symbol of a consecutive run of symbol containing elements of said preceding reel.

13. The gaming machine of claim 1 wherein said at least one said reel is a first left-most reel.

14. The gaming machine of claim 1 wherein said simulated rotatable reel, which includes said consecutive run of two or more symbol containing elements populated with said first or second identical symbol, is pre-spun at a relatively slow rate when a game sequence is initiated.

15. The gaming machine of claim 1 wherein said gaming machine is a single display stand-alone gaming machine.

US 8,366,540 B2

9

**16**. The gaming machine of claim **1** wherein said gaming machine is a stand-alone gaming machine provided with an upper secondary display.

**17**. The gaming machine of claim **1** wherein said gaming machine is one of a plurality of gaming machines linked to a progressive jackpot controller.

**18**. The gaming machine of claim **1** wherein said elements are N-sided elements; where N is a variable and values of N include N=3.

**19**. The gaming machine of claim **18** wherein said values of N include 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20.

**20**. The gaming machine of claim **18** wherein said N-sided elements are regular hexagons.

**21**. A method for increasing probability of a winning outcome on a gaming machine; wherein said winning outcome is determined by a game including pre-defined arrangements of a plurality of symbols displayed, on a display device of said gaming machine, in a matrix of symbol containing elements comprising portions of simulated rotatable reels; said method comprising a processor of the gaming machine configured to:

(a) arrange at least one of said simulated rotatable reels including at least one section in which a consecutive run of two or more of said symbol containing elements is populated by a first identical symbol; said first identical symbol being used for a first play of said game;

(b) randomly select a second identical symbol; and

(c) replace the first identical symbol by the second identical symbol in said consecutive run of two or more of said symbol containing elements, said second identical symbol being used for a second play of said game.

10

**22**. The method of claim **21** wherein, said consecutive run of two or more symbol containing elements comprises a section of a said simulated rotatable reel, such that all other remaining symbol containing elements of said simulated rotatable reel are populated with fixed symbols from the plurality symbols for each play of the game.

**23**. The method of claim **21** wherein said subset of said plurality of symbols is arranged on a notional non-visible inner reel, such that said identical symbol is randomly selected anew for each play of the game by virtual rotation of said notional non-visible inner reel.

**24**. The method of claim **21** wherein said matrix of elements comprises three rows and five columns, said columns comprising portions of said simulated rotatable reels.

**25**. The method of claim **21** wherein said at least one of said simulated rotatable reels is a first left-most reel.

**26**. The method of claim **25** wherein simulated rotatable reels other than said first left-most reel are each provided with at least one potential consecutive run of two or more simulated symbol containing elements adapted for modification from said fixed symbols to said identical symbol.

**27**. The method of claim **25** wherein said modification from said fixed symbols within said potential consecutive run of two or more symbol containing elements of said simulated rotatable reels other than said first left-most reel, occurs if said potential win element of a leftwardly preceding simulated rotatable reel falls within a said consecutive run of two or more symbol containing elements of said leftwardly preceding simulated rotatable reel.

* * * * *



US008622810B2

(12) **United States Patent**
Yoshimi

(10) Patent No.: **US 8,622,810 B2**
(45) Date of Patent: *** Jan. 7, 2014**

(54) **GAMING MACHINE WITH REPLACEMENT OF RUNS OF SYMBOLS CONTAINING IDENTICAL SYMBOLS WITH NEW IDENTICAL SYMBOLS**

(71) Applicant: **Konami Gaming, Inc.**, Las Vegas, NV (US)

(72) Inventor: **Osamu Yoshimi**, Botany (AU)

(73) Assignee: **Konami Gaming, Inc.**, Las Vegas, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/685,439**

(22) Filed: **Nov. 26, 2012**

(65) **Prior Publication Data**

US 2013/0084945 A1    Apr. 4, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/316,025, filed on Dec. 9, 2011, now Pat. No. 8,366,540, which is a continuation of application No. 11/299,009, filed on Dec. 9, 2005, now Pat. No. 8,096,869.

(30) **Foreign Application Priority Data**

Feb. 14, 2005    (AU) ................................. 2005900681

(51) **Int. Cl.**
A63F 9/24        (2006.01)
A63F 13/00       (2006.01)

(52) **U.S. Cl.**
USPC ..................................... 463/20; 463/16; 463/29

(58) **Field of Classification Search**
USPC ................. 463/16–20, 25, 29; 273/138.1, 139
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,448,419 A    5/1984  Teinaes
5,152,529 A   10/1992  Okada
(Continued)

FOREIGN PATENT DOCUMENTS

AU          768153         1/2002
AU      2002301067 B2      6/2003
(Continued)

OTHER PUBLICATIONS

International Search Report (Date of Mailing Apr. 22, 2005).
(Continued)

*Primary Examiner* — Milap Shah
(74) *Attorney, Agent, or Firm* — Howard & Howard Attorneys PLLC

(57)                **ABSTRACT**

A gaming machine comprising a processor configured to execute a game displaying a matrix of symbol containing elements having a plurality of rows and a plurality columns; at least one column of said matrix comprising a portion of a simulated rotatable reel of a plurality of said symbol containing elements; said simulated rotatable reel comprising sections of symbol containing elements displaying a plurality of symbols; said simulated rotatable reel including at least one section in which a consecutive run of two or more of said symbol containing elements is populated by a first identical symbol so that, said first identical symbol being used for a first play of said game, a second identical symbol being randomly selected, the first identical symbol being replaced by the second identical symbol in said consecutive run of two or more of said symbol containing elements, said second identical symbol being used for a second play of said game.

**15 Claims, 7 Drawing Sheets**





# US 8,622,810 B2

Page 2

(56)                **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,395,111 | A | 3/1995 | Inoue |
| 5,580,055 | A | 12/1996 | Hagiwara |
| 5,609,524 | A | 3/1997 | Inoue |
| 5,611,535 | A | 3/1997 | Tiberio |
| 5,624,119 | A | 4/1997 | Leake |
| 5,722,891 | A | 3/1998 | Inoue |
| 5,752,881 | A | 5/1998 | Inoue |
| 5,807,172 | A | 9/1998 | Piechowiak |
| 5,976,016 | A | 11/1999 | Moody et al. |
| 5,984,781 | A | 11/1999 | Sunaga |
| 6,007,066 | A | 12/1999 | Moody |
| 6,056,642 | A | 5/2000 | Bennett |
| 6,159,096 | A | 12/2000 | Yoseloff |
| 6,227,971 | B1 | 5/2001 | Weiss |
| 6,241,607 | B1 | 6/2001 | Payne et al. |
| 6,309,299 | B1 | 10/2001 | Weiss |
| 6,319,124 | B1 | 11/2001 | Baerlocher et al. |
| 6,394,902 | B1 | 5/2002 | Glavich et al. |
| 6,439,993 | B1 | 8/2002 | O'Halloran |
| 6,464,581 | B1 | 10/2002 | Yoseloff et al. |
| 6,517,432 | B1 | 2/2003 | Jaffe |
| 6,517,433 | B2 | 2/2003 | Loose et al. |
| 6,544,120 | B2 | 4/2003 | Ainsworth |
| 6,604,999 | B2 | 8/2003 | Ainsworth |
| 6,644,664 | B2 | 11/2003 | Muir et al. |
| 6,663,487 | B1 | 12/2003 | Ladner |
| 6,726,204 | B2 | 4/2004 | Inoue |
| 6,805,349 | B2 | 10/2004 | Baerlocher et al. |
| 6,869,357 | B2 | 3/2005 | Adams et al. |
| 6,880,826 | B2 | 4/2005 | Inoue |
| 6,893,018 | B2 | 5/2005 | Inoue |
| 6,896,615 | B2 | 5/2005 | Berman |
| 6,905,408 | B2 | 6/2005 | Inoue |
| 6,908,381 | B2 | 6/2005 | Ellis |
| 6,910,962 | B2 | 6/2005 | Marks et al. |
| 6,932,700 | B2 | 8/2005 | Bennett et al. |
| 6,960,134 | B2 | 11/2005 | Hartl et al. |
| 7,056,213 | B2 | 6/2006 | Ching et al. |
| 7,179,166 | B1 | 2/2007 | Abbott |
| 7,214,132 | B2 | 5/2007 | Inoue |
| 7,237,775 | B2 | 7/2007 | Thomas et al. |
| 7,252,589 | B1 | 8/2007 | Marks et al. |
| 7,252,591 | B2 | 8/2007 | Van Asdale |
| 7,311,602 | B2 | 12/2007 | Inoue |
| 7,316,395 | B1 | 1/2008 | Kromydas |
| 7,479,061 | B2 | 1/2009 | Okada |
| 7,690,984 | B2 | 4/2010 | Tran et al. |
| 8,096,869 | B2 * | 1/2012 | Yoshimi ........................ 463/20 |
| 8,366,540 | B2 * | 2/2013 | Yoshimi ........................ 463/20 |
| 2002/0039920 | A1 | 4/2002 | Bryant |
| 2002/0123378 | A1 | 9/2002 | Bucknall et al. |
| 2003/0013517 | A1 | 1/2003 | Bennett et al. |

| | | | |
|---|---|---|---|
| 2003/0027611 | A1 | 2/2003 | Recard |
| 2003/0087687 | A1 | 5/2003 | Locke et al. |
| 2003/0134673 | A1 | 7/2003 | Moody |
| 2004/0012145 | A1 | 1/2004 | Inoue |
| 2004/0014516 | A1 | 1/2004 | Inoue |
| 2004/0014517 | A1 | 1/2004 | Inoue |
| 2004/0017041 | A1 | 1/2004 | Inoue |
| 2004/0026854 | A1 | 2/2004 | Inoue |
| 2004/0036218 | A1 | 2/2004 | Inoue |
| 2004/0038726 | A1 | 2/2004 | Inoue |
| 2004/0048646 | A1 | 3/2004 | Visocnik |
| 2004/0053679 | A1 | 3/2004 | Getz et al. |
| 2004/0058727 | A1 | 3/2004 | Marks et al. |
| 2004/0063488 | A1 | 4/2004 | Berman |
| 2004/0072610 | A1 | 4/2004 | White et al. |
| 2004/0116175 | A1 | 6/2004 | Aida |
| 2004/0198486 | A1 | 10/2004 | Walker et al. |
| 2004/0219969 | A1 | 11/2004 | Casey et al. |
| 2004/0266520 | A1 | 12/2004 | Aida |
| 2005/0043083 | A1 | 2/2005 | Inoue |
| 2005/0043084 | A1 | 2/2005 | Inoue |
| 2005/0159208 | A1 | 7/2005 | Pacey |
| 2005/0277460 | A1 | 12/2005 | Inoue |
| 2006/0046830 | A1 | 3/2006 | Webb |
| 2006/0052155 | A1 | 3/2006 | Inoue |
| 2006/0084492 | A1 | 4/2006 | Baerlocher et al. |
| 2006/0084498 | A1 | 4/2006 | Baerlocher et al. |
| 2006/0166731 | A1 | 7/2006 | Yoshimi et al. |
| 2006/0183533 | A1 | 8/2006 | Tran et al. |
| 2006/0183534 | A1 | 8/2006 | Yoshimi |
| 2006/0247002 | A1 | 11/2006 | Yoshimi et al. |
| 2006/0287060 | A1 | 12/2006 | Yoshimi |
| 2007/0015565 | A1 | 1/2007 | Chan |
| 2007/0270203 | A1 | 11/2007 | Aida |
| 2008/0045300 | A1 | 2/2008 | Quayle et al. |
| 2008/0045323 | A1 | 2/2008 | Berman |
| 2009/0082087 | A1 | 3/2009 | Pacey et al. |
| 2009/0227332 | A1 | 9/2009 | Yoshizawa |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| AU | 2004203045 | A1 | 7/2004 |
| JP | 6-246043 | A | 9/1994 |
| JP | 2002-325881 | A | 11/2002 |
| JP | 2003-236055 | A | 8/2003 |

### OTHER PUBLICATIONS

Office Action for U.S. Appl. No. 11/281,258 (Notification Date Dec. 13, 2007).

Response to Office Action of Dec. 13, 2007 (dated Mar. 13, 2008) for U.S. Appl. No. 11/281,258.

Office Action for U.S. Appl. No. 11/413,707 (Notification Date Jan. 28, 2008).

* cited by examiner



Fig. 1

Fig. 2



Fig. 3

Fig. 4A

Fig. 4B

Fig. 4C

APPX0088



Fig. 5



Fig. 6



Fig. 7



Fig. 8

APPX0091



Fig. 9



Fig. 10

US 8,622,810 B2

1

## GAMING MACHINE WITH REPLACEMENT OF RUNS OF SYMBOLS CONTAINING IDENTICAL SYMBOLS WITH NEW IDENTICAL SYMBOLS

### CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 13/316,025 filed on Dec. 9, 2011, now U.S. Pat. No. 8,366,540, issued on Feb. 5, 2013, which is a continuation of U.S. patent application Ser. No. 11/299,009 filed on Dec. 5, 2005, now U.S. Pat. No. 8,096,869, issued on Jan. 17, 2012, which claims priority to Australian Patent Application No. 2005900681, filed on Feb. 14, 2005, the disclosures of which are hereby incorporated by reference in their entirety.

### BACKGROUND

The present invention relates to gaming machines for the playing of games of chance and, more particularly, to special features of games or feature games which may be offered on such machines.

Gaming, or poker machines, have become a major source of amusement and diversion in such places as clubs, hotels and casinos in many parts of the world.

Traditionally such machines were mechanical devices where a number of reels marked with a plurality of numbers or symbols could be made to spin randomly by the application of some mechanical input. If the subsequent patterns of numbers or symbols displayed on the reels, when these returned to a rest state, corresponded to predetermined patterns, the machine would provide a prize or payout. Generally such gaming machines have come to be regulated by government authorities as to their number and in the manner in which the machines must return a percentage of the monetary turnover to the players.

The introduction of electronics, computers and electronic graphical displays, has allowed a continual increase in the complexity and variations of gaming machines, games and displays while maintaining the basic concept of the traditional machine. Nevertheless, in some jurisdictions at least, government regulations effectively restrict the degree of variation which may be incorporated in games played on coin-freed machines.

Machines and games therefore that offer novel and stimulating variations on the basic game theme and environment, yet comply with these restrictions are eagerly sought by the gaming industry and there is consequently intense competition between machine manufacturers to innovate.

Games based on simulated rotatable reels typically display a matrix of elements each of which displays a symbol. Predetermined patterns of symbols, if displayed after the reels are spun and come to rest, may then award a prize to the player of the game. Typically also, the symbols are arranged in the elements of a reel so that adjoining elements do not display the same symbol.

An exception to this is found for example in Australian Patent Application number 2004203045 (Aristocrat Technologies Australia Pty Ltd), in which arrangements are envisaged where two special symbols may occur adjacent one to the other.

A similar exception is found in Australian Patent Application number 2002301067 (Stargames Corporation Limited), in which a specific symbol and the number of its occurrences in the display at the conclusion of a game sequence, is deter-

2

minant of a win. As indicated in FIG. 2 of the specification, two such symbols may appear in adjoining elements of a reel.

Both these examples of the prior art allow for only a single predetermined or special symbol to take up such adjacent positions on a reel.

It is an object of the present invention to address or at least ameliorate some of the above disadvantages.

### BRIEF DESCRIPTION OF INVENTION

Accordingly, in a first broad form of the invention, there is provided a gaming machine arranged to display a matrix of symbol containing elements; each column of said matrix comprising a portion of a simulated rotatable reel of said symbol containing elements; and wherein each of said symbol containing elements of at least one consecutive run of said symbol containing elements of at least one said reel is caused to display an identical symbol.

Preferably, said identical symbol is selected by a game controller from a subset of available symbols.

Preferably, each symbol of said subset of symbols is assigned a probability of selection.

Preferably, said matrix of elements is comprised of five columns and three rows of elements.

Preferably, said at least one said reel is a first left-most reel.

Preferably, each element of said first left-most reel other than elements of said at least one consecutive run of elements is populated by a random selection of said available symbols.

Preferably, said game controller selects one potential win element from each said reel.

Preferably, a prize is awarded to a player of a game on said gaming machine if a predetermined arrangement of said potential win elements is displayed on a pre-defined payline of said matrix of elements when a game sequence is concluded.

Preferably, elements of each of reels two, three, four and five are populated with a default random selection of said available symbols.

Preferably, each symbol of at least one pre-defined consecutive run of said elements of each of said reels two, three, four and five is adapted for potential modification from said default random selection of available symbols to a said identical symbol.

Preferably, said identical symbol is that symbol populating said consecutive run of elements of a leftwardly adjoining reel.

Preferably, said modification from said default random selection occurs within any one of said reels two, three, four or five, if a said win element of a preceding reel coincides with a said element of a consecutive run of elements of said preceding reel.

Preferably, each said reel, which includes said at least one consecutive run of identical symbols, is pre-spun at a relatively slow rate when a game sequence is initiated.

Preferably, all symbols of all elements of at least one said reel are identical.

Preferably, said gaming machine is a single display stand-alone gaming machine.

Preferably, said gaming machine is a stand-alone gaming machine provided with an upper secondary display.

Preferably, said gaming machine is one of a plurality of gaming machine linked to a progressive jackpot controller.

Preferably, said elements are N-sided elements; where N is a variable and values of N include N=1.

Preferably, said values of N include 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20.

Preferably, said N-sided elements are regular hexagons.

US 8,622,810 B2

3

In a further broad form of the invention there is provided a method for increasing probability of a winning outcome on a gaming machine; wherein said winning outcome is determined by pre-defined arrangements of symbols displayed in a matrix of elements comprising portions of simulated rotatable reels; said method including the steps of:

(a) arranging at least one consecutive run of elements of said simulated rotatable reels with at least one consecutive run of elements displaying an identical symbol; said identical symbol selected from a subset of available symbols.

(b) a game controller randomly selecting one element from each one of said simulated rotatable reels as a potential win element.

Preferably, said matrix of elements comprises three rows and five columns of said elements; said columns comprising portions of said rotatable reels.

Preferably, said identical symbol is selected from a look-up table of said subset of available symbols.

Preferably, at least one of said simulated rotatable reels is a first left-most reel.

Preferably, all said elements of said reels, except said at least one consecutive run of elements displaying said identical symbol on said first left-most reel, display randomly selected symbols from said available symbols.

Preferably, reels other than said first left-most reels are each provided with at least one potential consecutive run of elements adapted for modification from said randomly selected symbols to a said identical symbol.

Preferably, said modification from said randomly selected symbols within said potential consecutive run of said reels other than said first left-most reel, occurs if said potential win element of a leftwardly preceding reel falls within a said consecutive run of elements of said leftwardly preceding reel.

In yet a further broad form of the invention there is provided a method of implementing a game on a gaming machine; said method including the steps of:

(c) providing said gaming machine with a control module; said module including a microprocessor, a working memory and a data storage device connection means,

(d) writing program code to said data storage device,

(e) connecting said data storage device to said control module.

In still a further broad form of the invention there is provided media for storing, enabling digital code for playing games; said media comprising solid state data retaining devices including, read only memory (ROM) and erasable programmable read only memory (EPROM), compact flash cards and PCMCIA cards; said media further including disc-based storage devices.

### BRIEF DESCRIPTION OF DRAWINGS

Embodiments of the present invention will now be described with reference to the accompanying drawings wherein:

FIG. 1 is a partial view of a gaming machine with a display showing a matrix of elements and symbols comprising portions of simulated rotatable reels,

FIG. 2 is a schematic representation of the elements and symbols of portions of the first or left-most rotatable reel of FIG. 1,

FIG. 3 is a schematic representation of an "inner reel" or look-up table,

FIGS. 4A to 4C are schematic representations of portions of the reel of FIG. 2 and of the adjoining second reel for a particular game situation,

4

FIGS. 5 and 6 show examples of the display of FIG. 1 during play of a game using hexagonal elements,

FIG. 7 is a schematic representation of a control module, input keyboard and display for implementing the game embodiments of FIGS. 3 to 9,

FIG. 8 is a perspective view of a stand-alone gaming machine with a single display unit,

FIG. 9 is a front view of a stand-alone gaming machine with a main display and a secondary display unit,

FIG. 10 is a perspective view of a number of the gaming machines of FIG. 8 or 9 when linked to a progressive jackpot system.

### DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

#### First Preferred Embodiment

With reference to FIGS. 1 and 2, a gaming machine 10 is provided with a display 12, showing portions of a number of adjoining simulated rotatable reels 26 to 30. Each reel is divided into a given number of elements, for example 256 elements. In this example, when rotatable reels 26 to 30 are at rest, the display shows a matrix of elements 14 in five columns, 16 to 20 and three rows, 22 to 24, so that each column comprises a three-element portion of the respective simulated rotatable reel. Each element 14 of simulated rotatable reels 26 to 30 is arranged to display a symbol 32. With some exceptions, as explained below, the sequence of symbols within the elements of a reel remains fixed for all games played.

A game controller (not shown) pre-selects at random, at the initiation of a game sequence, a potential win element for each reel from the set of elements. That is, the game controller predetermines which element, and therefore which symbol, will be displayed in a pay line position at the end of a game sequence, and may therefore contribute to a winning outcome.

In this first preferred embodiment of the invention, at least one reel, the first left-most reel, is arranged to have at least one run of an identical symbol in each of a number of consecutive elements. The arrangement is shown schematically in FIG. 2 where portions of the left-most reel 26 are shown in strip form and, for example, a run of kings (crown symbol) is arranged for display in runs of five consecutive elements 30 at three locations 31 to 33 respectively. The three runs of consecutive elements in this example are elements 20 to 24, 100 to 104 and 200 to 204, within the 256-element length of the strip. In this preferred embodiment, the number of elements in a run and the location of the consecutive run or runs within the strip are predetermined and remain constant for each game played on the machine. The identical symbol which populates these consecutive run or runs of elements may be considered as one of a set of "inner reel" symbols.

The game controller (not shown) determines the identical symbol to be displayed in each consecutive element of the run or runs of consecutive elements in which the symbol is to be shown. The selection of the identical symbol is through a notional rotation of an "inner reel" 34 shown as a strip of elements and symbols in FIG. 3. This "inner reel" is in effect a look-up table and is not displayed, but its simulated rotation and "coming to rest" determines which symbol will populate the run or runs of consecutive elements of the left-most reel.

The symbols of the "inner reel" or look-up table from which the selection is made, are a sub-set of the set of symbols displayed in the remaining non-"inner reel" elements of the left-most reel. Thus, where the symbols are those of a suit of cards, the "inner reel" symbols may be those of the Ace, King,

US 8,622,810 B2

5

Queen and Jack, sometimes called the trump or court cards. The look-up table could also include a "wild" or "scatter" symbol. As previously noted, the arrangement or ordering of the symbols in the elements of the reel, other than the consecutive run or runs of elements, remains constant for every game, only the selection of the identical symbol from the look-up table is performed anew for each new play of a game.

The symbols 36 of the look-up table 34 need not all have the same probability of selection but may be assigned a hierarchy of probability. Thus for example, those symbols for which a winning combination confers on the player of a game a relatively higher value prize, such as the ace and the king, may have an inversely proportional probability of being selected as an "inner reel" symbol.

The reels are now spun as normal. The player will notice the run or runs of identical symbols passing through the display 12 for each revolution of the left-most reel 26, thereby providing a heightening of interest, since the odds of a winning arrangement of symbols appearing on a pre-defined pay line in the matrix at the conclusion of the game sequence will be increased.

### Second Preferred Embodiment

In a second preferred embodiment of the invention, the second reel, that is the second reel from the left in this example, may also be modified to include at least one run of consecutive elements displaying the same "inner reel" symbol as that used to populate the elements of the consecutive run or runs of the left-most reel. As for the first, left-most reel, the number and location of the consecutive elements of the potential run or runs within the strip of elements forming the simulated reel, is predetermined and remains constant.

Prior to modification, all the elements of the second reel (and likewise those of the third fourth and fifth reel) are randomly populated with symbols from the set of available symbols. Unless modification is triggered in the manner explained below, the ordering of these symbols within the elements of the reels remains constant for every game; only those symbols of the potential run or runs being displaced should a modifying event occur.

The populating of the potential "inner reel" elements of the second reel, and of any subsequent reels, is dependent on the potential win element for the first, or preceding reel, which was randomly selected by the game controller, lying within a run of consecutive elements of that reel. For example if, as shown in FIG. 4A, in the left-most reel 26, which has consecutive runs comprising the elements as numbered in the First Preferred Embodiment above, the potential win element selected is element number 103, the second reel 27 will be modified. Second reel 27 in this example has two potential runs 40 and 41 of consecutive "inner reel" elements, element numbers 83 to 87 and 191 to 195 respectively, which in a default state are randomly populated from the set of available symbols as shown in FIG. 4B. However, because the selected potential win element 103 of reel 26 falls within run 32, the potential "inner reel" elements 83 to 87 and 191 to 195 of reel 27 are replaced with the same identical symbol as used for the consecutive run or runs of the left-most reel 26 as shown in FIG. 4C.

A player will now discern a bias of symbols, (in our example crown symbols), in both the first, left-most, and second reels as these are spun during the play of a game. The effect is clearly an increase in the probability of a winning combination of symbols appearing along a pre-defined pay line within the matrix and consequently a raised level of interest in the outcome of the game for the player.

6

The same process of populating potential "inner reel" elements with the "inner reel" symbol of the preceding reel, may be sequentially applied to the third, fourth and fifth reels. As described for the second reel, the modification of a succeeding reel depends on the selected potential win element of the preceding reel falling within a run of "inner reel" elements of that reel.

### Third Preferred Embodiment

In at least one preferred form of this embodiment, a player is made aware of the populating of one or more consecutive runs of the left-most reel with the identical symbol. This may be done prior to the main game sequence, for example, by a slower pre-spin of only the left-most reel. If any further reels are so populated, each may be pre-spun sequentially.

The displayed game rules and experience will alert a player to the fact that the potential winning element for a given reel is positioned somewhere within the run, or one of the runs of consecutive elements populated with the identical symbol if the second and any subsequent reels are also pre-spun to display a run or runs of that symbol. The player will appreciate that the probability of a winning combination occurring increases with each additional reel which is pre-spun to display its run or runs of that symbol.

### Fourth Preferred Embodiment

The above described embodiments may be applied to a main game of a gaming machine or to a feature game offered as a result of some triggering event in a main game.

In a preferred embodiment of the invention as adapted for a feature game, the number of elements comprising a run of identical "inner reel" symbols and the number of such runs in any given reel is not constant but may be determined in a number of ways. Thus, in at least one preferred embodiment, the number of elements comprising a run may be a function of the amount of a bet placed by the player on the main game which triggered the feature game, or as a function of accumulated throughput of bets over a given time period. In one special case, all the elements of the first left-most reel may be populated by the same "inner reel" symbol.

Likewise, the number of runs in a given reel may be a function also of the betting pattern preceding the conferring of the feature game or alternatively, may be a function of the particular triggering event of the main game which led to the feature game.

### Fifth Preferred Embodiment

The elements comprising the matrix of elements of any of the above described embodiments may be of conventional rectangular configuration, but in at least one preferred embodiment the delineation of an element, that is, the boundary defining the field containing a symbol, may be any N-sided figure, where N may take the value 1 (thus a circular field) or any value from 3 to 20. In at least one preferred form of N-sided element, as shown in FIGS. 5 and 6, the elements 50 are hexagon shape for the value of N=6.

Game Implementation

Any of the above described embodiments may be implemented on any gaming machine or group of gaming machine provided with a control module. As shown in FIG. 7, a control module 60 is provided with a microprocessor 62 and working random access memory (RAM) 64. The program code driving any of the described embodiments may be introduced into the control module 60 by connection of a data storage device

APPX0096

US 8,622,810 B2

7

66. The device may take any of a number of forms, such as read only memory (ROM), erasable read only memory (EPROM), Compact Flash Card, PCMCIA card and the like. Alternatively, control module 60 may incorporate a hard disc drive to which the code may be written via a suitable input device.

Control module 60 acts to implement appropriate modules of the program code according to inputs from a user keyboard 68 and outputs video imagery to at least a main display module 70.

1. Stand-Alone Gaming Machines

As shown in FIG. 8, any of the above described embodiments for use on electronic display gaming machines may be incorporated into a stand-alone gaming machine 100 provided with a single display unit 112. In this implementation of games according to the invention, both main games and feature games (if offered) are displayed on the single display unit.

2. Stand-Alone Gaming Machines with Secondary Display Unit

In a further preferred embodiment of the invention as shown in FIG. 9, a stand-alone gaming machine 120 is provided with a secondary display unit 125 as well as a main display unit 122. In this embodiment the main game played on the primary display unit may take the form of either the first or second preferred embodiments described above. It is then a triggering event in the main game which offers a player a feature game as described in the third preferred embodiment above.

3. Gaming Machines Linked to Progressive Jackpot System

In yet a further preferred embodiment of the invention as shown in FIG. 10, a plurality of gaming machines 300 are arranged side by side in a line or arc so as to allow each of the players (not shown) of the machines to view a common jackpot prize display unit 313. Each individual machine 310 is provided with at least a main game display unit 315 for the playing of a main game according to the above described first and second embodiments.

Each of machines 310 of the embodiment illustrated in FIG. 7 is electronically linked to a jackpot control module 311 which monitors the volume of play on each of the linked machines and displays an incrementing jackpot value 312 determined according to the combined volume of play on the linked machines.

A win of the jackpot prize may be triggered by specific outcomes of either a main game or of a feature game. If the jackpot trigger is dependent on an outcome of the feature game, players on adjoining machines may be made aware by means of the common display that a potential triggering of the jackpot is to commence on the machine offered the feature game, thus adding interest for all the players.

It will be appreciated that the linked machines may form part of Local Area Networks (LAN) or Wide Area Networks (WAN).

What is claimed is:

1. A gaming machine comprising:

a memory device configured to store data representing a reel, the reel having a predetermined number of symbol positions, wherein each symbol position has an associated symbol from a set of symbols, the reel having a run of consecutive symbol positions, the run of consecutive symbol positions being initially populated with a first identical symbol from the set of symbols prior to initiation of a first instance of a game;

a display device configured to display a matrix having a plurality of display elements arranged in a column, the number of display elements in the column being less

8

than the predetermined number of symbol positions in the reel, and the display device being further configured to display a portion of the reels such that the symbols associated with some of the symbol positions of the reel are displayed in the matrix when the reel is in a stop position; and

a game controller configured to (i) initiate the first instance of a game using the reel, (ii) randomly select a second identical symbol from the set of symbols, (iii) replace each of the first identical symbols in the run of consecutive symbol positions of the reel with the second identical symbol, and (iv) initiate a second instance of the game using the reel having the run of consecutive symbol positions populated with the second identical symbol.

2. The gaming machine, as set forth in claim 1, wherein the second identical symbol is randomly selected by the game controller from a subset of the set of symbols.

3. The gaming machine, as set forth in claim 2, wherein each symbol of the subset of symbols is assigned a probability of selection.

4. The gaming machine, as set forth in claim 1, wherein the first identical symbol is randomly selected.

5. The gaming machine, as set forth in claim 1, wherein the reel is a first reel, the memory device further configured to store data representing second, third, fourth and fifth reels, wherein the matrix of elements is comprised of five columns and three rows of elements, each of the five columns being associated with a respective one of the reels.

6. The gaming machine, as set forth in claim 5, wherein the first reel is a left-most reel.

7. The gaming machine, as set forth in claim 1, wherein the reel is a virtual reel.

8. A method comprising:

storing data, in a memory device, representing a reel, the reel having a predetermined number of symbol positions, wherein each symbol position has an associated symbol from a set of symbols, the reel having a run of consecutive symbol positions, the run of consecutive symbol positions being initially populated with a first identical symbol from the set of symbols prior to initiation of a first instance of a game;

displaying, via a display device, a matrix having a plurality of display elements arranged in a column, the number of display elements in the column being less than the predetermined number of symbol positions in the reel, and display, via the display device, a portion of the reel such that the symbols associated with some of the symbol positions of the reel are displayed in the matrix when the reel is in a stop position;

initiating, via a game controller, the first instance of the game using the reel;

randomly selecting, via the game controller, a second identical symbol from the set of symbols;

replacing each of the first identical symbols in the run of consecutive symbol positions of the reel with the second identical symbol; and

initiating a second instance of the game using the reel having the run of consecutive symbol positions populated with the second identical symbol.

9. The method, as set forth in claim 8, wherein the second identical symbol is randomly selected from a subset of the set of symbols.

10. The method, as set forth in claim 9, wherein each symbol of the subset of symbols is assigned a probability of selection.

US 8,622,810 B2

9                                                                    10

**11**. The method, as set forth in claim **8**, wherein the first identical symbol is randomly selected.

**12**. The method, as set forth in claim **8**, wherein the reel is a first reel, the game further including second, third, fourth and fifth reels, wherein the matrix of elements is comprised of five columns and three rows of elements, each of the five columns being associated with a respective one of the reels.

**13**. The method, as set forth in claim **12**, wherein the first reel is a left-most reel.

**14**. The method, as set forth in claim **8**, wherein the reel is a virtual reel.

**15**. A non-transitory computer readable medium recording a program for controlling a computer to function as a:

a memory device configured to store data representing a reel, the reel having a predetermined number of symbol positions, wherein each symbol position has an associated symbol from a set of symbols, the reel having a run of consecutive symbol positions, the run of consecutive symbol positions being initially populated with a first identical symbol from the set of symbols prior to initiation of a first instance of a game;

a display device configured to display a matrix having a plurality of display elements arranged in a column, the number of display elements in the column being less than the predetermined number of symbol positions in the reel, and the display device being further configured to display a portion of the reels such that the symbols associated with some of the symbol positions of the reel are displayed in the matrix when the reel is in a stop position; and

a game controller configured to (i) initiate the first instance of a game using the reel, (ii) randomly select a second identical symbol from the set of symbols, (iii) replace each of the first identical symbols in the run of consecutive symbol positions of the reel with the second identical symbol, and (iv) initiate a second instance of the game using the reel having the run of consecutive symbol positions populated with the second identical symbol.

*    *    *    *    *



US008616955B2

(12) **United States Patent**
Yoshimi

(10) Patent No.: **US 8,616,955 B2**
(45) Date of Patent: **\*Dec. 31, 2013**

(54) **GAMING MACHINE WITH RUNS OF SYMBOLS POPULATED WITH IDENTICAL SYMBOLS DURING SPINNING OF REELS**

(71) Applicant: **Konami Gaming, Inc.**, Las Vegas, NV (US)

(72) Inventor: **Osamu Yoshimi**, Botany, NSW (AU)

(73) Assignee: **Konami Games, Inc.**, Las Vegas, NV (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/685,392**

(22) Filed: **Nov. 26, 2012**

(65) **Prior Publication Data**

US 2013/0084944 A1        Apr. 4, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/316,025, filed on Dec. 9, 2011, now Pat. No. 8,366,540, which is a continuation of application No. 11/299,009, filed on Dec. 9, 2005, now Pat. No. 8,096,869.

(30) **Foreign Application Priority Data**

Feb. 14, 2005    (AU) .................................. 2005900681

(51) **Int. Cl.**
    *A63F 9/24*        (2006.01)
    *A63F 13/00*       (2006.01)

(52) **U.S. Cl.**
    USPC .................................. **463/20**; 463/16; 463/29

(58) **Field of Classification Search**
    USPC ................ 463/16–20, 25, 29; 273/138.1, 139
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,448,419 A | 5/1984 | Teinaes |
| 5,152,529 A | 10/1992 | Okada |

(Continued)

FOREIGN PATENT DOCUMENTS

| AU | 768153 | | 1/2002 |
| AU | 2002301067 | B2 | 6/2003 |

(Continued)

OTHER PUBLICATIONS

International Search Report (Date of Mailing Apr. 22, 2005).

(Continued)

*Primary Examiner* — Milap Shah
(74) *Attorney, Agent, or Firm* — Howard & Howard Attorneys PLLC

(57)    **ABSTRACT**

A gaming machine comprising a processor configured to execute a game displaying a matrix of symbol containing elements having a plurality of rows and a plurality columns; at least one column of said matrix comprising a portion of a simulated rotatable reel of a plurality of said symbol containing elements; said simulated rotatable reel comprising sections of symbol containing elements displaying a plurality of symbols; said simulated rotatable reel including at least one section in which a consecutive run of two or more of said symbol containing elements is populated by a first identical symbol so that, said first identical symbol being used for a first play of said game, a second identical symbol being randomly selected, the first identical symbol being replaced by the second identical symbol in said consecutive run of two or more of said symbol containing elements, said second identical symbol being used for a second play of said game.

**19 Claims, 7 Drawing Sheets**



# US 8,616,955 B2
Page 2

(56)                 **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,395,111 | A | 3/1995 | Inoue |
| 5,580,055 | A | 12/1996 | Hagiwara |
| 5,609,524 | A | 3/1997 | Inoue |
| 5,611,535 | A | 3/1997 | Tiberio |
| 5,624,119 | A | 4/1997 | Leake |
| 5,722,891 | A | 3/1998 | Inoue |
| 5,752,881 | A | 5/1998 | Inoue |
| 5,807,172 | A | 9/1998 | Piechowiak |
| 5,976,016 | A | 11/1999 | Moody et al. |
| 5,984,781 | A | 11/1999 | Sunaga |
| 6,007,066 | A | 12/1999 | Moody |
| 6,056,642 | A | 5/2000 | Bennett |
| 6,159,096 | A | 12/2000 | Yoseloff |
| 6,227,971 | B1 | 5/2001 | Weiss |
| 6,241,607 | B1 | 6/2001 | Payne et al. |
| 6,309,299 | B1 | 10/2001 | Weiss |
| 6,319,124 | B1 | 11/2001 | Baerlocher et al. |
| 6,394,902 | B1 | 5/2002 | Glavich et al. |
| 6,439,993 | B1 | 8/2002 | O'Halloran |
| 6,464,581 | B1 | 10/2002 | Yoseloff et al. |
| 6,517,432 | B1 | 2/2003 | Jaffe |
| 6,517,433 | B2 | 2/2003 | Loose et al. |
| 6,544,120 | B2 | 4/2003 | Ainsworth |
| 6,604,999 | B2 | 8/2003 | Ainsworth |
| 6,644,664 | B2 | 11/2003 | Muir et al. |
| 6,663,487 | B1 | 12/2003 | Ladner |
| 6,726,204 | B2 | 4/2004 | Inoue |
| 6,805,349 | B2 | 10/2004 | Baerlocher et al. |
| 6,869,357 | B2 | 3/2005 | Adams et al. |
| 6,880,826 | B2 | 4/2005 | Inoue |
| 6,893,018 | B2 | 5/2005 | Berman |
| 6,896,615 | B2 | 5/2005 | Berman |
| 6,905,408 | B2 | 6/2005 | Inoue |
| 6,908,381 | B2 | 6/2005 | Ellis |
| 6,910,962 | B2 | 6/2005 | Marks et al. |
| 6,932,700 | B2 | 8/2005 | Bennett et al. |
| 6,960,134 | B2 | 11/2005 | Hartl et al. |
| 7,056,213 | B2 | 6/2006 | Ching et al. |
| 7,179,166 | B1 | 2/2007 | Abbott |
| 7,214,132 | B2 | 5/2007 | Inoue |
| 7,237,775 | B2 | 7/2007 | Thomas et al. |
| 7,252,589 | B1 | 8/2007 | Marks et al. |
| 7,252,591 | B2 | 8/2007 | Van Asdale |
| 7,311,602 | B2 | 12/2007 | Inoue |
| 7,316,395 | B1 | 1/2008 | Kromydas |
| 7,479,061 | B2 | 1/2009 | Okada |
| 7,690,984 | B2 | 4/2010 | Tran et al. |
| 8,096,869 | B2 * | 1/2012 | Yoshimi ..................... 463/20 |
| 8,366,540 | B2 * | 2/2013 | Yoshimi ..................... 463/20 |
| 2002/0039920 | A1 | 4/2002 | Bryant |
| 2002/0123378 | A1 | 9/2002 | Bucknall et al. |
| 2003/0013517 | A1 | 1/2003 | Bennett et al. |

| | | | |
|---|---|---|---|
| 2003/0027611 | A1 | 2/2003 | Recard |
| 2003/0087687 | A1 | 5/2003 | Locke et al. |
| 2003/0134673 | A1 | 7/2003 | Moody |
| 2004/0012145 | A1 | 1/2004 | Inoue |
| 2004/0014516 | A1 | 1/2004 | Inoue |
| 2004/0014517 | A1 | 1/2004 | Inoue |
| 2004/0017041 | A1 | 1/2004 | Inoue |
| 2004/0026854 | A1 | 2/2004 | Inoue |
| 2004/0036218 | A1 | 2/2004 | Inoue |
| 2004/0038726 | A1 | 2/2004 | Inoue |
| 2004/0048646 | A1 | 3/2004 | Visocnik |
| 2004/0053679 | A1 | 3/2004 | Getz et al. |
| 2004/0058727 | A1 | 3/2004 | Marks et al. |
| 2004/0063488 | A1 | 4/2004 | Berman |
| 2004/0072610 | A1 | 4/2004 | White et al. |
| 2004/0116175 | A1 | 6/2004 | Aida |
| 2004/0198486 | A1 | 10/2004 | Walker et al. |
| 2004/0219969 | A1 | 11/2004 | Casey et al. |
| 2004/0266520 | A1 | 12/2004 | Aida |
| 2005/0043083 | A1 | 2/2005 | Inoue |
| 2005/0043084 | A1 | 2/2005 | Inoue |
| 2005/0159208 | A1 | 7/2005 | Pacey |
| 2005/0277460 | A1 | 12/2005 | Inoue |
| 2006/0046830 | A1 | 3/2006 | Webb |
| 2006/0052155 | A1 | 3/2006 | Inoue |
| 2006/0084492 | A1 | 4/2006 | Baerlocher et al. |
| 2006/0084498 | A1 | 4/2006 | Baerlocher et al. |
| 2006/0166731 | A1 | 7/2006 | Yoshimi et al. |
| 2006/0183533 | A1 | 8/2006 | Tran et al. |
| 2006/0183534 | A1 | 8/2006 | Yoshimi |
| 2006/0247002 | A1 | 11/2006 | Yoshimi et al. |
| 2006/0287060 | A1 | 12/2006 | Yoshimi |
| 2007/0015565 | A1 | 1/2007 | Chan |
| 2007/0270203 | A1 | 11/2007 | Aida |
| 2008/0045300 | A1 | 2/2008 | Quayle et al. |
| 2008/0045323 | A1 | 2/2008 | Berman |
| 2009/0082087 | A1 | 3/2009 | Pacey et al. |
| 2009/0227332 | A1 | 9/2009 | Yoshizawa |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 2004203045 A1 | 7/2004 |
| JP | 6-246043 A | 9/1994 |
| JP | 2002-325881 A | 11/2002 |
| JP | 2003-236055 A | 8/2003 |

OTHER PUBLICATIONS

Office Action for U.S. Appl. No. 11/281,258 (Notification Date Dec. 13, 2007).
Response to Office Action of Dec. 13, 2007 (dated Mar. 13, 2008) for U.S. Appl. No. 11/281,258.
Office Action for U.S. Appl. No. 11/413,707 (Notification Date Jan. 28, 2008).

* cited by examiner



Fig. 1

Fig. 2



Fig. 3

Fig. 4A

Fig. 4B

Fig. 4C

Case: 22-1370   Document: 30   Page: 137   Filed: 07/18/2022



Fig. 5



Fig. 6



Fig. 7



Fig. 8



Fig. 9



Fig. 10

US 8,616,955 B2

1

## GAMING MACHINE WITH RUNS OF SYMBOLS POPULATED WITH IDENTICAL SYMBOLS DURING SPINNING OF REELS

### CROSS-REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 13/316,025 filed on Dec. 9, 2011, now U.S. Pat. No. 8,366,540, issued on Feb. 5, 2013, which is a continuation of U.S. patent application Ser. No. 11/299,009 filed on Dec. 5, 2005, now U.S. Pat. No. 8,096,869, issued on Jan. 17, 2012, which claims priority to Australian Patent Application No. 2005900681, filed on Feb. 14, 2005, the disclosures of which are hereby incorporated by reference in their entirety.

### BACKGROUND

The present invention relates to gaming machines for the playing of games of chance and, more particularly, to special features of games or feature games which may be offered on such machines.

Gaming, or poker machines, have become a major source of amusement and diversion in such places as clubs, hotels and casinos in many parts of the world.

Traditionally such machines were mechanical devices where a number of reels marked with a plurality of numbers or symbols could be made to spin randomly by the application of some mechanical input. If the subsequent patterns of numbers or symbols displayed on the reels, when these returned to a rest state, corresponded to predetermined patterns, the machine would provide a prize or payout. Generally such gaming machines have come to be regulated by government authorities as to their number and in the manner in which the machines must return a percentage of the monetary turnover to the players.

The introduction of electronics, computers and electronic graphical displays, has allowed a continual increase in the complexity and variations of gaming machines, games and displays while maintaining the basic concept of the traditional machine. Nevertheless, in some jurisdictions at least, government regulations effectively restrict the degree of variation which may be incorporated in games played on coin-freed machines.

Machines and games therefore that offer novel and stimulating variations on the basic game theme and environment, yet comply with these restrictions are eagerly sought by the gaming industry and there is consequently intense competition between machine manufacturers to innovate.

Games based on simulated rotatable reels typically display a matrix of elements each of which displays a symbol. Predetermined patterns of symbols, if displayed after the reels are spun and come to rest, may then award a prize to the player of the game. Typically also, the symbols are arranged in the elements of a reel so that adjoining elements do not display the same symbol.

An exception to this is found for example in Australian Patent Application number 2004203045 (Aristocrat Technologies Australia Pty Ltd), in which arrangements are envisaged where two special symbols may occur adjacent one to the other.

A similar exception is found in Australian Patent Application number 2002301067 (Stargames Corporation Limited), in which a specific symbol and the number of its occurrences in the display at the conclusion of a game sequence, is determinant of a win. As indicated in FIG. 2 of the specification, two such symbols may appear in adjoining elements of a reel.

2

Both these examples of the prior art allow for only a single predetermined or special symbol to take up such adjacent positions on a reel.

It is an object of the present invention to address or at least ameliorate some of the above disadvantages.

### BRIEF DESCRIPTION OF INVENTION

Accordingly, in a first broad form of the invention, there is provided a gaming machine arranged to display a matrix of symbol containing elements; each column of said matrix comprising a portion of a simulated rotatable reel of said symbol containing elements; and wherein each of said symbol containing elements of at least one consecutive run of said symbol containing elements of at least one said reel is caused to display an identical symbol.

Preferably, said identical symbol is selected by a game controller from a subset of available symbols.

Preferably, each symbol of said subset of symbols is assigned a probability of selection.

Preferably, said matrix of elements is comprised of five columns and three rows of elements.

Preferably, said at least one said reel is a first left-most reel.

Preferably, each element of said first left-most reel other than elements of said at least one consecutive run of elements is populated by a random selection of said available symbols.

Preferably, said game controller selects one potential win element from each said reel.

Preferably, a prize is awarded to a player of a game on said gaming machine if a predetermined arrangement of said potential win elements is displayed on a pre-defined payline of said matrix of elements when a game sequence is concluded.

Preferably, elements of each of reels two, three, four and five are populated with a default random selection of said available symbols.

Preferably, each symbol of at least one pre-defined consecutive run of said elements of each of said reels two, three, four and five is adapted for potential modification from said default random selection of available symbols to a said identical symbol.

Preferably, said identical symbol is that symbol populating said consecutive run of elements of a leftwardly adjoining reel.

Preferably, said modification from said default random selection occurs within any one of said reels two, three, four or five, if a said win element of a preceding reel coincides with a said element of a consecutive run of elements of said preceding reel.

Preferably, each said reel, which includes said at least one consecutive run of identical symbols, is pre-spun at a relatively slow rate when a game sequence is initiated.

Preferably, all symbols of all elements of at least one said reel are identical.

Preferably, said gaming machine is a single display stand-alone gaming machine.

Preferably, said gaming machine is a stand-alone gaming machine provided with an upper secondary display.

Preferably, said gaming machine is one of a plurality of gaming machine linked to a progressive jackpot controller.

Preferably, said elements are N-sided elements; where N is a variable and values of N include N=1.

Preferably, said values of N include 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20.

Preferably, said N-sided elements are regular hexagons.

In a further broad form of the invention there is provided a method for increasing probability of a winning outcome on a

US 8,616,955 B2

3

gaming machine; wherein said winning outcome is determined by pre-defined arrangements of symbols displayed in a matrix of elements comprising portions of simulated rotatable reels; said method including the steps of:

(a) arranging at least of said simulated rotatable reels with at least one consecutive run of elements displaying an identical symbol; said identical symbol selected from a subset of available symbols.

(b) a game controller randomly selecting one element from each one of said simulated rotatable reels as a potential win element.

Preferably, said matrix of elements comprises three rows and five columns of said elements; said columns comprising portions of said rotatable reels.

Preferably, said identical symbol is selected from a look-up table of said subset of available symbols.

Preferably, said at least one of said simulated rotatable reels is a first left-most reel.

Preferably, all said elements of said reels, except said at least one consecutive run of elements displaying said identical symbol on said first left-most reel, display randomly selected symbols from said available symbols.

Preferably, reels other than said first left-most reels are each provided with at least one potential consecutive run of elements adapted for modification from said randomly selected symbols to a said identical symbol.

Preferably, said modification from said randomly selected symbols within said potential consecutive run of said reels other than said first left-most reel, occurs if said potential win element of a leftwardly preceding reel falls within a said consecutive run of elements of said leftwardly preceding reel.

In yet a further broad form of the invention there is provided a method of implementing a game on a gaming machine; said method including the steps of:

(c) providing said gaming machine with a control module; said module including a microprocessor, a working memory and a data storage device connection means,

(d) writing program code to said data storage device,

(e) connecting said data storage device to said control module.

In still a further broad form of the invention there is provided media for storing enabling digital code for playing games; said media comprising solid state data retaining devices including, read only memory (ROM) and erasable programmable read only memory (EPROM), compact flash cards and PCMCIA cards; said media further including disc-based storage devices.

BRIEF DESCRIPTION OF DRAWINGS

Embodiments of the present invention will now be described with reference to the accompanying drawings wherein:

FIG. 1 is a partial view of a gaming machine with a display showing a matrix of elements and symbols comprising portions of simulated rotatable reels,

FIG. 2 is a schematic representation of the elements and symbols of portions of the first or left-most rotatable reel of FIG. 1,

FIG. 3 is a schematic representation of an "inner reel" or look-up table,

FIGS. 4A to 4C are schematic representations of portions of the reel of FIG. 2 and of the adjoining second reel for a particular game situation,

FIGS. 5 and 6 show examples of the display of FIG. 1 during play of a game using hexagonal elements,

4

FIG. 7 is a schematic representation of a control module, input keyboard and display for implementing the game embodiments of FIGS. 3 to 9,

FIG. 8 is a perspective view of a stand-alone gaming machine with a single display unit,

FIG. 9 is a front view of a stand-alone gaming machine with a main display and a secondary display unit,

FIG. 10 is a perspective view of a number of the gaming machines of FIG. 8 or 9 when linked to a progressive jackpot system.

DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

First Preferred Embodiment

With reference to FIGS. 1 and 2, a gaming machine 10 is provided with a display 12, showing portions of a number of adjoining simulated rotatable reels 26 to 30. Each reel is divided into a given number of elements, for example 256 elements. In this example, when rotatable reels 26 to 30 are at rest, the display shows a matrix of elements 14 in five columns, 16 to 20 and three rows, 22 to 24, so that each column comprises a three-element portion of the respective simulated rotatable reel. Each element 14 of simulated rotatable reels 26 to 30 is arranged to display a symbol 32. With some exceptions, as explained below, the sequence of symbols within the elements of a reel remains fixed for all games played.

A game controller (not shown) pre-selects at random, at the initiation of a game sequence, a potential win element for each reel from the set of elements. That is, the game controller predetermines which element, and therefore which symbol, will be displayed in a pay line position at the end of a game sequence, and may therefore contribute to a winning outcome.

In this first preferred embodiment of the invention, at least one reel, the first left-most reel, is arranged to have at least one run of an identical symbol in each of a number of consecutive elements. The arrangement is shown schematically in FIG. 2 where portions of the left-most reel 26 are shown in strip form and, for example, a run of kings (crown symbol) is arranged for display in runs of five consecutive elements 30 at three locations 31 to 33 respectively. The three runs of consecutive elements in this example are elements 20 to 24, 100 to 104 and 200 to 204, within the 256-element length of the strip. In this preferred embodiment, the number of elements in a run and the location of the consecutive run or runs within the strip are predetermined and remain constant for each game played on the machine. The identical symbol which populates those consecutive run or runs of elements may be considered as one of a set of "inner reel" symbols.

The game controller (not shown) determines the identical symbol to be displayed in each consecutive element of the run or runs of consecutive elements in which the symbol is to be shown. The selection of the identical symbol is through a notional rotation of an "inner reel" 34 shown as a strip of elements and symbols in FIG. 3. This "inner reel" is in effect a look-up table and is not displayed, but its simulated rotation and "coming to rest" determines which symbol will populate the run or runs of consecutive elements of the left-most reel.

The symbols of the "inner reel" or look-up table from which the selection is made, are a sub-set of the set of symbols displayed in the remaining non-"inner reel" elements of the left-most reel. Thus, where the symbols are those of a suit of cards, the "inner reel" symbols may be those of the Ace, King, Queen and Jack, sometimes called the trump or court cards. The look-up table could also include a "wild" or "scatter"

US 8,616,955 B2

5

symbol. As previously noted, the arrangement or ordering of the symbols in the elements of the reel, other than the consecutive run or runs of elements, remain constant for every game, only the selection of the identical symbol from the look-up table is performed anew for each new play of a game.

The symbols 36 of the look-up table 34 need not all have the same probability of selection but may be assigned a hierarchy of probability. Thus for example, those symbols for which a winning combination confers on the player of a game a relatively higher value prize, such as the ace and the king, may have an inversely proportional probability of being selected as an "inner reel" symbol.

The reels are now spun as normal. The player will notice the run or runs of identical symbols passing through the display 12 for each revolution of the left-most reel 26, thereby providing a heightening of interest, since the odds of a winning arrangement of symbols appearing on a pre-defined pay line in the matrix at the conclusion of the game sequence will be increased.

Second Preferred Embodiment

In a second preferred embodiment of the invention, the second reel, that is the second reel from the left in this example, may also be modified to include at least one run of consecutive elements displaying the same "inner reel" symbol as that used to populate the elements of the consecutive run or runs of the left-most reel. As for the first, left-most reel, the number and location of the consecutive elements of the potential run or runs within the strip of elements forming the simulated reel, is predetermined and remains constant.

Prior to modification, all the elements of the second reel (and likewise those of the third fourth and fifth reel) are randomly populated with symbols from the set of available symbols. Unless modification is triggered in the manner explained below, the ordering of these symbols within the elements of the reels remains constant for every game; only those symbols of the potential run or runs being displaced should a modifying event occur.

The populating of the potential "inner reel" elements of the second reel, and of any subsequent reels, is dependent on the potential win element for the first, or preceding reel, which was randomly selected by the game controller, lying within a run of consecutive elements of that reel. For example if, as shown in FIG. 4A, in the left-most reel 26, which has consecutive runs comprising the elements as numbered in the First Preferred Embodiment above, the potential win element selected is element number 103, the second reel 27 will be modified. Second reel 27 in this example has two potential runs 40 and 41 of consecutive "inner reel" elements, element numbers 83 to 87 and 191 to 195 respectively, which in a default state are randomly populated from the set of available symbols as shown in FIG. 4B. However, because the selected potential win element 103 of reel 26 falls within run 32, the potential "inner reel" elements 83 to 87 and 191 to 195 of reel 27 are replaced with the same identical symbol as used for the consecutive run or runs of the left-most reel 26 as shown in FIG. 4C.

A player will now discern a bias of symbols, (in our example crown symbols), in both the first, left-most, and second reels as these are spun during the play of a game. The effect is clearly an increase in the probability of a winning combination of symbols appearing along a pre-defined pay line within the matrix and consequently a raised level of interest in the outcome of the game for the player.

The same process of populating potential "inner reel" elements with the "inner reel" symbol of the preceding reel, may

6

be sequentially applied to the third, fourth and fifth reels. As described for the second reel, the modification of a succeeding reel depends on the selected potential win element of the preceding reel falling within a run of "inner reel" elements of that reel.

Third Preferred Embodiment

In at least one preferred form of this embodiment, a player is made aware of the populating of one or more consecutive runs of the left-most reel with the identical symbol. This may be done prior to the main game sequence, for example, by a slower pre-spin of only the left-most reel. If any further reels are so populated, each may be pre-spun sequentially.

The displayed game rules and experience will alert a player to the fact that the potential winning element for a given reel is positioned somewhere within the run, or one of the runs of consecutive elements populated with the identical symbol if the second and any subsequent reels are also pre-spun to display a run or runs of that symbol. The player will appreciate that the probability of a winning combination occurring increases with each additional reel which is pre-spun to display its run or runs of elements with the same symbol.

Fourth Preferred Embodiment

The above described embodiments may be applied to a main game of a gaming machine or to a feature game offered as a result of some triggering event in a main game.

In a preferred embodiment of the invention as adapted for a feature game, the number of elements comprising a run of identical "inner reel" symbols and the number of such runs in any given reel is not constant but may be determined in a number of ways. Thus, in at least one preferred embodiment, the number of elements comprising a run may be a function of the amount of a bet placed by the player on the main game which triggered the feature game, or as a function of accumulated throughput of bets over a given time period. In one special case, all the elements of the first left-most reel may be populated by the same "inner reel" symbol.

Likewise, the number of runs in a given reel may be a function also of the betting pattern preceding the conferring of the feature game or alternatively, may be a function of the particular triggering event of the main game which led to the feature game.

Fifth Preferred Embodiment

The elements comprising the matrix of elements of any of the above described embodiments may be of conventional rectangular configuration, but in at least one preferred embodiment the delineation of an element, that is, the boundary defining the field containing a symbol, may be any N-sided figure, where N may take the value 1 (thus a circular field) or any value from 3 to 20. In at least one preferred form of N-sided element, as shown in FIGS. 5 and 6, the elements 50 are hexagon shape for the value of N=6.

Game Implementation

Any of the above described embodiments may be implemented on any gaming machine or group of gaming machine provided with a control module. As shown in FIG. 7, a control module 60 is provided with a microprocessor 62 and working random access memory (RAM) 64. The program code driving any of the described embodiments may be introduced into the control module 60 by connection of a data storage device 66. The device may take any of a number of forms, such as read only memory (ROM), erasable read only memory

US 8,616,955 B2

7

(EPROM), Compact Flash Card, PCMCIA card and the like. Alternatively, control module 60 may incorporate a hard disc drive to which the code may be written via a suitable input device.

Control module 60 acts to implement appropriate elements of the program code according to inputs from a user keyboard 68 and outputs video imagery to at least a main display module 70.

1. Stand-Alone Gaming Machines

As shown in FIG. 8, any of the above described embodiments for use on electronic display gaming machines may be incorporated into a stand-alone gaming machine 100 provided with a single display unit 112. In this implementation of games according to the invention, both main games and feature games (if offered) are displayed on the single display unit.

2. Stand-Alone Gaming Machines with Secondary Display Unit

In a further preferred embodiment of the invention as shown in FIG. 9, a stand-alone gaming machine 120 is provided with a secondary display unit 125 as well as a main display unit 122. In this embodiment the main game played on the primary display unit may take the form of either the first or second preferred embodiments described above. It is then a triggering event in the main game which offers a player a feature game as described in the third preferred embodiment above.

3. Gaming Machines Linked to Progressive Jackpot System

In yet a further preferred embodiment of the invention as shown in FIG. 10, a plurality of gaming machines 300 are arranged side by side in a line or arc so as to allow each of the players (not shown) of the machines to view a common jackpot prize display unit 313. Each individual machine 310 is provided with at least a main game display unit 315 for the playing of a main game according to the above described first and second embodiments.

Each of machines 310 of the embodiment illustrated in FIG. 7 is electronically linked to a jackpot control module 311 which monitors the volume of play on each of the linked machines and displays an incrementing jackpot value 312 determined according to the combined volume of play on the linked machines.

A win of the jackpot prize may be triggered by specific outcomes of either a main game or of a feature game. If the jackpot trigger is dependent on an outcome of the feature game, players on adjoining machines may be made aware by means of the common display that a potential triggering of the jackpot is to commence on the machine offered the feature game, thus adding interest for all the players.

It will be appreciated that the linked machines may form part of Local Area Networks (LAN) or Wide Area Networks (WAN).

What is claimed is:

1. A gaming machine for providing a game to a player, comprising:

a memory device configured to store data representing a reel having a predetermined number of symbol positions, wherein each symbol position has an associated symbol from a set of symbols, the reel having a run of consecutive symbol positions, wherein each of the symbol positions of the run of consecutive symbol positions is initially populated, prior to initiation of an instance of a game, by one of (i) a symbol from the set of symbols, wherein at least one of the symbol positions in the run of consecutive symbol positions is populated with a symbol that is different than a symbol in one of the other symbol positions in the run of consecutive symbol posi-

8

tions or (ii) each symbol position being populated with an identical symbol from the set of symbols;

a display device configured to display a matrix having a plurality of display elements arranged in a column, a number of the display elements in the column being less than the predetermined number of symbol positions in the reel, the display device being further configured to display a portion of the reel such that the symbols associated with some of the symbol positions of the reel are displayed in the matrix when the reel is in a stop position; and

a game controller configured to initiate the instance of the game using the reel during which the reel is spun at a game speed, and the game controller being further configured to replace each of the symbols associated with the run of consecutive symbol positions with an identical replacement symbol during spinning of the reel;

wherein the display device is configured to indicate to the player that the symbols associated with the run of consecutive symbol positions are being replaced with the identical replacement symbol, while the reel is spinning.

2. The gaming machine, as set forth in claim 1, wherein the reel is spun at a speed slower than the game speed, and wherein the replacement of the symbols associated with the run of consecutive symbol positions with the identical replacement symbol is performed while the reel is spinning at the speed slower than the game speed.

3. The gaming machine, as set forth in claim 1, wherein the reel is initially spun at a first speed and the first speed is ramped up to the game speed, and wherein the replacement of the symbols associated with the run of consecutive symbol positions with the identical replacement symbol is performed while speed of the reel is being ramped up to the game speed from the first speed.

4. The gaming machine, as set forth in claim 1, wherein the identical replacement symbol is selected by the game controller from a subset of the set of symbols.

5. The gaming machine, as set forth in claim 1, wherein the identical replacement symbol is randomly selected from a subset of the set of symbols.

6. The gaming machine, as set forth in claim 4, wherein each symbol of the subset of symbols is assigned a probability of selection.

7. The gaming machine, as set forth in claim 1, wherein the reel is a first reel, the gaming machine further comprising second, third, fourth and fifth reels, wherein the matrix of elements is comprised of five columns and three rows of elements, the five columns being associated with a respective one of the reels.

8. The gaming machine, as set forth in claim 7, wherein the first reel is a left-most reel.

9. The gaming machine, as set forth in claim 1, wherein the reel is a virtual reel.

10. A method of comprising:

storing data, in a memory device, representing a reel, the reel having a predetermined number of symbol positions, wherein each symbol position has an associated symbol from a set of symbols, the reel having a run of consecutive symbol positions, wherein each of the symbol positions of the run of consecutive symbol positions is initially populated, prior to initiation of an instance of a game, by one of (i) a symbol from the set of symbols, wherein at least one of the symbol positions in the run of consecutive symbol positions is populated with a symbol that is different than a symbol in one of the other symbol positions in the run of consecutive symbol posi-

US 8,616,955 B2

9

tions, or (ii) each symbol position being populated with an identical symbol from the set of symbols;

display, via a display device, a matrix having a plurality of display elements arranged in a column, the number of display elements in the column being less than the predetermined number of symbol positions in the reel, and displaying a portion of the reel such that the symbols associated with some of the symbol positions of the reel are displayed in the matrix when the reel is in a stop position:

initiating, via a game controller, play of the instance of the game using the reel during which the reel is spun at a game speed;

replacing each of the symbols associated with of the run of consecutive symbol positions with an identical replacement symbol; and

displaying, via the display device, an indication to the player that the symbols associated with the run of consecutive symbol positions are being replaced with the identical replacement symbol, while the reel is spinning.

**11**. The method, as set forth in claim **10**, wherein the reel is spun at a speed slower than the game speed, and wherein the replacement of the symbols associated with of the run of consecutive symbol positions with the identical replacement symbol is performed while the reel is spinning at the speed slower than the game speed.

**12**. The method, as set forth in claim **10**, wherein the reel is initially spun at a first speed and the first speed is ramped up to the game speed, and wherein the replacement of the symbols associated with the run of consecutive symbol positions with the identical replacement symbol is performed while speed of the reel is being ramped up to the game speed from the first speed.

**13**. The method, as set forth in claim **10**, wherein the identical replacement symbol is selected by the game controller from a subset of the set of symbols.

**14**. The method, as set forth in claim **10**, wherein the identical replacement symbol is randomly selected from a subset of the set of symbols.

**15**. The method, as set forth in claim **14**, wherein each symbol of the subset of symbols is assigned a probability of selection.

**16**. The method, as set forth in claim **10**, wherein the reel is a first reel, the game further comprising second, third, fourth and fifth reels, wherein the matrix of elements is comprised of

10

five columns and three rows of elements, the five columns being associated with a respective one of the reels.

**17**. The method, as set forth in claim **16**, wherein the first reel is a left-most reel.

**18**. The method, as set forth in claim **10**, wherein the reel is a virtual reel.

**19**. A non-transitory computer readable medium recording a program for controlling a computer to function as a:

a memory device configured to store data representing a reel having a predetermined number of symbol positions, wherein each element has an associated symbol from a set of symbols, the reel having a run of consecutive symbol positions, wherein each of the symbol positions of the run of consecutive symbol positions is initially populated, prior to initiation of an instance of a game, by one of (i) a symbol from the set of symbols, wherein at least one of the symbol positions in the run of consecutive symbol positions is populated with a symbol that is different than a symbol in one of the other symbol positions in the run of consecutive symbol positions, or (ii) each symbol position being associated with an identical symbol from the set of symbols;

a display device configured to display a matrix having a plurality of display elements arranged in a column, a number of the display elements in the column being less than the predetermined number of symbol positions in the reel, the display device being further configured to display a portion of the reel such that the symbols associated with some of the symbol positions of the reel are displayed in the matrix when the reel is in a stop position; and

a game controller configured to initiate the instance of the game using the reel during which the reel is spun at a game speed, and the game controller being further configured to replace each of the symbols associated with the run of consecutive symbol positions with an identical replacement symbol during spinning of the reel;

wherein the display device is configured to indicate to the player that the symbols associated with the run of consecutive symbol positions are being replaced with the identical replacement symbol, while the reel is spinning.

*   *   *   *   *

UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.          : 8,616,955 B2                                    Page 1 of 1
APPLICATION NO.     : 13/685392
DATED               : December 31, 2013
INVENTOR(S)         : Osamu Yoshimi

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page item (73) Assignee: delete "Konami Games, Inc." and replace with --Konami
Gaming, Inc.--

Signed and Sealed this
Fifteenth Day of April, 2014

Michelle K. Lee

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.        : 8,616,955 B2                                    Page 1 of 1
APPLICATION NO.   : 13/685392
DATED             : December 31, 2013
INVENTOR(S)       : Osamu Yoshimi

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

Column 1, lines 11-12: delete "Dec. 5, 2005" and replace with -- Dec. 9, 2005 --.

Signed and Sealed this
Tenth Day of June, 2014

Michelle K. Lee
Deputy Director of the United States Patent and Trademark Office